UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

THOMAS S. SWANSON, Individually and On : 
Behalf of All Others Similarly Situated,

                    Plaintiff,

    vs.

INTERFACE, INC., DANIEL T. HENDRIX,
JAY D. GOULD, BRUCE A. HAUSMANN,
and PATRICK C. LYNCH,

                Defendants.

———————————————————— x

Civil Action No. 1:20-cv-05518-BMC

<u>CLASS ACTION</u>

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAW**

<u>DEMAND FOR JURY TRIAL</u>

Lead Plaintiff Steamfitters Local 449 Pension Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's Amended Complaint for Violations of the Federal Securities Laws, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, the SEC Order (defined below), wire and press releases published by and regarding Interface, Inc. ("Interface" or the "Company"), and analysts' reports and advisories about the Company.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Interface common stock between May 12, 2016 and September 28, 2020, inclusive (the "Class Period"), against the Company and certain of its current and former executive officers (together, "Defendants," as further defined below) seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Interface is a designer and producer of modular carpet, also known as carpet tile.  The Company sells its modular flooring products worldwide.

3.      On September 28, 2020, the SEC announced the culmination of its years-long investigation into Interface's historical EPS calculations and rounding practices by issuing the SEC Order,[1] which included findings by the SEC of inappropriate earnings management by, or at the

---

[1]     The "SEC Order" refers to the September 28, 2020 Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8a of the Securities Act of 1933, Sections 4c and

direction of, the Company's two most senior accounting executives, as well as violations of the federal securities laws.

4.      As detailed below, from the second quarter of 2015 through the second quarter of 2016, Interface reported artificially inflated earnings per share ("EPS").  This was done by improper and fictitious manual adjustments to Interface's accounting entries by, or at the direction of its Chief Financial Officer, Defendant Patrick C. Lynch ("Lynch"), and the Company's controller, Gregory J. Bauer ("Bauer"), which caused Interface's EPS figures to be materially misstated at all relevant times.  These adjustments did not comply with generally accepted accounting principles ("GAAP") and artificially inflated Interface's income and EPS.  As a result, Interface falsely reported meeting or exceeding EPS growth estimates.

5.      The SEC Order also found that "Interface employees caused Interface to produce documents in response to commission investigative requests that were suggestive of contemporaneous support for journal entries that, in truth, did not exist at the time the entries were recorded," and had continued to modify documents even after the SEC began its investigation.

6.      In anticipation of a public administrative and cease-and-desist proceeding by the SEC, Interface, Bauer and Lynch submitted offers of settlement, which the SEC accepted, as detailed in the SEC Order.  Those offers of settlement require, among other things: (i) that Interface, Bauer and Lynch cease and desist from violating the federal securities laws; (ii) that Bauer and Lynch are denied the privilege of appearing or practicing before the SEC as an accountant (with an allowance to apply for reinstatement at a later time); (iii) that Interface pay a $5 million fine; (iv) that Defendant Lynch pay a $70,000 fine; and (v) that Bauer pay a $45,000 fine.

---

21c of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order.

7.     This case focuses on Defendants' continued misrepresentations about Interface's EPS and its internal and disclosure controls.  As detailed herein, throughout the Class Period, Defendants repeatedly misrepresented Interface's EPS to investors, as well as the accuracy of its financial results and the strength of its internal controls and disclosure controls.

8.     These adjustments to the Company's EPS were intended to ensure that the Company met or exceeded analysts' consensus estimates and were also done, in part, because Interface's Omnibus Stock Incentive Plan had been amended at the time to be tied to certain performance objectives, including EPS and the Company's stock price.

9.     On April 24, 2019, Defendants disclosed the existence of both the SEC investigation and the SEC subpoenas served on Interface concerning Interface's historic EPS calculations and disclosures.

10.     On this news, the price of Interface common stock fell $1.43 per share, or $8.37%, to close at $15.66 per share on April 25, 2019.

11.     After disclosure of the SEC Order, Interface's stock price fell $0.20 per share, or 3.13%, over the following two trading sessions to close at $6.18 per share on September 29, 2020.

12.     As a result of Defendants' materially false and misleading statements and omissions, Interface common stock traded at artificially inflated prices during the Class Period.  After the above revelations, the price of Interface common stock declined significantly.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

- 3 -

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b).

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Market ("NASDAQ"), a national securities market.

17.     Interface operates a location in New York at 330 Fifth Avenue 12th Floor New York, NY 10001.

## PARTIES

18.     Lead Plaintiff purchased Interface common stock during the Class Period, as set forth in its previously filed certification, which is incorporated herein by reference, and was damaged thereby.

19.     Interface is the world's leading manufacturer of modular carpet.  During the Class Period, Interface's shares traded under the ticker "TILE" on NASDAQ, an efficient market.

20.     Defendant Daniel T. Hendrix ("Hendrix") has served as Interface's President and Chief Executive Officer ("CEO") since January 20, 2020.  Hendrix is also Chairman of the Board of Interface, and previously served as the Company's CEO from 2001 to 2017.

21.     Defendants Jay D. Gould ("Gould") served as Interface's CEO from before the start of the Class Period until January 20, 2020, when the Company announced that he was "terminated after an investigation concluded that he engaged in personal behavior that violated Company policy and core values."  Gould succeeded Hendrix as CEO in 2017.

22.     Defendant Bruce A. Hausmann ("Hausmann") has served as Interface's Chief Financial Officer ("CFO") since 2016.

23.     Defendant Patrick C. Lynch ("Lynch") served as Interface's CFO from 2001-2016.

- 4 -

24.     Defendants Hendrix, Gould, and Hausmann and Lynch are sometimes referred to herein as the "Individual Defendants."

25.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Interface's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

26.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Interface.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Interface stock was a success, as it: (i) deceived the investing public regarding Interface's profitability and earnings; (ii) artificially inflated the price of Interface common stock; and (iii) caused Lead Plaintiff and other members of the Class (defined below) to purchase Interface common stock at artificially inflated prices.

27.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports

of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

28.     Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

29.     As officers and controlling persons of a publicly held company whose shares were registered with the SEC pursuant to the Exchange Act, and were traded over NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Interface's business and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

31.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

32.     Interface is a world leader in the design, production and sales of modular carpet, also referred to as carpet tile, that is used for a wide variety of commercial and residential application, as well as resilient flooring.

33.     Interface has manufacturing locations on four continents, allowing them to service accounts across the globe, but principally in the Americas, Europe and Asia-Pacific markets.

- 7 -

Interface markets their modular carpet in over 100 countries under both *Interface* and *Flor* brand names.

34.     The Company distributes its products through two primary channels: (1) direct sales to end users; and (2) indirect sales through independent contractors, installers and distributors.  The Company primarily sells to the corporate office market, including new corporate construction and renovation, but also sells its products to clients in retail, government institutions, schools and educational facilities, healthcare facilities, hospitality centers, residences and home offices.

### Interface Knowingly Misrepresented Its EPS

35.     As a public company subject to the Exchange Act, Interface periodically reported earnings results and other relevant financial information.  This included publicly disclosing the Company's EPS for the prior quarter, year-to-date, and year end.

36.     Starting in the second quarter of 2015, and continuing through the second quarter of 2016, Interface reported artificially inflated quarterly and year end EPS, which did not accurately reflect Interface's underlying performance.

37.     During this time period, Interface booked unsupported accounting adjustments to Interface's management bonus accruals, expenses related to the Consultant, and stock-based compensation arrangements.

38.     Interface manually adjusted these metrics in a way that did not comply with GAAP, thereby artificially inflating Interface's income and EPS, which resulted in Interface meeting or beating consensus estimates for EPS and falsely reflecting earnings growth.  Defendant Lynch also directed Interface's then-Corporate Controller, "Bauer", to enter journal entries in two quarters that wholly lacked any support and did not comply with GAAP.

39.     As detailed below in ¶115, Interface lacked adequate accounting controls or procedures to prevent unsupported, manual, period end, journal entries, allowing for these manual

entries to be made and artificially inflate Interface's EPS.  Interface also lacked critical journal entry controls and employed subordinate accountants who were not knowledgeable in GAAP.

40.     These misstatements and adjustments caused Interface to make false disclosures in public filings, press releases, and earnings calls about its actual EPS results, its earnings growth, and its pattern of meeting or beating consensus analyst estimates.

41.     Had Interface's reported financial results complied with GAAP, as required, Interface's reported earnings would have been less than reported, and in two quarters in which it reported that it had met analyst consensus EPS, it would have, in fact, missed the consensus estimates.

**The Second Quarter of 2015**

42.     In the second quarter of 2015, Interface reported EPS of $0.33.  The Company touted this EPS result as having "tied our all-time record in the fourth quarter of 2007."  While this result was significantly above analysts' consensus estimates for the quarter, Defendants failed to disclose that it had only been accomplished by their manipulation of accounting entries in violation of GAAP.

43.     Specifically, earlier in the quarter, in June 2015, Interface had learned of an unexpected $725,000 death benefit that it was required to pay.  To compensate for this sudden expense, Bauer directed that a $500,000 reduction be made to the management bonus accrual.

44.     Bauer believed that decreasing the bonus accrual would limit the net income impact of the unexpected death benefit expense to a "250k hit," thereby lessening the blow to Interface's earnings numbers, particularly EPS.  This adjustment did not comply with GAAP.

45.     Interface's policy for management bonuses was to pay non-discretionary management bonuses based on the achievement of established targets for operating income before incentives ("OIBI") and cash flow.  If Interface met the stated "goal" for those targets, management would

receive 100% of their bonus potential.  If Interface exceeded the goal, management would receive up to 150% of their bonus potential depending on the amount by which the goal was exceeded.

