**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

THOMAS S. SWANSON, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

   - v. -

INTERFACE, INC., DANIEL T. HENDRIX,
JAY D. GOULD, BRUCE A. HAUSMANN, and
PATRICK C. LYNCH,

        Defendants.

Case No. 1:20-cv-05518-BMC

**MEMORANDUM OF LAW IN
SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT**

# Table of Contents

Page

Table of Authorities .................................................................................................. ii

Preliminary Statement ............................................................................................... 1

Statement of Facts ..................................................................................................... 2

     A.    Interface and the Individual Defendants ................................................. 2

     B.    The SEC Investigation and Settlement ................................................... 3

     C.    The Alleged Misstatements, Copied from the SEC's Statement of "Facts" .......... 3

          1.    Alleged Under-Accruals for Incentive Compensation ................................ 4

          2.    Alleged Over-Valuation of a Consultant's Life Insurance Policy ................ 5

     D.    The AC's Allegations of Scienter ........................................................... 6

     E.    The Alleged Corrective Disclosure Dates ............................................... 7

Argument ................................................................................................................... 7

I.     The AC Fails to Allege a Material Misstatement. ............................................ 8

     A.    The AC Improperly Relies Upon the SEC's Statement of "Facts." ....................... 8

     B.    The Alleged Misstatements Are Matters of Opinion, and the AC is Subject to and Fails to Satisfy the *Omnicare* Standard ........................................... 9

     C.    The Accounting Adjustments Were Not Material. ................................. 11

II.    The AC Fails to Allege a Strong Inference of Scienter. ................................ 13

     A.    The AC Fails to Allege Any Motive to Defraud ................................... 14

     B.    The AC Fails to Allege Conscious Misbehavior or Recklessness. ......... 16

     C.    The AC's Remaining Theories Are Insufficient to Plead Scienter. ........ 18

III.   The AC Fails to Allege Loss Causation ......................................................... 19

     A.    All Relevant Accounting Charges Were Revealed in 2015 and 2016. .......... 20

     B.    Any New Information in 2019 and 2020 Was Not "Corrective." .......... 21

     C.    The AC Fails to Allege a Stock Price Drop After the SEC Settlement. ........ 21

IV.   The AC Fails to Allege a Control Person Claim ............................................ 23

Conclusion ............................................................................................................... 23

## Table of Authorities

**Page(s)**

**Cases**

*Acito* v. *IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)..................................................................................16

*Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010)..................................................................20

*Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*,
  568 U.S. 455 (2013)....................................................................................7, 22

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-cv-1545, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ........................10, 11

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..............................................................................23

*In re Avista Corp. Sec. Litig.*,
  415 F. Supp. 2d 1214 (E.D. Wash. 2005) ............................................................21

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. Sept. 29, 2017) ....................................................11

*Barrett* v. *PJT Partners, Inc.*,
  No. 16-cv-2841, 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ...............................14

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988)..................................................................................11, 22

*In re Carter-Wallace, Inc., Sec. Litig.*,
  220 F.3d 36 (2d Cir. 2000)..............................................................................14

*Chapman* v. *Muller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)..............................................................15, 16

*Chill* v. *Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)............................................................................17

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................................20

*City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ............................................................14, 15

*In re Comverse Tech., Inc. Sec. Litig.*,
  No. 06-cv-1825, 2008 WL 2795927 (E.D.N.Y. July 18, 2008)................................23

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................8

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
   No. 19-cv-6180, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021)............................18

*In re Donna Karan Int'l Sec. Litig.*,
   No. 97-cv-2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ............................16

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)...........................................................11, 12, 14, 16

*Edward J. Goodman Life Income Tr.* v. *Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. 2010) .............................................................................13

*Fait* v. *Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011).................................................................................9

*Fishbaum* v. *Liz Claiborne, Inc.*,
   189 F.3d 460 (2d Cir. 1999).................................................................................16

*Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.*,
   No. 09-cv-4050, 2010 WL 3790810 (S.D.N.Y. Mar. 16, 2012)............................8

*Fraker* v. *Bayer Corp.*,
   No. 08-cv-1564, 2009 WL 5865687 (E.D. Cal. Oct. 6, 2009)................................8

*Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC.*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005)...................................................................20

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................15

*Glaser* v. *The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................15, 18, 19

*In re Glenayre Techs., Inc. Sec. Litig.*,
   No. 96-cv-8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998), *aff'd sub nom.*,
   *Kwalbrun* v. *Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999) ...........................14

*Golub* v. *Gigamon Inc.*,
   2021 WL 1554439 (9th Cir. Apr. 20, 2021) .........................................................10

*Gregory* v. *ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................................................................9

*In re Henry Schein, Inc. Sec. Litig.*,
   No. 18-cv-01428, 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ....................15, 19

iii

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
   647 F.3d 479 (2d Cir. 2011)..........................................................................................12

*IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015)..........................................................................................11

*Janbay* v. *Canadian Solar, Inc.*,
   No. 10-cv-4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012)...............................21

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001)..........................................................................................16

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..........................................................................16

*Lentell* v. *Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)....................................................................................19, 22

*Lipsky* v. *Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)............................................................................................8

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   910 F. Supp. 2d 561 (S.D.N.Y. 2012)...........................................................................17

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).........17

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) ..............................................................................18, 23

*Martin* v. *Quartermain*,
   732 F. App'x 37 (2d Cir. 2019) ....................................................................................10

*In re Maxim Integrated Prods., Inc. Secs. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ........................................................................21

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................................8

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*,
   549 F.3d 1049 (9th Cir. 2008) ......................................................................................21

*Meyer* v. *Greene*,
   710 F.3d 1189 (11th Cir. 2013) ...............................................................................20, 21

*MicroCapital Fund LP* v. *Conn's Inc.*,
   No. 18-cv-1020, 2019 WL 3451153 (S.D. Tex. July 24, 2019) ...................................19

iv

*Mills* v. *Polar Molecular Corp*,
    12 F.3d 1170 (2d Cir. 1993)............................................................................7

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth*
    *Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*,
    No. 15-cv-6034, 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ..........................................12

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)........................................................................1, 9

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)............................................................20, 21

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)................................................................20

*Pavelic & LeFlore* v. *Marvel Entm't Grp.*,
    493 U.S. 120 (1989)...........................................................................8

*In re Perrigo Co. PLC Sec. Litig.*,
    435 F. Supp. 3d 571 (S.D.N.Y. 2020)..............................................................17

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020)..............................................................15

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011).................................................................8

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)..............................................................13

*In re PolyMedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005)..........................................................................22

*Pope Investments II LLC* v. *Deheng Law Firm*,
    No. 10-cv-6608, 2011 WL 5837818 (S.D.N.Y. Nov. 21, 2011)..........................................18