46.     When Bauer improperly reduced the bonus accrual by $500,000, Interface's best estimate was that annual bonuses at levels far greater than 100% would be paid.  Reducing the accrual by $500,000, however, caused Interface's accrual level to fall far below the 100% level.

47.     At the end of the quarter, when Interface was purportedly on track to report an all-time record EPS of $0.33, Bauer maintained the accrual level at well below 100% despite the best estimates that showed 150% annual bonus was probable to be paid out.

48.     Accordingly, in total, Interface's management bonus accrual and related expenses for Q2 2015 were understated by approximately $1.58 million, or 5% of pre-tax income, and its EPS was falsely inflated by $0.02.

49.     Securities analysts covering Interface reacted favorably to the increased EPS figures.  For example, on July 30, 2015, analysts from BB&T Capital Markets stated, "Q2'15 EPS beat.  Interface reported Q2'15 EPS of $0.33 vs our estimate of $0.26 and consensus of $0.29 . . . ."

**The Third Quarter of 2015**

50.     In the third quarter of 2015, Interface publicly reported that it had met consensus estimates for EPS of $0.31, again misrepresenting to the market that Interface had beat or met consensus estimates for EPS, when in fact, it had only done so as a result by manipulating accounting entries in violation of GAAP.

51.     Specifically, Interface misstated expenses which inflated Interface's pre-tax income by 12%, or a total of over $3.12 million.  Rather than report that it had met consensus EPS estimates, Interface should have reported a $0.04 miss.

52.     In the third quarter of 2015, Interface improperly accounted for a collateral split dollar life insurance arrangement that Interface had with the Consultant.  Interface agreed to pay for

the annual premiums for a whole life insurance policy owned by the consultant. The Consultant, in turn, agreed to repay those premiums to Interface in or around May 2016.

53.     As collateral for the premium payments, the Consultant assigned to Interface the cash surrender value ("CSV") of his policy up to the amount of the premiums paid.  Any amount of the policy's CSV in excess of the premiums paid belonged to the consultant outright.

54.     Interface, however, recorded the full value of the CSV on its balance sheet, when the value actually recorded should never have exceeded the amount of unreimbursed premiums paid.

55.     Interface learned that the CSV, recorded by Bauer and Interface as an asset at the time, would need to be written down by $871,140, the amount recognized in excess of the premiums paid.  Interface, however, incrementally reduced the asset's value over the following ten months, in equal installments of $87,114.

56.     By the end of the third quarter of 2015, Interface had only recorded $174,228 against the $871,140 excess valuation.

57.     This improper accounting treatment inflated the value of the CSV on Interfaces books by approximately $697,000 (the difference between $871,140 and $174,228).

58.     This error, standing alone, increased Interface's EPS by almost $0.01, had it been recorded properly, *Interface's reported EPS that met consensus estimates would have actually missed consensus estimates.*[2]

59.     Also in the third quarter of 2015, Interface directed staff to book adjustments to achieve "a pick up of about 740k," and later that same day, Interface improperly reduced the expense for a stock grant by $628,000.

---

[2]     All emphasis is added unless otherwise noted.

60.     These adjustments to the stock-based compensation figures did not comply with GAAP and artificially inflated Interface's EPS by almost $0.01.  Not fraudulently altering these figures would have changed Interface's EPS that reportedly met consensus estimates to missing them.

61.     At the same time Bauer and Interface reduced the stock grant expense figures, they directed that the management bonus accrual be increased by only $100,000 even though Interface's best estimates for OIBI and cash flows indicated that the management bonus liability was under accrued by approximately $1.67 million.

62.     While Interface justified this improper accounting as necessary to "correct bonus accrual," the adjustment still left the bonus accrual – and associated expenses – understated by approximately $1.57 million in the third quarter of 2015.  As a result of this improper accounting treatment, Interface avoided reporting a $0.016 reduction to its EPS for the quarter and a miss of consensus estimates.

63.     Finally, Interface was aware that after the foregoing improper accounting adjustments in the third quarter of 2015, its EPS was still going to fall short of consensus estimates.  To avoid that, Lynch and Bauer directed the full reversal of the $225,000 that had been accrued to date for the Consultant's bonus.  This last-minute manual adjustment did not comply with GAAP.  The Consultant's bonus was paid pro rata, and thus, it was incorrect to reverse the full (or any) amount.

64.     This improper accounting adjustment artificially inflated Interface's EPS by $0.002 – just enough for Interface to round up to $0.31 and report EPS in line with analysts' consensus estimates.  *In total, Interface's accounting adjustments and errors in the third quarter of 2015 caused Interface's income for the third quarter of 2015 to be overstated by approximately $3.12 million, or 12% of pre-tax income, inflating its reported EPS by $0.04.*

## The Fourth Quarter of 2015

65.    In the fourth quarter of 2015, Interface reported quarterly EPS of $0.28 and an annual EPS of $1.10, which Interface touted as a record and a $0.02 beat of consensus estimates for the year.  Interface's quarterly earnings release touted these results stating the "*fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share*[.]"

66.    In truth, however, Interface's results were artificially inflated by the improper accounting adjustments to the Consultant's bonus, the CSV, and the management bonus.  Had the financial statements complied with GAAP at the end of 2015, *Interface would have reported a $0.03 miss of the consensus for the quarter, and instead of beating analyst consensus estimates for the year, Interface would have reported only a meet.*

67.    Once Interface's third quarter books were closed and Interface had publicly reported its EPS results, Bauer resumed the monthly accrual for the Consultant's bonus.  By year end, Interface had accrued a balance of only $75,000, for this bonus even though the Consultant was due his full $300,000.  Nonetheless, neither Lynch nor Bauer directed the $225,000 increase required to make up for the reversal in the previous quarter.

68.    Further adjustments were also made regarding the Consultant's CSV.  During the closing process for the quarter, Bauer directed his financial manager to "reverse half. . . . for now" of the approximately $436,000 they had recorded by that time to write down the CSV asset.  This maneuver did not comply with GAAP and acted to reduce Interface's expenses by approximately $218,000.

69.    Shortly thereafter, Bauer directed the monthly write-down process to stop.  As a result, these improper accounting adjustments and entries overstated the CSV asset and associated

- 13 -

income by approximately $653,000, which in turn inflated its quarter-end and year-end EPS by $0.01.

70.     Next, on that same day, Bauer directed that a $350,000 balance held in another liability account be used to decrease general expenses by $150,000 and increase the management bonus accrual by $200,000 without any corresponding increase to bonus expense.  These further adjustments did not comply with GAAP.

71.     Interface's internal financial statements and best estimates at the time made clear that the bonus was under-accrued by approximately $949,000.  By increasing the accrual by only $200,000, Interface's bonus accrual and related expenses remained understated at year-end by approximately $749,000, which in turn inflated both its quarter-end and year-end EPS by $0.01.

72.     In sum, these accrual adjustments and improper accounting adjustments caused Interface to overstate income by a total of $1.63 million, or 7% of the quarter's pre-tax income. They also caused Interface's EPS to be inflated by $0.02.  In reality, Interface should have reported EPS of $0.26 for the quarter and $1.08 for the year.

### First Quarter of 2016

73.     For the first quarter of 2016, Interface reported EPS of $0.20, meeting consensus estimates and representing a quarter-over-quarter increase of $0.01.  However, during the first quarter, Interface reported weak sales results.

74.     To compensate for these weak sales figures, Bauer directed that the remaining $218,000 CSV write-down balance be reversed in full.  That same day, Lynch and Bauer directed their staff to reverse the entire $740,000 balance in the management bonus accrual, even though Interface's best estimates for OIBI and cash flow suggested that an accrual of approximately $1 million was necessary in the quarter.

75.     These adjustments – which did not comply with GAAP – resulted in an immediate $958,000 increase to income and a $0.01 increase in EPS.

76.     Shortly thereafter, and after discussing with Lynch how the Company would "articulate to [the] street" declining sales trends, Bauer directed his financial manager to increase the CSV asset's value another $210,000, stating simply, "Think we are gonna need that cash surrender value. . . ."  Given this asset increase and Interface's intervening payment of another premium, Bauer continued to overstate the CSV asset, now by a total of $994,000.

77.     This adjustment did not comply with GAAP, and functioned to artificially increase Interface's reported EPS figures, allowing interface to publicly announce EPS of $0.20, which met consensus estimates.

78.     Also in the first quarter of 2016, Interface understated the Company's stock-based compensation expense, allowing the Company to report artificially inflated EPS and meet consensus estimates.

79.     Although the internal financial statements and best estimates for annual EPS plus dividends ("EPSD") showed it was probable that one of the Company's stock grants would vest in full by the end of the year, Interface failed to record any associated increase in expense.  As a result, Interface's stock expense for the quarter was understated by approximately $387,000.

80.     Despite the sales issues, analysts covering Interface expressed optimism because Interface purportedly was able to compensate and exceed EPS estimates.  For example, on April 28, 2016, analysts at BB&T Capital Markets reported "Interface reported Q1'2016 EPS that was in line with consensus estimate and ahead of our estimate by $0.01, despite a slight top line miss." That same day, analysts at Barclays adjusted their "FY16 and FY17 estimates to EPS estimates to $1.23 (from $1.22) and $1.39 (from $1.37)[.]"

81.     Ultimately, Interface's income for the first quarter of 2016 was overstated by approximately $2.43 million, or 15% of pre-tax income, and its EPS was inflated by $0.03.

### Second Quarter of 2016

82.     For the second quarter of 2016, Interface reported EPS of $0.32.   In the accompanying press release and earnings call, Interface and Defendant Hendrix described the Company's performance as "strong," the "second best quarterly earnings ever," and "just a penny short of the all-time record."