*Ret. Sys.* v. *Controladora Vuela Compañía de Aviación, S.A.B. de C.V.*,
    No. 15-cv-1337, 2016 WL 3685089 (S.D.N.Y. July 6, 2016).............................................11

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004)..............................................................11

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................18

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011)..............................................................10

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
 729 F. Supp. 2d 569 (S.D.N.Y. 2010) ....................................................................22

*In re Serologicals Sec. Litig.*,
 No. 00-cv-1025, 2003 WL 24033694 (N.D. Ga. Feb. 20, 2003) ............................19

*Shahzad* v. *H.J. Meyers & Co.*,
 No. 95-cv-6196, 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) ...................................8

*Strougo* v. *Barclays PLC*,
 312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................................22

*Tabak* v. *Canadian Solar Inc.*,
 549 F. App'x 24 (2d Cir. 2013) .......................................................................12, 13

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008)....................................................................................14

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)................................................................................................13

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
 No. 16-cv-4581, 2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019)............................19

*Thomas* v. *Shiloh Indus.*,
 No. 15-cv-7449, 2017 WL 2937620 (S.D.N.Y. July 7, 2017)..........................14, 17

*W. Virginia Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*,
 344 F. App'x 717 (2d Cir. 2009) ............................................................................13

*In re Wachovia Equity Sec. Litig.*,
 753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................................................................18

*Warney* v. *Monroe County*,
 587 F.3d 113 (2d Cir. 2009)......................................................................................2

*Waters* v. *Gen. Elec. Co.*,
 No. 08-cv-8484, 2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010), *aff'd sub
 nom.*, *GE Invs.* v. *Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011) ......................22

*Weiss* v. *Amkor Tech., Inc.*,
 527 F. Supp. 2d 938 (D. Ariz. 2007) ......................................................................22

*Wochos* v. *Tesla, Inc.*,
 985 F.3d 1180 (9th Cir. 2021) ................................................................................23

*In re XP Inc. Sec. Litig.*,
 No. 20-cv-1502, 2021 WL 861917 (E.D.N.Y. Mar. 8, 2021)..................................21

*Xu* v. *Gridsum Holding Inc.*,
No. 18-cv-3655, 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)............................................13

*Zheng* v. *Pingtan Marine Enter. Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019) ..................................................................................18

*Ziemba* v. *Cascade Int'l, Inc.*,
256 F.3d 1194 (11th Cir. 2001) ..............................................................................................7

## Statutes & Rules

15 U.S.C. § 78u–4.................................................................................................... passim

Fed. R. Civ. P. 9......................................................................................................1, 7

Fed. R. Civ. P. 11...................................................................................................1, 8

Fed. R. Civ. P. 12...................................................................................................1, 7

## Other Authorities

John Finnerty & George Pushner, *An Improved Two-Trader Model for Measuring
Damages in Securities Fraud Class Actions*, 8 Stan. J.L. Bus. & Fin. 213
(2003)......................................................................................................................22

Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in
Securities Fraud Cases: Applications at the Securities and Exchange
Commission*, 49 Bus. Law. 545 (1994).................................................................22

Defendants Interface, Inc., Daniel T. Hendrix, Bruce A. Hausmann, Patrick C. Lynch, and Jay D. Gould respectfully submit this memorandum in support of their motion to dismiss or strike the Amended Complaint ("AC"), pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and 12(f) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, *et seq.* ("PSLRA").

### Preliminary Statement

The AC does little more than second-guess, with the benefit of hindsight, Interface's mid-year estimates of the amount of incentive compensation it would need to pay at year-end 2015 and 2016 and its valuation of a small, non-core asset.  It is based on the fact that Interface settled an SEC complaint charging the Company was negligent regarding these issues.  That is not a sufficient basis for a fraud claim.

Specifically, the AC is deficient in the following respects:

*First*, Plaintiff fails to allege a misstatement.  The AC's reliance on the SEC's un-admitted, un-adjudicated, and un-proven allegations is improper under binding Second Circuit precedent, the PSLRA, and Rules 9, 11, and 12.  Since no other allegations of a misstatement remain, the AC should be dismissed.  The alleged accounting errors also are estimates that are matters of opinion, and the AC fails to allege that Defendants' opinions were both wrong ("objectively false") and not honestly held when made ("subjectively false"), as required by *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  And, the AC fails to allege that the alleged errors—which were approximately 1% of expenses and less than 1% of assets—were material.

*Second*, Plaintiff does not allege facts that give rise to a strong inference of scienter.  The AC's allegations that certain Defendants made ordinary and unsuspicious stock sales or received commonplace incentive compensation (which the AC does not allege was increased by the alleged errors) does not present a motive to commit fraud.  And Plaintiff's theory that

Defendants were motivated to meet analysts' consensus earnings per share ("EPS") expectations does not fit.  Interface missed analysts' consensus EPS as often as it met it, and the one quarter during the class period where the alleged errors purportedly allowed the Company to meet consensus does not align with any alleged profit motive for any Defendant.

*Third*, the AC fails to allege loss causation for either of the purported corrective disclosure dates.  The disclosures of the SEC investigation (in April 2019) and SEC settlement (in September 2020) revealed only the SEC's investigation and allegations—which Plaintiff admits Interface had no duty to disclose earlier[1]—nothing more.  Those disclosures were at most a negative characterization of accounting charges previously disclosed in 2015 and 2016.  Notably, the day the SEC settlement was disclosed, Interface's stock price went *up*, not down.

*Finally*, the control person claims against the Individual Defendants fail for lack of a primary violation and the AC's inability to allege Defendants culpably participated in the alleged fraud.

## Statement of Facts[2]

### A.    Interface and the Individual Defendants

Interface designs and produces modular carpet.  AC ¶ 2.  Its stock trades on NASDAQ. *Id.* ¶ 19.  Daniel T. Hendrix was Interface's CEO from 2001 to 2017 and again from 2020 to the present.  *Id.* ¶ 20.  Jay D. Gould was CEO from 2017 to 2020.  *Id.* ¶ 21.  Patrick C. Lynch was

---

[1]    Dkt. No. 38, at 2 n.3.

[2]    "AC ¶ __" refers to paragraphs in the AC.  Those allegations are assumed to be true solely for purposes of this motion.  *See Warney* v. *Monroe County*, 587 F.3d 113, 116 (2d Cir. 2009).  Unless otherwise noted, all capitalized terms have the meaning given to them in the AC. "Ex. __" refers to exhibits to the Declaration of Shane D. Avidan dated June 16, 2021, filed herewith.