83.     In the second quarter of 2016, the day after Interface reported that it had met first quarter of 2016 analyst estimates for EPS, Bauer once again began to write down the CSV asset. However, as was contemplated by the operative agreement with the consultant, in May 2016, the consultant fully reimbursed Interface for the premiums paid – leaving Interface with no claim to the CSV at all.

84.     Rather than reducing the full value of the CSV asset, Bauer left $179,000 on Interface's books.  This improper maneuver alone, if corrected at the time, would have reduced Interface's EPS by $0.01.

85.     Also in the second quarter of 2016, Interface improperly directed a $400,000 reduction in bonus expense, which increased reported EPS by one penny.  Prior to this improper accounting, Interface's bonus accrual was at an approximate 50% achievement level given the improper reversal at the end of the first quarter of 2016.  The Company's internal financial statements and best estimates for OIBI and cash flows at the end of the second quarter of 2016 showed a probable bonus achievement of approximately 69% – indicating that Interface needed to increase expense to meet the expected liability.

86.     This improper accounting adjustment caused Interface's management bonus accrual and related expenses to be understated by a total of $951,000 in the Q2 2016, inflating its EPS by $0.01.

87.     Lynch and Bauer also caused Interface to understate its stock-based compensation expense in the second quarter of 2016, which enabled it to report $0.32 EPS.  As in the prior quarter, the internal financial statements and best estimates for EPSD showed it was probable that one of the Company's stock grants would vest in full by the end of the year.

88.     Interface failed to record the associated increase in expense, and Interface's stock expense was therefore understated by a cumulative total of $774,000 in Q2 2016.  This error would have resulted in Interface reducing EPS by almost another $0.01.

89.     In total, Interface's income for Q2 2016 was overstated by approximately $1.9 million, or 7% of pre-tax income, and its EPS was inflated by $0.02.

90.     Analysts covering Interface reacted favorably to Interface's reported EPS, in some instances raising their estimates.  For example, on July 29, 2016, analysts from SunTrust Robinson Humphrey stated "[Interface] reported 2Q16 EPS of $0.32, above the Street consensus of $0.29 . . . [w]e have raised our 2016 EPS estimate to $1.16 from $1.08 and our 2017 EPS estimate to $1.30 from $1.18."

91.     On November 2, 2016 Interface announced that Lynch would be leaving his position as CFO.

92.     On February 22, 2017 Interface announced that Defendant Hendrix was retiring from his role as CEO, a position he had held for 17 years, and would be replaced by Defendant Gould.

93.     On March 13, 2017 Defendant Hausmann was appointed CFO.

**The Truth Slowly Emerges**

The SEC Investigation

94.     In November 2017, the SEC began investigating the substance of Interface's reported historical EPS calculations (the "SEC Investigation").

95.     The SEC also served subpoenas on Interface in February 2018, July 2018, and April 2019.  However, Interface did not disclose the existence of the SEC Investigation until it received the third subpoena, and by which time the SEC had already requested that Interface conduct its own internal investigation into its historical quarterly EPS reporting.

96.     On April 24, 2019, Interface filed a periodic report on Form 8-K with the SEC. Defendants disclosed, for the first time, the existence of the SEC Investigation, stating:

> "Interface, Inc. [] received a letter in November 2017 from the [SEC] requesting that the Company voluntarily provide information and documents in connection with an investigation into the Company's historical quarterly [EPS] calculations and rounding practices during the period 2014-2017.  ***The Company subsequently received subpoenas from the SEC in February 2018, July 2018 and April 2019 requesting additional documents and information***.  In the fourth quarter of 2018, the Company conducted at the SEC's request an internal investigation into these and other related issues for seven quarters in 2015, 2016 and 2017."

97.     The Company also disclosed in the same filing that:

> "[O]n April 23, 2019, ***Gregory J. Bauer, the Company's Vice President and Chief Accounting Officer, went on paid administrative leave from the Company after it was learned that in 2018 in the process of collecting materials from 2015, 2016 and 2017 for production to the SEC, he added certain notes to those materials that were then produced to the SEC.***  The Company believes at this time, however, that the after-the-fact inclusion of these notes had no impact on the EPS calculations that are the subject of the above-described investigation or on subsequent EPS calculations."

98.     On this news, Interface's stock price fell $1.43 per share, or 8.37%, to close at $15.66 per share on April 25, 2019.

99.     Defendants had actual knowledge of the issues being investigated by the SEC, as well as their own access to information undermining their prior representations, including the results of

the Company's internal investigation.  Defendants also knew or had access to information undermining the accuracy of their statements regarding the Company's reported EPS, the accuracy of the Company's financial reporting and the strength of the Company's internal controls and disclosure controls.  None of this, however, was disclosed to investors.

### The SEC Order

100.   On September 28, 2020, the SEC issued the SEC Order in which it found that Interface had violated Securities Act Sections 17(a)(2) and 17(a)(3) and Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

101.   The SEC also found that Bauer had: (i) willfully violated Securities Act Sections 17(a)(2) and 17(a)(3) and Exchange Act Rule 13b2-1; and (ii) caused Interface's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

102.   The SEC Order also found that Lynch had: (i) willfully violated Exchange Act Rule 13b2-1; and (ii) caused Interface's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a- 11, and 13a-13 promulgated thereunder.

103.   Aside from the improper accounting adjustments that were made from Q2 2015 through Q2 2016, the SEC determined that, during the course of its investigation,  Interface had deliberately impeded its investigation by producing documents in response to investigative requests that were suggestive of contemporaneous support for journal entries that, in truth, did not exist at the time the entries were recorded.  One of Interface's employees also certified as contemporaneous business records certain documents that, in fact, had been modified after the investigation began, and that these deliberate actions impeded the SEC's investigation.

104.   In connection with the SEC's findings in the SEC Order, Interface agreed to pay a $5 million dollar fine, and the SEC ordered Interface to cease-and-desist from violating the federal

securities laws.  Bauer also agreed to pay a fine in the amount of $45,000 and Defendant Lynch agreed to pay a fine in the amount of $70,000.

105.    Following disclosure of the SEC Order, Interface's stock price fell $0.20 per share, or 3.13%, over the following two trading sessions to close at $6.18 per share on September 29, 2020.

106.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class Members have suffered significant losses and damages.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### Statements Made Prior to the Class Period

107.    On July 29, 2015, Interface filed a current report on Form 8-K, with Interface's quarterly earnings release appended as Exhibit 99.1.  Interface reported EPS results of $0.33 for the second quarter of 2015.

108.    In the summary section of the earnings release, Interface stated that "[t]he Company reported net income of $34.0 million, or $0.51 per share, for the first six months of 2015.  This compares with net income of $17.1 million, or $0.26 per share, in the first six months of 2014."

109.    The next day, Interface hosted its quarterly earnings call with analysts.  Defendant Hendrix stated "[t]his quarter's earnings per share of $0.33 ties our all-time record set in the fourth quarter of 2007."

110.    The statements referenced above in ¶¶107-109 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)      that Interface's reported EPS for Q2 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)      that Interface lacked critical journal entry controls and its internal controls were inadequate; and

(d)      as a result of the foregoing, Interface's reported EPS for Q2 2015 was materially overstated at all relevant times.

111.    On August 10, 2015, Interface filed a quarterly report on Form 10-Q with the SEC, for the second quarter of 2015, the period ended July 5, 2015 (the "Q2 2015 10-Q").  The Q2 2015 10-Q, which was signed by Defendant Lynch, stated under "Item 4. Controls and Procedures" that:

> "As of the end of the period covered by this Quarterly Report on Form 10-Q, an evaluation was performed under the supervision and with the participation of our management, including our President and Chief Executive Officer and our Senior Vice President and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures . . . *[b]ased on that evaluation our President and Chief Executive Officer and our Senior Vice President and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report.*  There were no changes in our internal control over financial reporting that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

112.    The Q2 2015 10-Q also reported Interface's EPS as $0.33 for the quarterly period ended July 5, 2015 and included EPS comparisons for the "Six Months Ended" July 5, 2015 and June 29, 2014 which incorporated the false and misleading EPS calculations from the second quarter of 2015.

113.    Appended as Exhibits 31.1 and 31.2 respectively were signed certifications, wherein Defendants Hendrix and Lynch made several representations regarding the accuracy of the Q2 2015 Form 10-Q and the design and maintenance of the Company's internal controls over financial reporting and disclosure controls, specifically stating as follows:

1.      I have reviewed this quarterly report on Form 10-Q of Interface, Inc.;

- 21 -

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

114.     Appended as Exhibits 32.1 and 32.2 respectively were the signed SOX certifications, wherein Defendants Hendrix and Lynch certified that the Quarterly Report for the Quarterly Period Ended July 5, 2015 on Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "the information contained in the Report fairly presents, in all material respects, the financial conditions and results of operations of the company."

115.     The statements referenced above in ¶¶111-114 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)     that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)     that Interface's reported EPS for Q2 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)     that Interface lacked critical journal entry controls and its internal controls were inadequate; and

(d)     as a result of the foregoing, Interface's reported EPS for Q2 2015 was materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

116.     On October 28, 2015, Interface filed a current report on Form 8-K, with Interface's quarterly earnings release appended as Exhibit 99.1.  Interface reported EPS results of $0.31 for the third quarter of 2015.  Defendant Hendrix was quoted as saying "We posted solid results in the third quarter across each of our operating divisions. . . ."

- 23 -

117.    The next day, Interface hosted its quarterly earnings call with analysts. Defendant Hendrix stated "[o]perating income was outstanding . . . [a]long with the benefit of lower interest expense, that translated into $0.31 earnings per share." Defendant Hendrix further stated "[l]ooking ahead, I think we're in an excellent position to close out 2015 as our best year ever."