CFO from 2001 to 2016, *id.* ¶ 23, when Bruce A. Hausmann succeeded him.  *Id.* ¶ 22.  Hendrix,

Gould, Lynch, and Hausmann are the Individual Defendants.

### B.      The SEC Investigation and Settlement

On April 24, 2019, Interface disclosed that it was being investigated by the SEC and that

it had placed non-party Gregory J. Bauer on administrative leave after discovering he had added

certain notes to documents he was collecting for production to the SEC.  *Id.* ¶ 96–97.  Bauer was

Interface's controller during the relevant period (from 2011 to 2017).  Ex. A at 3.

On September 28, 2020, the SEC issued an administrative order accepting an offer of

settlement from Interface, Bauer, and Lynch.  AC ¶¶ 6, 100–02.  The SEC alleged that Interface

and Bauer negligently violated section 17 of the Securities Act by negligently under-accruing

certain incentive compensation and negligently over-valuing a life insurance policy from 2Q15

to 2Q16.  *Id.* ¶¶ 100–01; Ex. A.  The SEC also alleged that Interface, Bauer, and Lynch violated

section 13 of the Exchange Act, and various rules thereunder, by failing to maintain adequate

books and records and internal controls.  AC ¶¶ 100–02.

The SEC Order is accompanied by a 7-page statement of "Facts."  *See* Ex. A at 4–10.

Interface, Lynch, and Bauer did not admit any of the allegations in the SEC Order, including the

statement of "Facts."  *Id.* at 2 & n.3.  Interface, Lynch, and Bauer agreed to pay $5 million,

$70,000, and $45,000, respectively (AC ¶ 6), and Lynch and Bauer agreed to temporary

suspensions.  Ex. A at 12–13.

### C.      The Alleged Misstatements, Copied from the SEC's Statement of "Facts"

Plaintiffs' principal theory in this lawsuit is that Interface under-reported expenses and/or

over-valued an asset from 2Q15 to 2Q16, and that these accounting errors allowed Interface to

beat analysts' consensus of Interface's EPS in two quarters—3Q15 (before the purported class

period begins) and 1Q16.  AC ¶¶ 51, 81.[3]  The class period starts on May 12, 2016, when

Interface filed its 10-Q for 1Q16, and continues until September 28, 2020, when the SEC

settlement was announced.

The alleged accounting errors relate to accruals for contingent future compensation

expenses and the valuation of an insurance policy Interface held as security for payments a

consultant owed for premiums Interface paid on the policy.  *Id.* ¶¶ 1, 7, 43–48, 52–57, 59–63, 67,

70–77, 79, 83–89, 225.  The AC also alleges that the Individual Defendants falsely certified that

they had "evaluated" Interface's disclosure controls and "concluded" that they were "effective."

*Id.* ¶¶ 111-115, 146, 148.

All of these allegations are taken from the SEC order.  Ex. A.  The AC does not allege

*any* independent source of information for an alleged accounting error or misstatement.

### 1.    Alleged Under-Accruals for Incentive Compensation

The alleged under-accruals relate to three incentive-compensation expenses: (1) cash

bonuses for management, (2) stock awards to management, and (3) a consultant's bonus.

<u>Cash Bonuses</u>.  The AC alleges Interface paid non-discretionary cash bonuses to

management based on the achievement of targets for operating income before incentives (OIBI)

and cash flow.  AC ¶ 45.  The targets for these cash bonuses are *not* alleged to have been tied to

EPS.  The AC alleges that Interface under-accrued for year-end bonuses (*id.* ¶¶ 45–47), which

were based on annual performance.  Ex. C at 11–12.  Each quarter Interface estimated and

established an accounting accrual towards that potential future expense.  Because annual

---

[3]    Interface did *not* publish any forwarding-looking "guidance" on EPS, but certain Wall Street
analysts did.  Historically, Interface had an inconsistent record of meeting the analysts'
consensus EPS:  it "missed" consensus from 1Q to 3Q14, and in 4Q15, 3Q16, and 1Q17;
"beat" consensus from 4Q14 to 2Q15 and in 2Q16, 4Q16, and 2Q17; and "met" consensus in
3Q15 and 1Q16.  Ex. B.

performance could not be known during the course of the year, the accruals were based on predictions about the range of potential performance and bonus outcomes.  The AC alleges those accruals were too low in five quarters:  2Q15 to 2Q16.  For the 2015 bonus, the AC alleges that Interface was under-accrued by $1.58 million in 2Q15 (*see* AC ¶ 48), $1.57 million in 3Q15 (*id.* ¶ 62), and $749,000 in 4Q15 (*id.* ¶ 71).  For the 2016 bonus, the AC alleges that Interface was under-accrued by approximately $1 million in 1Q16 (*id.* ¶ 74) and $951,000 in 2Q16 (*id.* ¶ 86).  These amounts were less than 1% of Interface's total expenses of $888 million for 2015 and $854 million for 2016.  *See* Ex. D at 23.

Stock Awards.  The AC alleges Interface also awarded stock to management based on targets for annual EPSD (EPS plus dividends).  AC ¶ 254.  Although there is no cash cost for these awards, relevant accounting rules treat stock awards as an expense and require an accrual for stock awards based on estimates of, among other things, the likelihood that shares will vest. *See* Ex. E.  Each quarter, Interface estimated and established such an accrual.  The AC alleges that this accrual was too low in three quarters: 3Q15, 1Q16, and 2Q16.  Specifically, the AC alleges that Interface was under-accrued for stock awards by $628,000 in 3Q15 (AC ¶ 59), $387,000 in 1Q16 (*id.* ¶ 79), and $774,000 in 2Q16 (*id.* ¶ 88).  These amounts also were less than 1% of Interface's total expenses for 2015 and 2016.  *See* Ex. D at 23.

Consultant Bonus.  Interface also had a contract with a consultant providing that Interface could owe a bonus of $300,000 at year-end 2015.  AC ¶¶ 63, 67.  The AC alleges that Interface under-accrued for this expense by $225,000 in both 3Q and 4Q15.  *Id.*  The AC does not allege whether the consultant ever became entitled to the bonus, or whether it was ever paid.

### 2.    Alleged Over-Valuation of a Consultant's Life Insurance Policy

The contract with the consultant also provided that Interface would advance the premiums for a life insurance policy, and the consultant would repay the premiums "in or around

May 2016." *Id.* ¶ 52.  As collateral, the consultant assigned the cash surrender value ("CSV") of the policy to Interface.  *Id.* ¶ 53.  The AC alleges that the amount of the CSV in excess of unreimbursed premiums "belonged to the consultant outright," and thus that Interface should have capped the value of the CSV at the amount of unreimbursed premiums.  *Id.* ¶ 54.