118.    The statements referenced above in ¶¶116-117 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for Q3 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)    that Interface lacked critical journal entry controls and its internal controls were inadequate; and as a result of the foregoing, Interface's reported EPS for Q3 2015 was materially overstated at all relevant times.

119.    On November 12, 2015, Interface filed a quarterly report on Form 10-Q with the SEC (the "Q3 2015 10-Q"), which was signed by Defendant Lynch. Interface included substantially the same statements concerning the adequacy of its internal controls as reflected in ¶111.

120.    The Q3 2015 10-Q also reported Interface's EPS as $.031 for the quarterly period ended October 4, 2015 and included EPS comparisons for the "Nine Months Ended" October 4, 2015 and September 28, 2014, which incorporated the false and misleading EPS calculations from the second and third quarter of 2015.

121.     The Q3 2015 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Hendrix and Lynch, which repeated the same representations set forth above in ¶¶113-114.

122.     The statements referenced above in ¶¶119-121 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)     that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)     that Interface's reported EPS for Q3 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)     that Interface lacked critical journal entry controls and its internal controls were inadequate; and

(d)     as a result of the foregoing, Interface's reported EPS for Q3 2015 was materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

123.     On February 24, 2016, Interface filed a current report on Form 8-K, with Interface's quarterly earnings release appended as Exhibit 99.1.  Interface reported EPS results of $0.28 for the fourth quarter of 2015.  Defendant Hendrix was quoted as saying, in pertinent part, the following: "***[t]he fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share***," and "[f]or the full year, our net sales were up 8% on a currency neutral basis, gross margin was up 430 basis points, adjusted operating income margin was up 300 basis points, and ***adjusted EPS was up 77% versus 2014***."

124.    In the summary section of the earnings release Interface stated *"The Company reported net income . . . [as] $1.10 per share, for 2015.  This is a 77.4% improvement compared with net income of . . . or $0.62 per share, in 2014 . . . ."*

125.    The next day, Interface hosted its quarterly earnings call with analysts.  Defendant Hendrix reiterated that *"fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share . . . ."*

126.    The statements referenced above in ¶¶123-125 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for the fourth quarter and full year 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)    as a result of the foregoing, Interface's reported EPS for Q4 and full year 2015 was materially overstated at all relevant times.

127.    On March 2, 2016 Interface filed its Annual Report on Form 10-K for the year 2015 (the "2015 10-K").  Interface included substantially the same statements concerning the adequacy of its internal controls as reflected in ¶111.

128.    The Company also included comparative EPS figures for fiscal years 2013, 2014, and 2015, reiterating the fiscal year 2015 EPS figure of $1.10.

129.    The 2015 10-K also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Hendrix and Lynch, which repeated the same representations set forth above in ¶¶113-114.

130.    The statements referenced above in ¶¶127-129 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for 2015 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for 2015 was materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-K did not present, in all material respects, Interface's true financial condition and results of operations.

131.    On April 27, 2016, Interface filed a current report on Form 8-K, signed by Defendant Lynch, with Interface's quarterly earnings release appended as Exhibit 99.1.  For the first quarter of 2016, Interface reported EPS results of $0.20, an increase from the $0.19 in the prior year period.

132.    Defendant Hendrix was quoted saying "[t]he earnings power we have created in our business drove improvements in gross profit and net income despite a 6% decline in first quarter revenue. . . ."

133.     The next day, on April 28, 2016, Interface hosted its quarterly earnings call with analysts.  Defendant Hendrix reiterated that "[d]espite the decline in sales, with the earnings power we've created in our business we were able to achieve year-over-year improvements in gross profit, operating margin, net income, and earnings per share."  Defendant Lynch summarized Interface's financial reporting.

134.     The statements referenced above in ¶¶131-133 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)     that Bauer and Defendant Lynch had made, or directed others to make, improper adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)     that Interface's reported EPS for Q1 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)     as a result of the foregoing, Interface's reported EPS for Q1 2016 was materially overstated at all relevant times.

**Material Misstatements and Omissions During the Class Period**

135.     The statements referenced above in ¶¶107-109, 111-114, 116-117, 119-121, 123-125, 127-129, 131-133 remained alive and uncorrected during the Class Period.

136.     On May 12, 2016, the first day of the Class Period, Interface filed with the SEC a quarterly report on Form 10-Q, for the first quarter of 2016, the period ended April 3, 2016 (the "Q1 2016 10-Q").  The Q1 2016 10-Q, which was signed by Defendant Lynch, contained substantially the same representations as to the adequacy of Interface's internal controls as in ¶¶111 above.  The quarterly report also stated that the Company's quarterly EPS was $0.32.

137.    The Q1 2016 10-Q also included EPS comparisons for the "Three Months Ended" April 3, 2016 and April 5, 2015, which incorporated the false and misleading EPS calculations from the second quarter of 2015 through the first quarter of 2016.

138.    The Q1 2016 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Hendrix and Lynch, which repeated the same representations set forth above in ¶¶113-114.

139.    The statements referenced above in ¶¶136-138 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for Q2 2015 through Q1 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q2 2015 through Q1 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-K did not present, in all material respects, Interface's true financial condition and results of operations.

140.    On July 27, 2016, Interface filed a current report on Form 8-K, signed by Lynch, with Interface's quarterly earnings release for the second quarter of 2016 ("Q2 2016") appended as Exhibit 99.1. Defendant Hendrix was quoted as saying, in pertinent part, that "[f]or the sixth quarter in a row, we posted a triple digit year over year increase in gross margin, . . . [t]hese dynamics drove

- 29 -

our earnings per share to $0.32, just a penny shy of the quarterly record $0.33 in the second quarter last year."  In the summary section of the earnings release, Interface stated "[n]et Income during the second quarter of 2016 was down slightly to $20.7 million, or $.32 per share, compared with net income of $21.7 million, or $.33 per share, in the record second quarter last year."

141.    The earnings release also summarized Interface's EPS figures against prior periods, highlighting "[n]et Income during the second quarter of 2016 was down slightly to $20.7 million, or $.32 per share, compared with net income of $21.7 million, or $.33 per share, in the record second quarter last year[,]" and "[t]he company reported net income of $33.6 million, or $0.51 per share, for the first six months of 2016.  This compares with net income of $34.0 million, or $0.51 per share, in the first six months of 2015."

142.    The next day, Interface held its quarterly earnings conference call with analysts.  On the call, defendant Hendrix reiterated that "[a]t the bottom line, the result of earnings per share of 0.32, *which represents our second best quarterly earnings ever compared with the records $0.33 in the second quarter of last year.*"

143.    Defendant Gould stated that "[o]n the strength of our gross margin improvement, our operating margin improved 20 basis points year-over-year to 12.8%.  *Our earnings per share were strong at $0.32, just a penny short of the all-time record of $0.33* . . . ."

144.    Defendant Lynch summarized Interface's financial performance for the quarter, explaining that "[o]ur balance sheet is in great shape and leaves us with the flexibility to invest as necessary in the business as well as continue to return capital to our shareholders.  As a result, we increased our quarterly dividend to $0.06 per share per quarter."

145.    The statements referenced above in ¶¶140-144 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

- 30 -

(a)      that Bauer and defendant Lynch had made, or directed others to make, improper adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)      that Interface's reported EPS for Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)      as a result of the foregoing, Interface's reported EPS for Q2 2016 was materially overstated at all relevant times.

146.      On August 11, 2016, Interface filed a quarterly report with the SEC on Form 10-Q, for the second quarter of 2016, the period ended July 3, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q, which was signed by Defendant Lynch, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶¶111 above. The quarterly report also repeated the Company's quarterly EPS of $0.32.

147.      The Q2 2016 10-Q also included EPS comparisons for the "Six Months Ended" July 3, 2016 and July 5, 2015, which incorporated the false and misleading EPS calculations from the second quarter of 2015 through the second quarter of 2016.

148.      The Q2 2016 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Hendrix and Lynch, which repeated the same representations set forth above in ¶¶113-114.

149.      The statements referenced above in ¶¶146-148 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)      that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

- 31 -

(b)      that Interface's reported EPS for Q2 2015 through Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)      that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)      as a result of the foregoing, Interface's reported EPS for Q2 2015 through Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

150.   On November 2, 2016, Interface filed a current report on Form 8-K announcing that Defendant Lynch would no longer serve as CFO, and further stating that "Mr. Lynch ably served with the Company for 20 years, including 15 years as its Chief Financial Officer."

151.   The statements in ¶150 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)      that Lynch had directed his subordinates to manually book accounting entries that did not comply with GAAP from the second quarter of 2015 through the second quarter of 2016;

(b)      that Lynch, in his capacity as CFO, had falsely certified that Interface's annual and quarterly SEC filings from the second quarter of 2015 through the second quarter of 2016 fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in Interface's annual and quarterly SEC filings from the second quarter of 2015 through the second quarter of 2016 fairly presented, in all material respects, the financial conditions and results of operations of the Company;

(c)      that Lynch, in his capacity as CFO, had falsely certified that Interface's internal controls and disclosure controls were adequate; and

(d)      that, as a result of the foregoing, Mr. Lynch had not ably served with the Company for 20 years, including 15 years as its Chief Financial Officer.  At the very least, this statement created a duty to disclose that Mr. Lynch had, in fact, not ably served the Company because he had engaged in the wrongful acts described herein.

152.      On November 10, 2016, Interface filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2016, the period ended October 2, 2016 (the "Q3 2016 10-Q").  The Q3 2016 10-Q, which was signed by Defendant Lynch, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶111 above.