Interface allegedly valued the CSV at intermediate measures (between the amount of premiums and the CSV) in 3Q and 4Q15, and then at the full CSV in 1Q16.  *Id.* ¶¶ 55–57, 68–69, 74–76.  After the consultant repaid the premiums, Interface allegedly continued to value the CSV at $179,000 in 2Q16.  *Id.* ¶¶ 83–84.  As a result, the AC alleges that Interface's assets were over-valued by $697,000 in 3Q15 (*id.* ¶ 57), $653,000 in 4Q15 (*id.* ¶ 69), $994,000 in 1Q16 (*id.* ¶ 76), and $179,000 in 2Q16 (*id.* ¶ 84).  These amounts are less than 0.2% of Interface's assets in 2015 and 2016.  *See* Ex. D at 19.

As for EPS, the AC alleges that in one quarter before the purported class period, 3Q15, and one quarter during the class period, 1Q16, Interface would have missed consensus EPS if it had not made these purported errors.  In all of the other quarters, Interface would have beat EPS even if the alleged errors were excluded (2Q15, 2Q16), or missed EPS even with the purported errors (4Q15).  *See id.* ¶¶ 42, 48–51, 65, 66, 72, 73, 81, 89, 90.[4]

### D.      The AC's Allegations of Scienter

Although the SEC alleged that Interface's alleged accounting errors amounted only to *negligence* (*id.* ¶¶ 100–01; Ex. A), Plaintiff alleges *fraud* under sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder.  AC ¶ 1.  In support of scienter, the AC cites: (i) the SEC Order; (ii) stock sales by Hendrix and Lynch (but not Gould or Hausmann); (iii) the

---

[4]     Demonstrative charts of (1) the alleged expense under-accruals and over-valuation of the CSV and (2) the alleged impact of the accounting adjustments on EPS, are submitted as Exhibit F.

purported link between stock awards and EPS; (iv) the Individual Defendants' public statements about EPS; (iv) Lynch's resignation; and (v) SOX certifications signed by the Individual Defendants.  AC ¶¶ 233–58.

### E.    The Alleged Corrective Disclosure Dates

The AC alleges two corrective disclosure dates: (1) April 24, 2019, when Interface disclosed the investigations and Bauer's leave of absence, and (2) September 28, 2020, when the SEC settlement was announced (before the market opened).  *Id.* ¶¶ 270, 273.  Interface's share price fell by $1.43 (8.37%) on April 24, 2019.  *Id.* ¶ 271.  Interface's share price did *not* fall on September 28, 2020; it *increased* by $0.12 (2%).  Ex. G.  The AC alleges, instead, that the share price fell by $0.20 (3.13%) *two* days after the disclosure was made, on September 28 to 29.  AC ¶ 275.

### Argument

To state a claim under Rule 10b-5(b), Plaintiff must allege:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460–61 (2013).

Plaintiff must plead fraud "with particularity."  Fed. R. Civ. P. 9(b).  This includes who, what, when, where, and "why the statements were fraudulent."  *Mills* v. *Polar Molecular Corp*, 12 F.3d 1170, 1175 (2d Cir. 1993).  The PSLRA likewise requires pleading with particularity.  15 U.S.C. § 78u–4(b)(1), (2), (3)(a).  The Court may strike from a pleading any "immaterial" allegation.  Fed. R. Civ. P. 12(f).

The AC should be dismissed because it fails to allege a material misstatement, scienter, or loss causation.

I.      **The AC Fails to Allege a Material Misstatement.**

A.      **The AC Improperly Relies Upon the SEC's Statement of "Facts."**

As a threshold matter, all the AC's allegations sourced from the SEC's statement of facts should be stricken.  The SEC settlement was "the result of private bargaining," not a "hearing or rulings or any form of decision on the merits."  *Lipsky* v. *Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).  Such a document "can not be used as evidence," so allegations sourced from it "can have no possible bearing on" a private securities fraud suit, and thus are "immaterial . . . for the purposes of Rule 12(f)."  *Id.* at 893–94.  Following *Lipsky*'s binding precedent, courts in this Circuit have granted motions to strike allegations that are derived from allegations in settlements with the SEC or other agencies.  *See, e.g.*, *Footbridge Ltd. Trust* v. *Countrywide Fin. Corp.*, No. 09-cv-4050, 2010 WL 3790810, at *5 (S.D.N.Y. Mar. 16, 2012) (striking allegations "based on pleadings, settlements, and government investigations in other cases," including SEC complaint alleging Countrywide executives committed fraud); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 218 F.R.D. 76, 78–79 (S.D.N.Y. 2003) (striking paragraphs "that refer to or rely on the SEC's complaints" against defendants not adjudicated on the merits).[5]  The PSLRA and Rule 11 further underscore the rule of *Lipsky*.[6]

---

[5]   *See, also In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593–94 (S.D.N.Y. 2011) (granting motion to strike allegations "derived wholesale" from CFTC settlement); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005–06 (N.D. Cal. 2008) (striking paragraphs based on allegations based on facts in SEC complaint where plaintiffs "d[id] not contend that they conducted independent investigation into the facts alleged in the SEC complaint or [that they] had any additional bases for the specific allegations"); *Shahzad* v. *H.J. Meyers & Co*., No. 95-cv-6196, 1997 WL 47817, at *13–14 (S.D.N.Y. Feb. 6, 1997) (striking references to seven consent orders with various state and federal securities regulators).

[6]   *See Pavelic & LeFlore* v. *Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) (under Rule 11(b), counsel have "nondelegable responsibility" to "personally . . . validate the truth and legal reasonableness of the papers filed"); *Fraker* v. *Bayer Corp.*, No. 08-cv-1564, 2009 WL

Here, the AC generally attributes all its allegations to the SEC Order and to "information and belief." AC at p. 1. A redline comparison confirms that all relevant allegations of falsity are derived from the SEC's statement of facts. *See* Ex. H.[7] The other types of sources mentioned in the AC—"public documents, conference calls and announcements," SEC filings, "wire and press releases," and "analyst reports," AC at p. 1—are not cited in support of any allegations of falsity and could not plausibly support them. Thus, after allegations based on the SEC Order are struck, no allegation of falsity will remain, and the AC should be dismissed.

### B. The Alleged Misstatements Are Matters of Opinion, and the AC is Subject to and Fails to Satisfy the *Omnicare* Standard.

Under *Omnicare*, statements of opinion are not actionable unless they are both objectively and subjectively false.[8] In other words, investors cannot "second-guess inherently subjective and uncertain assessments" or "Monday morning quarterback an issuer's opinions." *Omnicare*, 575 U.S. at 186.