153.      The Q3 2016 10-Q also included EPS comparisons for the "Nine Months Ended" October 2, 2016 and October 4, 2015, which incorporated the false and misleading EPS calculations from the second quarter of 2015 through the second quarter of 2016.

154.      The Q3 2016 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Hendrix and Lynch, which repeated the same representations set forth above in ¶¶113-114.

155.      The statements referenced above in ¶¶152-154 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)      that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)      that Interface's reported EPS for Q2 2015 through Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)      that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)      as a result of the foregoing, Interface's reported EPS for Q2 2015 through Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

156.    On February 23, 2017, Interface hosted its quarterly earnings call with analysts,. During the call, Defendant Hendrix announced his retirement as President and CEO, and stated that "***[Interface has] just come off two of the best years in the Company's history*** and I'm really looking forward to what we're going to accomplish over the next few years."

157.    In the same earnings call, Defendant Gould explained "we delivered fourth quarter EPS of $0.28 pulling even with the fourth quarter of the previous year and closing out the full year of 2016 at $1.03, which is our second best earnings in the history of the Company."

158.    The statements referenced above in ¶¶156-157 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)      that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS in Q1 and Q2 of 2016;

(b)      that Interface's reported EPS for 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)      as a result of the foregoing, Interface's reported EPS for 2016 was materially overstated at all relevant times.

159.    On March 2, 2017, Interface filed its annual report on Form 10-K with the SEC for the fiscal year ended January 1, 2017 (the "2016 10-K").  The 2016 10-K, which was signed by

Defendants Hendrix and Gould, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶111 above.

160.    The 2016 10-K provided investors with a comparison of Interface's EPS calculations for 2014, 2015, and 2016, which incorporated the falsified EPS calculation for the second quarter of 2015 through the second quarter of 2016.

161.    The 2016 10-K also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendant Hendrix, which repeated the same representations set forth above in ¶¶113-114.

162.    The statements referenced above in ¶¶159-161 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS in Q1 and Q2 of 2016;

(b)    that Interface's reported EPS for Q2 2015 through Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q2 2015 through Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-K did not present, in all material respects, Interface's true financial condition and results of operations.

163.    On May 11, 2017, Interface filed a quarterly report with the SEC on Form 10-Q for the second quarter of 2017, the period ended April 2, 2017 (the "Q2 2017 10-Q").  The Q2 2017 10-

Q, which was signed by Defendant Hausmann, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶111 above.

164.    The Q2 2017 10-Q also included EPS comparisons for the "Three Months Ended" April 2, 2017 and April 3, 2016, which incorporated the false and misleading EPS from the first quarter of 2016.

165.    The Q2 2017 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Gould and Hausmann, which repeated the same representations set forth above in ¶¶113-114.

166.    The statements referenced above in ¶¶163-165 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS in Q1 2016;

(b)    that Interface's reported EPS for Q1 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q1 2016 was materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

167.    On July 26, 2017, Interface filed a current report on Form 8-K, with Interface's quarterly earnings release appended as Exhibit 99.1.  Interface reported "[n]et Income during the

second quarter of 2017 was $20.9 million, or $0.33 per diluted share, an increase over the prior year net income of $20.7 million, or $0.32 per diluted share."

168.    Interface also stated that, "[o]n a GAAP basis, the Company reported . . . $0.46 per share, for the first half of 2017, which included previously announced restructuring and asset impairment costs.  Excluding these costs, the Company reported net income of $34.2 million, or $0.54 per share, for the first half of 2017 versus $33.6 million, or $0.51 per share, for the first six months of 2016."

169.    The next day, July 27, 2017, Interface hosted its quarterly earnings call with analysts to discuss the Q2 2017 results.  Defendant Housmann stated that "[n]et income during the second quarter of 2017 was $20.9 million or $0.44 per share, which was an increase over prior year net income of $20.7 million or $0.32 per share."

170.    The statements referenced above in ¶¶167-169 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS for Q1 and Q2 of 2016;

(b)    that Interface's reported EPS for Q1 and Q2 of 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)    as a result of the foregoing, Interface's reported EPS for Q1 and Q2 of 2016 was materially overstated at all relevant times.

171.    On August 10, 2017, Interface filed a quarterly report with the SEC on Form 10-Q for the second quarter of 2017, the period ended July 2, 2017 (the "Q2 2017 10-Q").  The Q2 2017 10-

Q, which was signed by Defendant Hausmann, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶111 above.

172.    The Q2 2017 10-Q also included Interface EPS comparisons for the "Six Months Ended" July 2, 2017 and July 3, 2016, which incorporated the false and misleading EPS from the first and second quarters of 2016.

173.    The Q2 2017 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Gould and Hausmann, which repeated the same representations set forth above in ¶¶113-114.

174.    The statements referenced above in ¶¶171-173 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for Q1 and Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q1 and Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

175.    On October 25, 2017, Interface filed a current report on Form 8-K, with Interface's quarterly earnings release appended as Exhibit 99.1.  Interface reported "the Company reported net

income of $53.6 million, or $0.86 per share, for the first nine months of 2017 versus $49.5 million, or $0.76 per share, for the first nine months of 2016."

176.     On November 6, 2017, Interface filed a current report on Form 8-K, with Interface's presentation to the 2017 Global Industrial Conference appended as Exhibit 99.1.  Interface included a comparison of year to date EPS figures of $0.76 and $0.86 for 2016 and 2017 respectively.

177.     The statements referenced above in ¶¶175-176 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)     that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)     that Interface's reported EPS for Q1 and Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP; and

(c)     as a result of the foregoing, Interface's reported EPS for Q1 and Q2 2016 was materially overstated at all relevant times.

178.     On November 9, 2017, Interface filed a quarterly report with the SEC on Form 10-Q for third quarter of 2017, the period ended October 1, 2017 (the "Q3 2017 10-Q").  The Q3 2017 10-Q, which was signed by Defendant Hausmann, contained substantially the same representation as to the adequacy of Interface's internal controls as in ¶111 above.

179.     The Q3 2017 10-Q also included Interface EPS comparisons for the "Nine Months Ended" October 1, 2017 and October 2, 2016, which incorporated the false and misleading EPS calculations from the first and second quarters of 2016.

180.     The Q3 2017 10-Q also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Gould and Hausmann, which repeated the same representations set forth above in ¶¶113-114.

181.     The statements referenced above in ¶¶178-180 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)     that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)     that Interface's reported EPS for Q1 and Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)     that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)     as a result of the foregoing, Interface's reported EPS for Q1 and Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-Q did not present, in all material respects, Interface's true financial condition and results of operations.

182.     On February 22, 2018, Interface hosted its Q4 2017 earnings call with analysts.  On the call, Defendant Hausmann compared Interface's 2017 reported EPS against Interfaces 2016 reported EPS, stating "[f]ull year GAAP EPS of $0.86 was up 4% compared to $0,83 in 2016. However, our full year adjusted EPS of $1.18 was up 15% versus 2016's adjusted EPS of $1.03."

183.     On February 28, 2018, Interface filed a current report on Form 8-K, with Interface's 2018 Investor Presentation appended as Exhibit 99.1.  Interface included a comparison of its fiscal

year 2017 and fiscal year 2016 EPS figures, reporting $0.86 and $0.83 respectively.  Interface also included fiscal year 2017 and 2016 adjusted EPS figures of $1.18 and $1.03 respectively.

184.    The statements referenced above in ¶¶182-183 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for Q1 and Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q1 and Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective.

185.    On March 1, 2018, Interface filed its annual report on Form 10-K with the SEC for the year ended December 31, 2017 (the "2017 10-K").  In the 2017 10-K, Interface repeated substantially the same statements concerning the adequacy of its internal controls as set forth in above in ¶111.

186.    The 2017 10-K also included year-over-year EPS comparisons for Interface's 2015, 2016, and 2017 EPS, including EPS for 2015 and 2016.

187.    The 2017 10-K also appended as Exhibits 31.1, 31.2, 32.1 and 32.2 the signed certifications of Defendants Gould and Hausmann, which repeated the same representations set forth above in ¶¶113-114.

188.    The statements referenced above in ¶¶185-187 were materially false and misleading because Defendants knew, or recklessly disregarded, but failed to disclose:

(a)    that Bauer and Defendant Lynch had made, or directed others to make, improper and unsupported adjustments to the Company's accounting entries for the purpose of manipulating the Company's reported EPS;

(b)    that Interface's reported EPS for Q2 2015 through Q2 2016 did not accurately reflect the Company's underlying financial performance and did not comply with GAAP;

(c)    that Interface lacked critical journal entry controls and its internal controls and disclosure controls were inadequate; and

(d)    as a result of the foregoing, Interface's reported EPS for Q2 2015 through Q2 2016 were materially overstated at all relevant times, its disclosure controls and procedures were not effective, and the information contained in the Company's Form 10-K did not present, in all material respects, Interface's true financial condition and results of operations.

## INTERFACE'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

189.    At all relevant times during the Class Period, Interface represented that its financial results were presented in accordance with GAAP.  Defendants knew, or recklessly ignored, that such representations were materially false and misleading statements of fact because, as detailed herein, the Company issued financial statements and financial disclosures during the Class Period that artificially overstated Interface's 2015 and 2016 earnings.

190.    GAAP generally encompasses those conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

17 C.F.R. §210.4-01(a)(1).   Interim financial statements must also comply with GAAP.   17 C.F.R. 210.10-01.

191.   Statement of Financial Accounting Concepts No. 2: *Qualitative Characteristics of Accounting Information*, provides that the notion that accounting information be reliable and relevant is "central to accounting" and that "the reliability of a measure rests on the faithfulness with which it represents what it purports to represent . . . ."