Interface's accruals for year-end incentive compensation, and its valuation of the CSV for the insurance policy, were both opinions. The accruals for incentive compensation were predictions of potential future expenses that depended upon an assessment of Interface's future performance. *Supra*, pp. 4–5. The valuation of the CSV depended upon predictions about whether "certain defined exceptions," which could entitle Interface to the full CSV, were

---

5865687, at *4–5 (E.D. Cal. Oct. 6, 2009) ("mentally stripping" allegations "made in, or inferred from," regulatory settlement order, as violative of Rule 11).

[7] Exhibit I is a redline comparing Paragraphs 39–89 of Plaintiff's AC to Paragraphs 1–35 of the SEC Order.

[8] *Omnicare* also allows claims based on false "embedded" facts or an omission as to the basis for an opinion. 575 U.S. at 185, 194. The AC does not allege either.

"probable." Ex. A at 5; *supra*, pp. 5–6.   Predicting future corporate financial performance or other future events are classic examples of opinions under *Omnicare*.[9]

The AC does not properly allege that Interface's estimates were objectively false.   It simply asserts, in conclusory fashion, that particular accruals were too low or valuations too high, but does not allege any facts or assumptions that support those conclusions.   For example, the AC simply asserts that, in 2Q15, management should have known that a maximum bonus at YE15 was "probable."   AC ¶¶ 46–47.   The AC does not explain *how* probable a maximum bonus was, whether there were other possibilities, or how probable those other possibilities were.   Nor does the AC allege the facts, known in 2Q15, that support that conclusion.   Without such allegations, the AC fails to allege that Interface's judgments were objectively "incorrect."

The AC also does not properly allege that Defendants subjectively disbelieved their estimates when they made them.   *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 567 (S.D.N.Y. 2011).   The AC asserts that Interface's "best estimate[s]" of incentive compensation were higher than what they recorded AC ¶¶ 46, 61, 71, 85, but does not allege any context for those purposed "best" estimates, such as who made them and how.   It does not allege that the relevant officers—the persons approving the relevant accruals—subjectively believed those estimates.   Without that, it is insufficient to allege that another opinion was "better" or "best."   *In*

---

[9]   *See Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011) ("[E]stimate[s] . . . will vary depending on the particular methodology and assumptions used," rendering them "subjective."); *Martin* v. *Quartermain*, 732 F. App'x 37, 40–41 & n.1 (2d Cir. 2019) ("projections about the future" are "quintessential opinion[s]"); *Golub* v. *Gigamon Inc.*, 2021 WL 1554439 at *1–2 (9th Cir. Apr. 20, 2021) (management's extrapolation from quarterly results to a "growth trajectory" is an opinion); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545, 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) ("exercise of judgment" in accounting, including for bonus expenses, results in data that is "a statement of opinion"); *Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) ("expectations for the future" are opinions).

*re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events.").

Interface's SEC filings also included certifications, required by the Sarbanes-Oxley Act, that management had "[e]valuated" disclosure controls and "concluded" that they were "effective."  AC ¶¶ 111, 113; *see also id.* ¶¶ 136, 146, 152, 159, 163, 171, 178, 185.  Those are also opinions.  *See e.g.*, *AmTrust*, 2019 WL 4257110, at *24–25.  Conclusions that controls are effective "do not purport to guarantee" that controls "will perform perfectly in every instance." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647–48 (S.D.N.Y. Sept. 29, 2017).  To allege that a SOX certification is false, Plaintiff must allege that "management did not, in fact, conduct the evaluations described" or that it identified a weakness not disclosed.  *Id.* at 648.  The AC alleges nothing of the sort.

### C.      The Accounting Adjustments Were Not Material.

The AC fails to allege that any error was material.  Materiality requires a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available."  *Basic Inc.* v. *Levinson*, 485 U.S. 224, 231–32 (1988) (citation omitted).  In the context of accounting errors, Courts should consider "both quantitative and qualitative factors."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Alleged misstatements of less than 5% are presumptively immaterial.  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015).  In determining the relevant denominator, "the items in issue should be compared to *like items* on the corporate financial statement."  *Dekalb Cnty. Emps.' Ret. Sys.* v. *Controladora Vuela Compañía de Aviación, S.A.B. de C.V.*, No. 15-cv-1337, 2016 WL 3685089,

at *3 (S.D.N.Y. July 6, 2016) (emphasis added) (citing *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000)).  The "like item" should most directly correspond to the alleged error.

The appropriate denominator for the incentive compensation quarterly accruals is quarterly expenses.  *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n* v. *MDC Partners, Inc.*, No. 15-cv-6034, 2016 WL 5794774, at *13–15 (S.D.N.Y. Sept. 30, 2016) (selecting total annual expenses as "the more appropriate comparison" for alleged under-reporting of CEO's compensation); *cf. Tabak* v. *Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013) (selecting total revenue for the quarter and year).  When aggregated, the alleged under-accruals are small—at most *1.08%* of total expenses.

| Period | Alleged Under-Accrual | Expenses | Error as % of Expenses |
|--------|----------------------|----------|------------------------|
| 2Q15 | $1,580,000 | $230,418,000 | 0.69% |
| 3Q15 | $2,423,000 | $223,384,000 | 1.08% |
| 4Q15 | $974,000 | $218,964,000 | 0.44% |
| 1Q16 | $1,436,000 | $201,527,000 | 0.71% |
| 2Q16 | $1,725,000 | $216,409,000 | 0.80% |

*See* Ex. I.

The alleged over-valuation of consultant's life insurance policy also is immaterial.  The collateral was an asset (AC ¶ 55), so the appropriate denominator is total assets.  *ECA*, 553 F.3d at 204.[10]  The alleged over-valuation was at most 0.13% of Interface's total assets.

| Period | Alleged Over-Valuation | Total Assets | Percentage |
|--------|-----------------------|--------------|------------|
| 2Q15 | N/A | $770,165,000 | N/A |
| 3Q15 | $697,000 | $749,895,000 | 0.09% |
| 4Q15 | $653,000 | $756,549,000 | 0.09% |
| 1Q16 | $994,000 | $776,472,000 | 0.13% |
| 2Q16 | $179,000 | $765,119,000 | 0.02% |

*See* Ex. I.

---

[10]   *Hutchison* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 488–89 & n.5 (2d Cir. 2011) (assessing $7.8 million impairment charge on value of loan against defendant's $1.1 billion total investment portfolio).