192.   As detailed in the SEC Order , Defendants repeatedly caused Interface to issue financial results that were the product of fabricated accounting entries that lacked support, or any reasonable basis, which were recorded for the sole purpose of managing the Company's earnings so that it could report desired financial outcomes.  In this way, Defendants knowingly issued fraudulent financial statements of the Company during the Class Period that were reverse engineered to meet, or exceed, predetermined quarterly earnings expectations.

### Interface's Fraudulent Financial Reporting Prior to the Class Period

193.   Prior to the beginning of the Class Period, Defendants caused Interface to issue materially false and misleading financial information.  This false financial information, as well as other representations noted herein, remained alive, uncorrected and were repeated, in all material respects, during the Class Period.  Defendants knew or recklessly disregarded, that such information was materially misleading in that it misrepresented and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

The 2015 Second Quarter Financial Results

194.   The Q2 2015 financial results were each were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's management bonus expense.  The totality of

these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$1.58 million, or 5%*.

195.     The Q2 2015 Form 10-Q was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)     that the Company's MD&A disclosures were materially false and misleading;

(c)     that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)     that the certifications issued by Defendants Hendrix and Lynch associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

<u>The 2015 Third Quarter Financial Results</u>

196.     The Q3 2015 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's expenses, including its management bonus and stock based compensation expenses.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$3.12 million, or 12%*.  Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to meet predetermined analyst consensus earnings estimates.

197.     The Q3 2015 Form 10-Q was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

- 44 -

(a)    that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)    that the Company's MD&A disclosures were materially false and misleading;

(c)    that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)    that the certifications issued by Defendants Hendrix and Lynch associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

The 2015 Fourth Quarter Financial Results

198.    The Q4 2015 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's expenses, including its management bonus expense.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$1.63 million, or 7%*.  Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to post "all-time records for net income and earnings per share."

199.    As detailed herein, the 2016 Form 10-K was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)    that the Company's MD&A disclosures were materially false and misleading;

(c)    that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)      that the certification issued by Defendant Hendrix associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

200.    The above noted material false and misleading statements of fact were incorporated in filings Interface made with the SEC later in the Class Period.

**Interface's Fraudulent Financial Reporting During the Class Period**

The 2016 First Quarter Financial Results

201.    The Q1 2016 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch directed Interface employees to record unsupported adjustments that materially understated the Company's management bonus and stock based compensation expenses.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$2.43 million, or 15%*.  Defendant Lynch directed these actions be taken to manipulate the Company's earnings for the sole purpose to allow Interface to meet predetermined analyst consensus earnings estimates.

202.    The Q1 2016 Form 10-Q was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)      that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)      that the Company's MD&A disclosures were materially false and misleading;

(c)      that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)     that the certifications issued by Defendants Hendrix and Lynch associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

The 2016 and 2015 Second Quarter Financial Results

203.    The Q2 2016 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's management bonus and stock based compensation expenses.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by ***$1.9 million, or 7%***.  Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to report its "second best quarterly earnings ever."

204.    The Q2 2015 financial results were each materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's management bonus expense.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by ***$1.58 million, or 5%***.  Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to report "earnings per share that tied our all-time record in the fourth quarter of 2007."

205.    The Q2 2016 Form 10-Q was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)     that the Company's MD&A disclosures were materially false and misleading;

(c)     that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)     that the certifications issued by Defendants Hendrix and Lynch associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

The 2016 and 2015 Third Quarter Financial Results

206.    The Q3 2016 financial results were materially false and misleading and presented in violation of GAAP because they incorporated the unsupported adjustments that Defendant Lynch caused Interface to record that materially understated the Company's expenses during the first two quarters of 2016.

207.    The Q3 2015 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's expenses, including its management bonus and stock based compensation expenses.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$3.12 million, or 12%*.  Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to meet predetermined analyst consensus earnings estimates.

208.    The Q3 2016 Form 10-Q was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)     that the Company's MD&A disclosures were materially false and misleading;

(c)      that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)      that the certifications issued by Defendants Hendrix and Lynch associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

The 2016 and 2015 Fourth Quarter Financial Results

209.   The Q4 2016 financial results were materially false and misleading and presented in violation of GAAP because they incorporated the unsupported adjustments that Defendant Lynch caused Interface to record that materially understated the Company's expenses during the first two quarters of 2016.

210.   The Q4 2015 financial results were materially false and misleading and presented in violation of GAAP because Defendant Lynch caused Interface to record unsupported adjustments that materially understated the Company's expenses, including its management bonus expense.  The totality of these fraudulent adjustments overstated Interface's pre-tax income during the quarter by *$1.63 million, or 7%*.   Defendant Lynch caused these actions to be taken to manipulate the Company's earnings for the sole purpose to allow Interface to post "all-time records for net income and earnings per share."

211.   As detailed herein, the 2016 Form 10-K was materially false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)      that the Company's financial statements and related disclosures were materially false and misleading and not presented in accordance with GAAP;

(b)      that the Company's MD&A disclosures were materially false and misleading;

- 49 -

(c)     that the disclosure controls and internal controls over financial reporting representations were materially false and misleading; and

(d)     that the certification issued by Defendant Hendrix associated with Interface's disclosure controls and internal controls over Interface's financial reporting were materially false and misleading.

212.    The above noted material false and misleading statements of fact issued during the Class Period were incorporated in filings Interface made with the SEC later in the Class Period.

**Interface's Financial Misstatements During the Class Period Were Material**

213.    As articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M, M*ateriality* ("CSAB Topic 1M"), materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

214.    Thus, CSAB Topic 1M notes, in pertinent part, that:

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations.  In so doing, it made clear that -

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.  Footnotes omitted.

215.    As alleged herein, Interface's quarterly pre-tax income from the 2015 second quarter through the 2016 second quarter was fraudulently overstated between ***5% and 15%***.  Accordingly, the misstatements of the Company's income-related financial measures during the Class Period are quantitatively material.

216.     With respect to the qualitative factors that may render a financial misstatement material, CSAB Topic 1M notes that a matter is material if there is a substantial likelihood that a reasonable person would consider it important.  According to CSAB Topic 1M, among the considerations that a reasonable person may deem important and render material a quantitatively small financial misstatement include:

- Whether the misstatement masks a change in earnings or other trends[;]

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise[; and]

- Whether the misstatement changes a loss into income or vice versa.

217.     Moreover, Interface's financial misstatements were the result of actions and directives taken by executive-level managers of Interface to intentionally overstate the Company's operating results.  In this regard, CSAB Topic 1M provides:

> [T]he staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.  While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.  The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings.  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.  Footnotes omitted.

218.     The factual allegations herein portray a pattern and practice of intentional misconduct by Interface's most senior executives that was designed to, and did, materially inflate the Company's operating results during the Class Period.  Thereafter, Defendants brazenly touted the Company's financial performance that was the product of flagrant misconduct that deliberately and materially inflated the Company's reported operating results during the Class Period.

219.    Finally, the materiality of Defendants' misstatements and adjustments has also been confirmed by the SEC.  Specifically, the SEC Order states that "[t]he adjustments and misstatements were also material to Interface's financial statements and caused Interface to make false disclosures in public filings, press releases, and earnings calls about its actual EPS results, its earnings growth, and its pattern of meeting or beating consensus analyst estimates."

## Interface's Violations of GAAP

220.    At all relevant times during the Class Period, Interface's financial statements were represented to have been presented in accordance with GAAP.  Defendants knew, or recklessly ignored, that such representations were materially false and misleading statements of fact because, in violation of some of the most basic and fundamental rules of accounting, Defendants repeatedly caused Interface to issue financial statements that artificially overstated Interface's income which improperly, systematically and repeatedly understated its expenses during 2015 and 2016.

221.    In doing so, Defendants disowned their responsibility to present Interface's business activities in accordance with Section 13 of the Exchange Act (17 U.S.C. §78m) which provides:

> Every issuer which has a class of securities registered pursuant to [Section 12] of this title and every issuer which is required to file reports pursuant to [Section 15(d)] of this title shall - -
>
> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>
>> (i)    transactions are executed in accordance with management's general or specific authorization;

(ii)     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(iii)     access to assets is permitted only in accordance with management's general or specific authorization; and

(iv)     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]

222.     The general accounting precept that expenses be recorded in the same period in which the corresponding benefit is realized is one of, if not the, most basic tenets underlying accrual accounting. *See* Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶85-87.

223.     GAAP, as set forth in Accounting Standards Codification ("ASC") Topic No. 450, *Contingencies*, requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable that a liability has been incurred and the amount can be reasonably estimated.  In addition, ASC Topic No. 710, *Salaries, Wages, and Bonuses*, requires compensation expense to be recognized and reported in financial statements in during the period services are performed.  Further, ASC Topic No. 718, *Compensation-Stock Compensation*, requires stock based compensation to be recognized and reported in financial statements the requisite service period.

224.     In failing to file financial statements with the SEC which conformed to the above noted provisions of GAAP, Defendants disseminated Interface financial statements that were presumptively misleading and inaccurate.

**Interface's Management's Discussion and Analysis of
Financial Condition and Operating Results Was Materially False and Misleading**

225.    Item 7 of Form 10-K and Item 2 Form 10-Q required Interface to furnish the information called for under Item 303 of Regulation S-K (17 C.F.R. §229.303), *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") during the Class Period.  In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events and uncertainties, which states, in pertinent part, as follows:

> **A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation**.
>
> *        *        *
>
> Events that have already occurred or are anticipated often give rise to known uncertainties.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

226.    In 2003, the SEC provided additional interpretative guidance relating to the requirements of Item 303.  This guidance states, in pertinent part:

> **We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.**  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.
>
> *        *        *

- 54 -

We would expect a good introduction or overview to provide a balanced, executive-level discussion that **identifies the most important themes or other significant matters with which management is concerned primarily in evaluating the company's financial condition and operating results**.  A good introduction or overview would . . . provide insight into material opportunities, challenges and risks, such as those presented by known material trends and uncertainties, on which the company's executives are most focused for both the short and long term, as well as the actions they are taking to address these opportunities, challenges and risks.