Plaintiff's attempt to use net income and EPS as the denominator should be rejected.[11] The alleged errors appear larger as a percentage of net income and EPS only because Interface was a low-margin company, whose net income was 7.2% (2015) or 5.7% (2016) of revenue (net sales).  *See* Ex. D at 19.  Because income "can vary so widely period to period," it provides "no real standard on which to judge the significance of the accounting error."  *Edward J. Goodman Life Income Tr.* v. *Jabil Circuit, Inc.*, 594 F.3d 783, 792 (11th Cir. 2010).  The AC's focus on it suggests that Plaintiff is "picking the metric that will yield the highest percentage values," *id.,* rather than the one that is most similar to the item under review.

No qualitative factor overcomes the quantitative immateriality of the alleged misstatements.  AC ¶¶ 216–19.  The alleged errors did not change losses into income, or conceal a declining trend.  *See id.*  While the AC alleges that the errors "hid[ ] a failure to meet analysts' consensus expectations" for EPS (*id.* ¶¶ 8, 216), that occurred, at most, in only two quarters, only one of which is during the class period.  *See* Ex. F.

## II.   <u>The AC Fails to Allege a Strong Inference of Scienter.</u>

The AC also fails to plead "particular[ized] facts" that give rise to a "strong inference" of scienter, *i.e.*, an "intent 'to deceive, manipulate or defraud.'"  *W. Virginia Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*, 344 F. App'x 717, 719 (2d Cir. 2009) (emphasis omitted) (quoting *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319, 324 (2007)).  A strong inference must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  To allege corporate scienter, the AC must plead "a strong

---

[11]   *See, e.g.*, *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 152 (S.D.N.Y. 2015) (rejecting plaintiff's reliance on smaller line item); *Tabak*, 549 F. App'x at 27; *Xu* v. *Gridsum Holding Inc.*, No. 18-cv-3655, 2020 WL 1508748, at *8–9 (S.D.N.Y. Mar. 30, 2020) (similar).

inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.,* 531 F.3d 190, 195 (2d Cir. 2008).[12]

The AC fails to allege either that Defendants "had the motive and opportunity to commit fraud," or "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA,* 553 F.3d at 198.  To allege motive, Plaintiff must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." *Id.*  To allege conscious misbehavior, Plaintiff must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted).  The AC fails to allege either.

**A.      The AC Fails to Allege Any Motive to Defraud.**

The AC attempts to allege motive based on stock sales by Hendrix and Lynch (AC ¶¶ 234–36) and Interface's incentive compensation plan (*id.* ¶¶ 254–57).  Neither is plausible.

Insiders commonly sell stock for various non-fraudulent reasons, including to monetize compensation or to diversify personal investments.  To allege scienter, a plaintiff must allege sales that are "unusual or suspicious," *City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*, 412 F. Supp. 3d 206, 225 (E.D.N.Y. 2019), which requires sales "dramatically out of line with prior trading practices" and "at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96-cv-8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), *aff'd sub nom.*, *Kwalbrun* v. *Glenayre Techs., Inc.*,

---

[12]   To impute an officer's intent to the company, the officer must be at the "management level," which typically is limited to the C-Suite.  *Barrett* v. *PJT Partners, Inc.*, No. 16-cv-2841, 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017).  During the relevant period, when Bauer was only the controller, he was below the management level.  *See Thomas* v. *Shiloh Indus.*, No. 15-cv-7449, 2017 WL 2937620, at *3–5 (S.D.N.Y. July 7, 2017).

201 F.3d 431 (2d Cir. 1999); *see In re Henry Schein, Inc. Sec. Litig.*, No. 18-cv-01428, 2019 WL 8638851, at *20–21 (E.D.N.Y. Sept. 27, 2019).  Plaintiffs must allege "net profits rather than their gross proceeds," and the "overall percentage changes in the defendants' holdings."  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013).  "[P]roceeds alone say nothing about a seller's motive."  *Chapman* v. *Muller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (quoting *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011)).

The AC fails to allege suspicious sales.  It simply lists Hendrix's and Lynch's sales (AC ¶¶ 235–36), without attempting to explain why they were unusual or timed to maximize profits beyond noting that the sales occurred sometime after the alleged accounting errors were made.  *See id.* ¶ 236.  To the contrary, those sales were consistent with their pre- and post-class period trading.  Ex. J at 1; Exs. K, L; *see In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 359–60 (S.D.N.Y. 2020).  The AC also fails to allege that Hendrix or Lynch received significant net profits, substantially disposed of their overall holdings, or made well-timed sales.  *See Gentiva*, 932 F. Supp. 2d at 381 (no inference of scienter where complaint failed to allege sales "soon after" misstatements).  There is no pattern of sales after the alleged misstatements or before the alleged corrective disclosures.  Ex. J at 1–2; Exs. K, L; *see Chapman*, 466 F. Supp. 3d at 412  (no inference of scienter for sales that did not occur "immediately prior to a negative disclosure").

Also, all of Lynch's sales, and more than 80% of Hendrix's, during the class period were pursuant to Rule 10b5-1 trading plans.  Exs. K, L.  Planned sales give rise to no inference.  *City of Warren*, 412 F. Supp. 3d at 226.  Although the plans were created during the class period, the AC does not allege "manipulative intent involved in the trading plan[s]."  *Id.*  Nor are Hendrix's un-planned sales, which occurred after he announced his retirement, at all suspicious.  *See* AC

¶ 156; Ex. J at 1; Ex. K; *see Chapman*, 466 F. Supp. 3d at 412 (sales after retirement "not inherently suspicious").  And, any inference of scienter is further undermined by Gould's and Hausmann's *increase* in net holdings during the class period and the fact that *neither sold any shares* during the class period.  Ex. M at 1–2; Exs. N, O; *see Fishbaum* v. *Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999) ("inferences of scienter can be undermined when an insider's sales of stock are offset by even larger stock acquisitions during the relevant time period"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382 (E.D.N.Y. 2003) ("net acquisition of shares cuts against the notion that defendants sought to unload their holdings . . . before their likely diminution in value following the disclosure of negative insider information").

Nor does incentive compensation provide motive.  Nearly all companies have such compensation, so the purported motive is too generalized.[13]  Plaintiff must allege "concrete benefits."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted).  The AC does not allege that any error increased incentive compensation by one share or one dollar.  Cash bonuses were tied to targets for OIBI and cash flow, not EPS.  *Supra*, p. 4.  And stock awards were tied to annual targets for EPSD (EPS plus dividends), not quarterly EPS.  *Supra*, p. 5.  The AC does not allege that the errors had any effect on OIBI or cash flow, or that they made a difference in whether the EPSD targets were met.  Moreover, *annual* targets provide no incentive to defer expenses within the same year.