227.     As detailed herein, the MD&A included in the Forms 10-K and 10-Q that Interface filed with the SEC during the Class Period contained materially false and misleading statements of fact about the Company's 2015 and 2016 earnings.

**Interface's Representations about its Disclosure Controls and Internal Control over Financial Reporting Were Materially False and Misleading**

228.     Item 9A of Form 10-K and Item 4 Form 10-Q required Interface to furnish the information called for under Item 307 of Regulation S-K (17 C.F.R. §229.307), *Disclosure Controls and Procedures* and Item 308 of Regulation S-K (17 C.F.R. §229.308), *Internal Control over Financial Reporting* during the Class Period.

229.     Item 307 of Regulation S-K required Interface's Forms 10-K and 10-Q during the Class Period to disclose the Individual Defendants' conclusions about the effectiveness of Interface's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

230.     During the Class Period, Defendants falsely and misleadingly represented in Interface's Forms 10-K and 10-Q that Interface's disclosure controls were operating effectively when they were not, as detailed herein.  These false and misleading representations were then fraudulently certified by the Individual Defendants, as set forth herein.

231.     Item 308 of Regulation S-K required Interface's Forms 10-K and 10-Q during the Class Period to disclose, among other things, the Individual Defendants' conclusions about the

effectiveness of Interface's internal control over financial reporting, defined by relevant regulation as:

> [A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> • Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> • Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and
>
> • Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

232. During the Class Period, Defendants falsely and misleadingly represented in Interface's Forms 10-K and 10-Q that Interface's internal controls over financial reporting were operating effectively when they were not, for the reasons detailed herein. These false and misleading representations were then fraudulently certified by the Individual Defendants, as set forth above.

## ADDITIONAL SCIENTER ALLEGATIONS

233. As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Interface and the Individual Defendants knew or recklessly disregarded that the statements identified above were materially false and misleading when made, had access to information contradicting their statements, and/or admitted material facts necessary to make those statements not misleading.

**Defendants' Class Period Stock Sales Support a Strong Inference of Scienter**

234.    As detailed above, Defendants possessed substantial motive for failing to disclose

Interface's accounting improprieties and Interface's falsified EPS results.

235.    Moreover, while Interface's EPS and common stock price were artificially inflated,

Defendants Hendrix and Lynch, as well as other Interface insiders, sold millions of dollars of their

personally-held shares of Interface common stock at artificially inflated prices, as set forth below:

| Filer Name | Title | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Daniel T. Hendrix | Chief Executive Officer | 6/1/2015 | 10,000 | $21.68 | $216,800 |
| | | 6/16/2015 | 1,709 | $23.24 | $39,717 |
| | | 6/17/2015 | 10,000 | $24.24 | $242,400 |
| | | 6/17/2015 | 5,791 | $23.28 | $134,814 |
| | | 6/25/2015 | 4,252 | $25.24 | $107,320 |
| | | 6/26/2015 | 10,748 | $25.24 | $271,280 |
| | | 7/1/2015 | 10,000 | $25.06 | $250,600 |
| | | 7/30/2015 | 32,500 | $25.74 | $836,550 |
| | | 5/2/2016 | 20,000 | $17.11 | $342,200 |
| | | 5/3/2016 | 20,000 | $16.56 | $331,200 |
| | | 6/6/2016 | 3,000 | $17.10 | $51,300 |
| | | 7/12/2016 | 3,000 | $16.00 | $48,000 |
| | | 8/1/2016 | 3,000 | $17.83 | $53,490 |
| | | 9/1/2016 | 3,000 | $17.70 | $53,100 |
| | | 10/3/2016 | 3,000 | $16.40 | $49,200 |
| | | 11/4/2016 | 3,000 | $16.00 | $48,000 |
| | | 12/1/2016 | 3,000 | $17.50 | $52,500 |
| | | 12/28/2016 | 5,000 | $18.95 | $94,750 |
| | | 1/3/2017 | 3,000 | $18.75 | $56,250 |
| | | 2/1/2017 | 3,000 | $18.22 | $54,660 |
| | | 2/27/2017 | 15,000 | $19.17 | $287,550 |
| | | 2/27/2017 | 3,000 | $19.10 | $57,300 |
| | | 3/1/2017 | 6,000 | $19.75 | $118,500 |
| | | 3/8/2017 | 20,000 | $19.36 | $387,200 |
| | | 3/16/2017 | 5,000 | $19.16 | $95,800 |
| | | 3/17/2017 | 5,000 | $19.15 | $95,750 |
| | | 4/3/2017 | 3,000 | $18.75 | $56,250 |
| | | 5/1/2017 | 3,000 | $19.82 | $59,460 |
| | | 5/23/2017 | 1,100 | $20.05 | $22,055 |
| | | 5/23/2017 | 3,900 | $20.08 | $78,312 |
| | | 6/2/2017 | 5,000 | $20.93 | $104,650 |
| | | 6/15/2017 | 6,000 | $19.74 | $118,440 |
| | | 7/17/2017 | 6,000 | $18.95 | $113,700 |

|  |  | 8/15/2017 | 6,000 | $19.11 | $114,660 |
|---|---|---|---|---|---|
|  |  | 9/15/2017 | 6,000 | $19.95 | $119,700 |
|  |  | 9/22/2017 | 5,000 | $21.45 | $107,250 |
|  |  | 9/26/2017 | 300 | $22.05 | $6,615 |
|  |  | 9/27/2017 | 500 | $22.08 | $11,040 |
|  |  | 9/28/2017 | 9,200 | $22.05 | $202,860 |
|  |  | 10/16/2017 | 6,000 | $21.79 | $130,740 |
|  |  | 10/26/2017 | 27,000 | $22.95 | $619,650 |
|  |  |  | 299,000 |  | $6,193,614 |
| Patrick C. Lynch | Chief Financial Officer | 3/16/2016 | 1,500 | $18.00 | $27,000 |
|  |  | 4/1/2016 | 1,500 | $18.22 | $27,330 |
|  |  | 7/28/2016 | 4,500 | $18.00 | $81,000 |
|  |  | 11/17/2016 | 6,000 | $18.00 | $108,000 |
|  |  | 12/8/2016 | 1,500 | $18.00 | $27,000 |
|  |  |  | 15,000 |  | $270,330 |

236.    The timing of these sales was unusual because they took place after Bauer and Lynch had already made and/or directed the entry of unsupported accounting entries to overstate the Company's reported EPS in order to meet or beat analysts' consensus estimates.

### That the Individual Defendants Made Numerous Specific Statements Regarding Interface's Current and Historic EPS Is Directly Relevant to Their Scienter

237.    The Individual Defendants made numerous specific statements during the Class Period about Interface's EPS.  For example, on February 24, 2016, Hendrix stated: "***The fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share***," and "[f]or the full year, our net sales were up 8% on a currency neutral basis, gross margin was up 430 basis points, adjusted operating income margin was up 300 basis points, and ***adjusted EPS was up 77% versus 2014***."  "

238.    In addition, on July 27, 2016 Hendrix was quoted "[f]or the sixth quarter in a row, we posted a triple digit year over year increase in gross margin, . . . [t]hese dynamics drove our earnings per share to $0.32, just a penny shy of the quarterly record $0.33 in the second quarter last year."

239.    On July 28, 2016, Gould stated *"[o]ur earnings per share were strong at $0.32, just a penny short of the all-time record of $0.33 . . ."*

240.    On February 22, 2018 Defendant Hausmann compared Interface's 2017 EPS figures against Interfaces 2016 EPS figures, stating "[f]ull year GAAP EPS of $0.86 was up 4% compared to $0,83 in 2016.  However, our full year adjusted EPS of $1.18 was up 15% versus 2016's adjusted EPS of $1.03."

241.    Moreover, even after the SEC first contacted Interface with concerns about the Company's historic EPS figures, and after Interface had been served with subpoenas related to the same topic, Defendants continued to refer to the EPS at issue, without any disclosure as to their falsity.

242.    Defendants' specific statements and comparisons to EPS in other years reflect that the Individual Defendants were receiving specific information regarding Interface's EPS calculations and financial results.  The only other plausible inference that could be drawn from these pronouncements is that the Individual Defendants either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to regarding such matters.  In either event, such deliberate recklessness satisfies the scienter requirement.

### The Existence, Resolution, and Findings of Fact in the SEC Order Support an Inference of Scienter

243.    The existence, resolution, and findings of fact set forth in the SEC Order support an inference of scienter.

244.    The SEC Order concluded that from the "second quarter of 2015 through the second quarter of 2016, Interface . . . reported [EPS] that did not accurately reflect the company's underlying performance."

245.    The SEC Order also concluded that the "adjustments and misstatements were . . . material to Interface's financial statements and caused Interface to make false disclosures in public filings, press releases, and earnings call about its actual EPS results[.]"

246.    The SEC first contacted Interface in November 2017, seeking "information and documents in connection with an investigation into the Company's historical quarterly [EPS] calculations and rounding practices during the period 2014-2017."

247.    Interface also received several subpoenas from the SEC with regard to the same conduct, with the first subpoena being served in February 2018, and the others in July 2018 and April 2019.

248.    However, as late as February 22, 2018, Interface was still incorporating its historic EPS from the time period that the SEC was investigating the accuracy of Interface's reported EPS. Further, Defendants did not disclose the existence of the SEC Investigation until after they had received the third related subpoena.