###    B.    The AC Fails to Allege Conscious Misbehavior or Recklessness.

Because the AC fails to allege motive, "the strength of the circumstantial allegations must be correspondingly greater."  *ECA*, 553 F.3d at 198–99.  Although the AC is not clear, it appears

---

[13]    *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *In re Donna Karan Int'l Sec. Litig.*, No. 97-cv-2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998).

to allege conscious misbehavior based on GAAP violations and the SEC investigation.  *See* AC

¶¶ 35–89, 99, 189–212, 248.  Neither suffices.

GAAP violations are insufficient to allege scienter.  *Chill* v. *Gen. Elec. Co.*, 101 F.3d

263, 270 (2d Cir. 1996).  "This is nowhere more true than" here, where "the application of

GAAP to a particular set of circumstances requires the exercise of judgment."[14]  The small

magnitude of the alleged errors (*supra*, pp. 5–6, 11–12) further weighs against scienter.[15]  It is

not plausible that management would commit fraud to boost EPS by only a few cents, and to

receive no personal benefit from doing so.  Indeed, Interface's historical performance versus

"consensus" is inconsistent with Plaintiff's theory.  Interface "missed" consensus about as often

as it "met" or "beat" it, including during Lynch and Bauer's tenure.  *See* Ex. B.  If Lynch and

Bauer were managing earnings to meet consensus, one would expect them to have come up with

the 1 cent needed to "meet" in 4Q15 or the few cents need to meet in other quarters.  *See supra*,

p. 6.

The SEC investigation, which began in November *2017*, also does not create an inference

of scienter during that period, much less in the earlier period of the alleged GAAP errors (2015

and 2016).  "Securities regulators are obligated to examine the behavior of public corporations,

and the fact that a regulator is fulfilling this role cannot be sufficient to allege scienter."  *In re*

---

[14]  *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 585 (S.D.N.Y. 2020); *see also Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (no inference of scienter from GAAP violations where "discretion is necessarily involved").

[15]  *Shiloh Indus.*, 2017 WL 1102664, at *4 (scienter "less plausible" where effect of accounting errors was "modest"); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014) ("modest size" of restatement "undercuts" inference of fraud."), *aff'd*, 616 F. App'x 442 (2d Cir. 2015); *cf. In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2012) ("failing to detect a fraud of large magnitude provides some circumstantial evidence of scienter").

*Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011). The same is true of an internal investigation. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016).

### C.    The AC's Remaining Theories Are Insufficient to Plead Scienter.

Unable to allege motive or conscious misbehavior, Plaintiff relies on several additional, defective theories that create no inference at all. The allegation that the Individual Defendants discussed EPS (AC ¶¶ 25, 27–28, 237–42) invokes the dubious "core operations" doctrine, which does not apply (because incentive compensation and insurance are not the "core" of Interface's business, which would be carpets) and which the Second Circuit has repeatedly questioned as a viable method for pleading scienter. *See, e.g., Zheng* v. *Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) (Second Circuit has "questioned" whether doctrine "survived the enactment of the PSLRA"); *Glaser*, 772 F. Supp. 2d at 596 n.17 ("questionable" whether doctrine "survived the PSLRA at all"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (similar).

The Individual Defendants' signature on the SOX certifications (AC ¶¶ 111, 113, 251–53) likewise "'add nothing substantial to the scienter calculus' because permitting those 'certifications to create an inference of scienter in every case where there was an accounting error would eviscerate the pleading requirements for scienter set forth in the PSLRA.'" *In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-cv-6180, 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021) (ellipsis and citation omitted); *see also Zheng*, 379 F. Supp. 3d at 181. SOX certifications are necessarily "[b]ased on [the officer's] knowledge" and "based on [their] evaluation." AC ¶¶ 111, 113. Nor do "[g]eneralized assertions of access to books and records and other sources of knowledge." *Pope Investments II LLC* v. *Deheng Law Firm*, No. 10-cv-6608, 2011 WL 5837818, at *6 (S.D.N.Y. Nov. 21, 2011).

As to Lynch's resignation (AC ¶¶ 249–50), only "highly unusual and suspicious" resignations can contribute to an inference.  *In re The Hain Celestial Grp. Inc. Sec. Litig.*, No. 16-cv-4581, 2019 WL 1429560, at *18 (E.D.N.Y. Mar. 29, 2019); *Glaser*, 772 F. Supp. 2d at 598.  Here, the AC fails to allege that his resignation was "somehow tied to the fraud alleged" or "somehow alerted defendants to the fraud."  *Glaser*, 772 F. Supp. 2d at 598.  Lynch retired after 20 years of service, continued to serve as CFO during the search for his successor, and was not terminated for cause.  *See* Ex. P.  In addition, he resigned 4 months after the last alleged error and a year and a half before the start of the SEC inquiry.  *See Hein*, 2019 WL 1429560, at *18.

Finally, Interface's admission-free settlement with the SEC of an allegation of negligence (AC ¶¶ 243–48) does not suggest scienter.  *See MicroCapital Fund LP* v. *Conn's Inc.*, No. 18-cv-1020, 2019 WL 3451153, at *18 (S.D. Tex. July 24, 2019) ("Because the SEC's claims are based on negligence and specifically acknowledge that the SEC does not need to prove scienter, [the SEC complaint and consent judgments] provide no support for the proposition of Defendants' actual knowledge at the time. . . .  Therefore, this contributes little, if at all, to an inference of scienter."); *In re Serologicals Sec. Litig.*, No. 00-cv-1025, 2003 WL 24033694, at *10 (N.D. Ga. Feb. 20, 2003) (allegations derived from SEC order that did not allege fraud failed to support scienter).

**III.   <u>The AC Fails to Allege Loss Causation.</u>**

The AC also fails to allege loss causation, *i.e.*, "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiff relies on a corrective disclosure theory of loss causation (*see* AC ¶¶ 270–75), which requires Plaintiff to plausibly allege (i) "a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected," and (ii) "that the market reacted negatively to the corrective disclosure."  *In re Henry*

19

*Schein*, 2019 WL 8638851, at *24; *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (to be "corrective," a disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint").  The AC fails to allege loss causation, for either date, for several reasons.

### A.     All Relevant Accounting Charges Were Revealed in 2015 and 2016.

All of the alleged balance-sheet effects of the alleged under-accruals and over-valuations materialized, and were disclosed, in 2015 and 2016 when the incentive compensation was paid and when the collateral was removed from Interface's balance sheet.  *Supra*, pp. 4–5.  Plaintiff does not allege that, in 2019 or 2020, any expense was yet to be paid or that any over-valued asset was still on Interface's books.[16]  Rather, the AC alleges that, in 2019 and 2020, it was revealed that already-paid expenses should have been paid even earlier and that an already-removed asset should have been removed even earlier.  AC ¶¶ 268–80.  That is, at most, a "negative characterization of already-public information," which, as a matter of law, cannot constitute a corrective disclosure.  *Omnicom*, 597 F.3d at 512; *see Meyer* v. *Greene*, 710 F.3d 1189, 1197–1200 (11th Cir. 2013) (presentation containing "in-depth analysis of information not readily available to the investing public," including that company's real estate assets needed to be impaired, was not corrective where presentation was based on publicly available information, plaintiffs invoked the efficient market theory, and thus the information was already reflected in the stock price).

---

[16]   *Cf. Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 257–58 (S.D.N.Y. 2010) (undisclosed losses not yet charged); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 306–07 (S.D.N.Y. 2005) (undisclosed debts not yet paid); *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 390–91, 402–03 (S.D.N.Y. 2005) (assets presently over-valued); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 240 (S.D.N.Y. 2010) (same).

### B.      Any New Information in 2019 and 2020 Was Not "Corrective."

Any additional disclosure, beyond the balance-sheet effects, was not "corrective."  As to

the SEC investigation, "[t]he announcement of an investigation reveals just that—an

investigation—and nothing more."  *Meyer*, 710 F.3d at 1201 (collecting cases).  Although such

an announcement may "portend an added *risk* of future corrective action," that is not equivalent

to a revelation to the market that a company's prior statements were false or fraudulent.  *Id.*  As

such, the announcement of an SEC investigation cannot constitute a corrective disclosure.  *Id.*;

*Metzler Inv. GMBH* v. *Corinthian Colls., Inc.*, 549 F.3d 1049, 1063–65 (9th Cir. 2008).[17]  That is

particularly so where, as here, Interface had no duty to make greater or earlier disclosure of the

SEC investigation.  *See In re XP Inc. Sec. Litig.*, No. 20-cv-1502, 2021 WL 861917, at *9–10

& n.9 (E.D.N.Y. Mar. 8, 2021) (Cogan, J.); ECF 38 at 2 n.3.

Nor was Bauer's placement on leave (AC ¶¶ 97, 270) "corrective."  Interface attributed it

to conduct in 2018 (not 2015 and 2016) and stated that his conduct "had no impact on the EPS

calculations."  *Id.* ¶ 97.  That "corrected" nothing.  *Omnicom*, 597 F.3d at 511–12 (resignation

announcement not "corrective" where it did not reveal new information concerning the alleged

fraud).

### C.      The AC Fails to Allege a Stock Price Drop After the SEC Settlement.

The September 2020 date suffers from the same defects, plus one more.  The SEC

settlement was announced before the start of trading on Monday, September 28 (*see* Ex. Q), and

the stock price *increased* that day, from $6.26 to $6.38 (up 1.92%).  Ex. G.  The AC thus fails to

---

[17]   *See also Janbay* v. *Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *15–16
(S.D.N.Y. Mar. 30, 2012); *In re Maxim Integrated Prods., Inc. Secs. Litig.*, 639 F. Supp. 2d
1038, 1047 (N.D. Cal. 2009); *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1220–21
(E.D. Wash. 2005).

satisfy an additional requirement of loss causation: that the corrective disclosure "negatively affected the value of the security." *Lentell*, 396 F.3d at 173; *see Waters* v. *Gen. Elec. Co.*, No. 08-cv-8484, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) ("The Court cannot find, and Plaintiffs have not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud."), *aff'd sub nom.*, *GE Invs.* v. *Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011).[18]

Unable to allege a stock price drop on September 28, the AC alleges that the stock price dropped *the next day*. AC ¶ 11. That is foreclosed by the AC's allegation that Interface trades in an efficient market. *Id.* ¶ 19; *cf. Meyer*, 710 F.3d at 1197–99 (loss causation not pleaded where allegations violated efficient market hypothesis). An efficient market "reflects all publicly available information," *Basic*, 485 U.S. at 246 & n.24, and does so "rapidly." *Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Rapidity requires that new information be reflected after a single trading day, if not faster.[19]

---

[18] That the stock price increased also reinforces the lack of correction. *See Weiss* v. *Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 946–47 (D. Ariz. 2007).

[19] *Strougo* v. *Barclays PLC*, 312 F.R.D. 307, 317 n.62 (S.D.N.Y. 2016) ("In an efficient market, stock prices should show statistically significant abnormal returns on days in which unexpected, material information is released into the market."); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 600 n.5 (S.D.N.Y. 2010) (EMH requires 1-day window, as "long event windows may include noise and information from other events, making it difficult to isolate the impact of the relevant event"); Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law. 545, 557 (1994) ("stock prices react quickly to the arrival of new information, often within a matter of seconds"); *see also In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 9 (1st Cir. 2005) (slow price reaction would create arbitrage opportunities inconsistent with EMH); John Finnerty & George Pushner, *An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions*, 8 Stan. J.L. Bus. & Fin. 213, 251 n.14 (2003) ("If the corrective disclosure is made during market hours, most studies show that the new information is incorporated in the stock price within 10 minutes. If it is revealed on day N during market hours, the close on day N should be the true price.").

In addition, the stock price quickly rebounded (Ex. H), which further "refutes the inference" of loss causation. *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021); *cf. In re Manulife*, 276 F.R.D. at 104 (loss causation implausible where plaintiff failed to explain rebound in stock price).

**IV.**     **The AC Fails to Allege a Control Person Claim.**

To state a section 20(a) claim, Plaintiff must allege (1) a primary violation by Interface, (2) control of Interface by the Individual Defendants, and (3) "culpable participation" by the Individual Defendants. *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Culpable participation, at a minimum, requires scienter. *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825, 2008 WL 2795927, *7 (E.D.N.Y. July 18, 2008). Because the AC fails to allege a primary violation or culpable participation as to any Individual Defendant, the claim should be dismissed.

**Conclusion**

The AC should be dismissed in its entirety and with prejudice.

Date:  June 16, 2021

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  */s/ Daniel J. Kramer*
Daniel J. Kramer
Harris Fischman
Shane D. Avidan
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
dkramer@paulweiss.com
hfischman@paulweiss.com
savidan@paulweiss.com

*Counsel for Interface, Inc., Daniel T. Hendrix, Bruce A. Hausmann and Patrick C. Lynch*

SQUIRE PATTON BOGGS (US) LLP

By:  */s/ David Long-Daniels*
David Long-Daniels
(*pro hac vice*)
1230 Peachtree Street NE, Suite 1700
Atlanta, GA 30309
Phone:  (678) 272-3200
Fax:  (678) 272-3211
david.long-daniels@squirepb.com

*Counsel for Jay D. Gould*