**Defendant Lynch's Suspiciously Timed Resignation Supports a Strong Inference of Scienter**

249.    On November 2, 2016, shortly after the second quarter of 2015 ended, Interface announced that Lynch was leaving his position as CFO that he had occupied for fifteen years.

250.    This sudden and unforeseen departure by Lynch, shortly after the end of the second quarter and after Lynch had sold hundreds of thousands of dollars worth of stock at artificially inflated prices, as discussed above, also supports a finding of scienter.

**Each Individual Defendant Signed SOX Certifications Appended to SEC Filings Incorporating the Falsified EPS Calculations**

251.    Each Individual Defendant possessed knowledge of facts that directly contradicted Interface's and their own public statements.  Nonetheless each Individual Defendant signed false and misleading SOX certifications during the Class Period, which acknowledged his responsibility to

investors for establishing and maintaining controls to ensure that material information about Interface was appropriately disclosed to investors.

252. Class Period 10-Qs and 10-Ks, with SOX certifications from each Individual Defendant at different times appended, included the false and misleading statement that Interface had adequate financial and disclosure controls that were periodically reviewed by management.

253. Class Period 10-Qs and 10-Ks, with SOX certifications from each Individual Defendant at different times appended, included the falsified EPS calculations and comparisons to previous EPS calculations for previous intervals.

**Interface's Omnibus Stock Incentive Plan Was Tied Directly to Improving Interface's EPS**

254. On February 18, 2015, just prior to the second quarter of 2015 and the first inflated EPS report identified in the SEC Order, Interface restated and amended its Omnibus Stock Incentive Plan (the "Plan").

255. The grant of stock options pursuant to the Plan was tied to certain "Performance Objectives," including the EPS attained by Interface, and other metrics hinging on Interface's share price.

256. Each Individual Defendant was granted access to the Plan, thus each Individual Defendant had an incentive to artificially inflate Interface's EPS calculations and reports, and otherwise inflate Interface's share value.

257. Lynch's insider sales detailed above were of shares granted to Lynch under the Plan.

## CORPORATE SCIENTER

258. The allegations described above establish a strong inference that Interface acted with corporate scienter throughout the Class Period, as its officers, management, and agents – including but not limited to Bauer (the Company's Controller) and Defendant Lynch (the Company's CFO), who engaged in the underlying fraud of entering and directing others to enter, unsupported

accounting entries – had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth regarding Interface's reported EPS calculations. By concealing these material facts from investors, Interface maintained and/or artificially inflated the prices of Interface's stock throughout the Class Period.

## CLASS ACTION ALLEGATIONS

259. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Interface common stock during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

260. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Interface common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Interface or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

261.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

262.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

263.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Interface;

(c)    whether the Individual Defendants caused Interface to issue false and misleading statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)    whether the price of Interface common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

264.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF THE PRESUMPTION OF RELIANCE:<br>FRAUD ON THE MARKET DOCTRINE

265.    During the Class Period, the market for Interface common stock was an efficient market for the follow reasons, among others:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Interface common stock traded in an efficient market;

(d)    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company's stock traded on the NASDAQ and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(g)    Lead Plaintiff and members of the Class purchased or acquired Interface common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

266.    Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

267.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## LOSS CAUSATION

268.    As detailed herein, Defendants' false and misleading statements and omissions caused and maintained artificial inflation in the price of Interface common stock by misrepresenting and concealing the relevant truth about Interface's financial results.  Lead Plaintiff and other investors purchased Interface common stock at these inflated prices and suffered damage when the price of Interface common stock declined upon the revelation of the relevant truth.

269.    As a result of their purchases of Interface common stock during the Class Period, Lead Plaintiff and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused Interface common stock to trade at artificially inflated levels throughout the Class Period.

270.    On April 24, 2019, Defendants filed a current report on Form 8-K with the SEC, disclosing that Interface's EPS calculations and rounding practices had been under investigation since at least November 2017, and disclosed that Bauer was on paid administrative leave after it was revealed that he added certain notes to materials submitted to the SEC in response to the investigation.

271.    On this news, Interface's stock price fell $1.43 per share, or 8.37%, to close at $15.66 per share on April 25, 2019.

272.    Despite the April 24, 2019 revelation, Interface's common stock continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions concerning the adequacy of: (i) Interface's disclosure

controls and procedures and internal controls over financial reporting; (ii) the Company's artificially inflated income and EPS in 2015 and 2016; (iii) the Company's active impediment of the SEC's investigation; and (iv) the true scope and liability of the Company, Bauer and Lynch.

273.    On September 28, 2020, the SEC announced the conclusion of its investigation into Interface's historical quarterly EPS calculations and rounding practices.  Interface agreed to pay a $5 million fine to resolve the matter and was ordered to cease and desist from violating the federal securities laws.  Specifically, the SEC's enforcement order, dated September 28, 2020, disclosed, *inter alia*:

> 1.    From the second quarter of 2015 through the second quarter of 2016, Interface, a global designer and manufacturer of modular carpet, reported earnings per share ("EPS") that did not accurately reflect the company's underlying performance.  During these five consecutive financial quarters, Interface's then-Corporate Controller, Bauer, directed or otherwise caused his subordinates to book unsupported, manual accounting adjustments to Interface's management bonus accruals, expenses related to a key independent consultant ("Consultant"), and stock based compensation.  These adjustments did not comply with generally accepted accounting principles ("GAAP") and artificially inflated Interface's income and EPS, which resulted in Interface meeting or beating consensus estimates for EPS and showing earnings growth. Interface's then-Chief Financial Officer ("CFO"), Lynch, also caused Bauer to direct entries in two quarters that lacked support and did not comply with GAAP. Bauer and Lynch were able to direct or cause these improper adjustments because Interface failed to have sufficient accounting controls or procedures in place to prevent unsupported, manual, period end, journal entries. Interface lacked critical journal entry controls and Bauer's subordinate accountants were not knowledgeable in GAAP.
>
> 2.    The adjustments and misstatements were also material to Interface's financial statements and caused Interface to make false disclosures in public filings, press releases, and earnings calls about its actual EPS results, its earnings growth, and its pattern of meeting or beating consensus analyst estimates.  Had Lynch and Bauer ensured the financial statements complied with GAAP, Interface's reported earnings would have been more volatile than reported, and in two quarters in which it reported meets of analyst consensus EPS, Interface would have in fact missed the consensus estimates. Consequently, Interface's conduct was materially misleading to investors in violation of the federal securities laws.

274.    Further, the SEC order disclosed:

38.   "Between November 2017 and March 2018, Interface employees caused Interface to produce documents in response to Commission investigative requests that were suggestive of contemporaneous support for journal entries that, in truth, did not exist at the time the entries were recorded.  One of these employees also certified as contemporaneous business records certain documents that, in fact, had been modified after the investigation began.  These shortcomings had the effect of impeding the staff's investigation."

Interface took remedial measures when the Company was notified of the issues, but only after the investigation was impeded.

275.   On this news, Interface's stock price fell $0.20 per share, or 3.3%, over the following two trading sessions to close at $6.18 per share on September 29, 2020.

276.   As a result of Defendants' false and misleading statements, Interface common stock traded at artificially inflated prices during the Class Period.  After the above revelations to the market, the price of Interface common stock declined significantly.

277.   By concealing from investors the adverse facts detailed herein, Defendants presented a materially misleading picture of Interface's business.  When the truth about the Company was revealed to the market, the price of Interface common stock substantially declined.  This share price decline removed all of the inflation from the price of Interface common stock, causing substantial economic losses to investors who purchased Interface common stock during the Class Period.

278.   The decline in the price of Interface common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Interface common stock negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' conduct as detailed herein.

279.   The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' scheme to artificially inflate the price of Interface common stock

and the subsequent significant decline in the value of Interface common stock when Defendants'
prior misrepresentations and the relevant truth were revealed.

280.    In sum, as detailed above, the share price decline described herein served to remove
artificial inflation from the price of Interface common stock, and was a direct and foreseeable
consequence of the revelation of the relevant truth concealed by Defendants.

## NO SAFE HARBOR

281.    The statutory safe harbor provided for forward-looking statements under certain
circumstances does not apply to any of the false statements alleged.  Many of the statements herein
were not identified as "forward-looking statements" when made.  To the extent there were any
forward-looking statements, no meaningful cautionary statements identified important factors that
could cause actual results to differ materially from those in the purportedly forward-looking
statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-
looking statements pleaded herein, Defendants are liable for those false forward-looking statements
because at the time each of those forward-looking statements was made, the particular speaker knew
or had actual knowledge that the particular forward-looking statement was false, and/or the forward-
looking statement was authorized and/or approved by an executive officer of Interface who knew
that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

282.    Lead Plaintiff repeats and realleges each and every allegation contained above as if
fully set forth herein.

283.    During the Class Period, Defendants disseminated or approved the false statements
above, which they knew or recklessly disregarded were misleading in that they contained

misrepresentations or omissions and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

284.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Interface common stock during the Class Period.

285.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Interface common stock.  Lead Plaintiff and the Class would not have purchased Interface common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

286.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Interface common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

287.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

288.    The Individual Defendants acted as controlling persons of Interface within the meaning of Section 20(a) of the Exchange Act:

289.    By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading;

290.    The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

291.    Because of their high ranking corporate positions at relevant times, the Individual Defendants directly participated in the Company's management and were directly involved in Interface's day-to-day operations.  The Individual Defendants also controlled the contents of Interface's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Lead Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  April 28, 2021                    ROBBINS GELLER RUDMAN
                                                          & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       PHILIP T. MERENDA

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

- 71 -

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on April 28, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD