# Exhibit A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 10854 / September 28, 2020

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 90018 / September 28, 2020

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4175 / September 28, 2020

**ADMINISTRATIVE PROCEEDING**
File No. 3-20085

| | |
|---|---|
| **In the Matter of**<br><br>   **INTERFACE, INC.,**<br>   **GREGORY J. BAUER, CPA,**<br>   and<br>   **PATRICK C. LYNCH, CPA,**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Interface, Inc. ("Interface") pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Gregory J. Bauer, CPA ("Bauer"), pursuant to Section 8A of the Securities Act, Sections 4C[1] and 21C of the

---

[1]    Section 4C provides, in relevant part, that:

Exchange Act, and Rule 102(e)(1)(iii) of the Commission's Rules of Practice,[2] and against Patrick C. Lynch, CPA ("Lynch") pursuant to Sections 4C and 21C of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

## II.

In anticipation of the institution of these proceedings, Interface, Bauer, and Lynch (collectively "Respondents") have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Securities Exchange Act of 1934, and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

### SUMMARY

1.      From the second quarter of 2015 through the second quarter of 2016, Interface, a global designer and manufacturer of modular carpet, reported earnings per share ("EPS") that did

---

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]      Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found … to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

[3]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

not accurately reflect the company's underlying performance.  During these five consecutive financial quarters, Interface's then-Corporate Controller, Bauer, directed or otherwise caused his subordinates to book unsupported, manual accounting adjustments to Interface's management bonus accruals, expenses related to a key independent consultant ("Consultant"), and stock based compensation.  These adjustments did not comply with generally accepted accounting principles ("GAAP") and artificially inflated Interface's income and EPS, which resulted in Interface meeting or beating consensus estimates for EPS and showing earnings growth.  Interface's then-Chief Financial Officer ("CFO"), Lynch, also caused Bauer to direct entries in two quarters that lacked support and did not comply with GAAP.  Bauer and Lynch were able to direct or cause these improper adjustments because Interface failed to have sufficient accounting controls or procedures in place to prevent unsupported, manual, period end, journal entries.  Interface lacked critical journal entry controls and Bauer's subordinate accountants were not knowledgeable in GAAP.

2.	The adjustments and misstatements were also material to Interface's financial statements and caused Interface to make false disclosures in public filings, press releases, and earnings calls about its actual EPS results, its earnings growth, and its pattern of meeting or beating consensus analyst estimates.  Had Lynch and Bauer ensured the financial statements complied with GAAP, Interface's reported earnings would have been more volatile than reported, and in two quarters in which it reported meets of analyst consensus EPS, Interface would have in fact missed the consensus estimates.  Consequently, Interface's conduct was materially misleading to investors in violation of the federal securities laws.

## RESPONDENTS

3.	Interface is a Georgia corporation with its principal place of business located in Atlanta, GA.  The company's shares are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ Exchange under the symbol "TILE."  Interface files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

4.	Bauer, age 44, resides in Smyrna, GA, and is a CPA licensed in the State of Georgia.  Bauer was Interface's Vice President and Controller from 2011 through October 2017, at which time he was promoted to the position of Vice President of Finance and Chief Accounting Officer.  Interface placed Bauer on paid administrative leave on April 23, 2019, and terminated his employment on July 15, 2020.

5.	Lynch, age 50, resides in Marietta, GA and is a CPA licensed in the State of Georgia.  His license lapsed in approximately 2004.  Lynch was Interface's CFO from June 2001 to November 2016, at which time he left Interface to be the CFO of another company.  From May 2019 to the present, Lynch has served as the CFO of a privately-held consolidating subsidiary of a public holding company.

**FACTS**

**Second Quarter of 2015**

6.      In Q2 2015, Interface reported EPS of $0.33 and its earnings release stated that it had "finished with earnings per share that tied our all-time record in the fourth quarter of 2007." In truth, Interface did not achieve record EPS in Q2 2015 because it understated its actual expenses for management bonuses by $1.58 million, which in turn inflated its pre-tax income by 5% and its EPS by $0.02.

7.      In early June 2015, after learning that Interface was required to pay an unexpected $725,000 death benefit, Bauer directed a $500,000 reduction to the management bonus accrual. Bauer's contemporaneous instruction stated that decreasing the bonus accrual would limit to about "a 250k hit" the net income impact of the unexpected death benefit expense.

8.      Bauer's decision to reduce the management bonus accrual in order to offset the surprise death benefit expense did not comply with GAAP.

9.      Interface paid non-discretionary management bonuses based on the achievement of established targets for operating income before incentives ("OIBI") and cash flow.  If Interface met the stated "goal" for those targets, management would receive 100% of their bonus potential.  If Interface exceeded the goal, management would receive up to a maximum, 150%, of their bonus potential depending on the amount by which the goal was exceeded.

10.      The internal financial forecasts reviewed by Lynch and Bauer and provided to the board of directors in Lynch's monthly and quarterly board reports reflected Interface's best estimates for probable OIBI and cash flow. Throughout the relevant period, Lynch and Bauer understood the formulas for calculating the bonus amount.  During the quarterly closing process, they both reviewed the bonus accrual and together determined whether to book any adjustments to it.

11.      At the time that Bauer improperly reduced the bonus accrual by $500,000, Interface's best estimate was that annual bonuses at levels far greater than 100% would be paid. Reducing the accrual by $500,000, however, caused Interface's accrual level to fall far below the 100% level.

12.      During the closing process for the second quarter, when Interface was on track to report an all-time record EPS of $0.33, Bauer kept the accrual level at well below 100% despite the best estimates that showed a maximum, 150%, annual bonus was probable to be paid.  As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.

13.      As a result and in total, Interface's management bonus accrual and related expenses for Q2 2015 were understated by approximately $1.58 million, or 5% of pre-tax income, and its EPS was falsely inflated by $0.02.

**Third Quarter of 2015**

14.    In Q3 2015, Interface publicly reported that it had met consensus estimates for EPS of $0.31, reflecting a continued pattern of meeting or beating analyst estimates for four consecutive quarters.  In truth, Lynch and Bauer had directed unsupported accounting entries and otherwise misstated expenses, which inflated Interface's pre-tax income by 12%, or a total of over $3.12 million.  Rather than report a meet of consensus EPS estimates, Interface should have reported a $0.04 miss.

15.    The first set of improper entries in Q3 2015 concerned Interface's accounting for a collateral split dollar life insurance arrangement that Interface had with its independent Consultant.  Under this arrangement, Interface agreed to pay for the annual premiums for a whole life insurance policy owned by the Consultant.  The Consultant, in turn, agreed to repay those premiums to Interface in or around May 2016.  As collateral for the premiums Interface paid, the Consultant assigned to Interface the cash surrender value ("CSV") of his policy up to the amount of the premiums paid.  Any amount of the policy's CSV in excess of the premiums paid belonged to the Consultant outright, with certain defined exceptions that did not and were not probable to occur.  Based on the plain language of Interface's agreement with the Consultant, the value of the CSV as reflected on Interface's books should have never exceeded the amount of unreimbursed premiums paid.  Yet Interface historically recorded the full value of the CSV on its balance sheet.

16.    During Q3 2015, Bauer learned that the asset would need to be written down by the amount recognized in excess of the premiums paid, $871,140.  He also learned that the Consultant would likely reimburse Interface for the premiums paid in May 2016.  Yet Bauer did not immediately write down the asset.  Contrary to GAAP, Bauer instead began a process of bleeding the value down in equal increments of $87,114 over ten months.  By the end of the quarter, Bauer had recorded just $174,228 against the $871,140 excess valuation.  As a result, Interface's CSV asset and associated income were inflated by approximately $697,000 (the difference between $871,140 and $174,228).  This error, standing alone, increased Interface's EPS by almost $0.01, and, if it had been recorded properly, would have changed Interface's reported meet of consensus estimates to a miss.

17.    The second set of improper entries in Q3 2015 concerned Interface's stock based compensation and management bonus.  In October 2015, Interface's finance department prepared the first draft of Interface's Q3 2015 consolidated internal financial statements, which showed that actual EPS for the quarter was $0.02 shy of the $0.31 analyst consensus estimate.  Bauer unreasonably directed his staff to book adjustments to achieve "a pick up of about 740k," and later that same day, Bauer and his staff improperly reduced the expense for a stock grant by $628,000.  The adjustment did not comply with GAAP and artificially inflated Interface's EPS by almost $0.01.  Standing alone, correcting this error would have changed Interface's reported meet of consensus estimates to a miss.

18.    On the same day that Bauer reduced the stock grant expense, he also directed his staff to increase the management bonus accrual by only $100,000 even though Interface's best estimates for OIBI and cash flows indicated that the management bonus liability was under-

5

accrued by approximately $1.67 million. The stated justification for the entry was to "correct bonus accrual," but the adjustment still left the bonus accrual – and associated expenses – understated by approximately $1.57 million in Q3 2015. As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy. As a result, Interface avoided reporting a $0.016 reduction to its EPS for the quarter and a miss of consensus estimates.

19.     A third and final set of entries concerned the annual bonus that Interface was obligated by contract to pay its Consultant. Updated Q3 2015 internal financial statements reflected the adjustments described in the forgoing paragraphs, but still showed actual EPS to be just shy of consensus estimates. Lynch and Bauer subsequently and unreasonably directed the full reversal of the $225,000 that had been accrued to date for the Consultant's bonus. This last-minute manual adjustment did not comply with GAAP. The Consultant's bonus was paid *pro rata*, and thus, it was incorrect to reverse the full (or any) amount. This error artificially boosted Interface's EPS by $0.002 – just enough for Interface to round up to $0.31 and report a meet of analyst consensus EPS estimates.

20.     In total, Interface's income for Q3 2015 was overstated by approximately $3.12 million, or 12% of pre-tax income, and its EPS was inflated by $0.04.

**Fourth Quarter of 2015**

21.     In Q4 2015, Interface reported a quarterly EPS of $0.28 and an annual EPS of $1.10, which represented a record for Interface and a $0.02 beat of consensus estimates for the year. While the quarter's EPS was a $0.01 miss of consensus, it was just enough to allow Interface to report a $0.02 beat of estimates for the year, and Interface's earnings release highlighted that the "fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share." In truth, however, Interface's results were artificially inflated by Bauer's adjustments to the Consultant's bonus, the CSV, and the management bonus. Had the financial statements complied with GAAP at the end of 2015, Interface would have reported a $0.03 miss of the consensus for the quarter, and instead of beating analyst consensus estimates for the year, Interface would have reported only a meet.

22.     After the third quarter's books had closed and the company reported that it met analyst consensus EPS estimates, Bauer resumed the monthly accrual for the Consultant's bonus. By year end, Interface had accrued a balance of only $75,000 even though the Consultant was due his full $300,000 bonus. However, neither Lynch nor Bauer directed the $225,000 increase required to make up for the reversal in the previous quarter.

23.     Bauer also directed unsupported adjustments to the Consultant's CSV. During the closing process for the quarter, Bauer directed his financial manager to "reverse half…for now" of the approximately $436,000 they had recorded by that time to write down the CSV asset as part of their improper bleed down process. This adjustment did not comply with GAAP and served only to artificially reduce expense by approximately $218,000. A few days later, Bauer also stopped the monthly bleed-down. As a result, Interface overstated the CSV asset and

6

associated income by approximately $653,000, which in turn inflated its quarter-end and year-end EPS by $0.01.

24.     Less than an hour after he had directed the $218,000 CSV expense reduction, Bauer also directed that a $350,000 balance he had in another liability account be used to decrease expense generally by $150,000 and increase the management bonus accrual by $200,000 without any corresponding increase to bonus expense.  Bauer's adjustments did not comply with GAAP, as Interface's internal financial statements and best estimates at the time made clear that the bonus was under-accrued by approximately $949,000.  As CFO, Lynch also should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.  By increasing the accrual by only $200,000, Interface's bonus accrual and related expenses remained understated at year end by approximately $749,000, which in turn inflated its quarter-end and year-end EPS by $0.01.

25.     In total, Bauer's improper adjustments and Lynch's failure to ensure the bonus accruals were accurate caused Interface to overstate income by a total of $1.63 million, or 7% of the quarter's pre-tax income.  They also caused Interface's EPS to be inflated by $0.02.  In reality, Interface should have reported EPS of $0.26 for the quarter and $1.08 for the year.

**First Quarter of 2016**

26.     In Q1 2016, Interface reported an EPS of $0.20, meeting consensus estimates and representing a quarter-over-quarter increase of $0.01.  However, these results were inflated because Lynch and Bauer had directed unsupported adjustments to the bonus accruals and otherwise caused Interface's stock based compensation expense to be understated.  Bauer also directed unsupported and improper adjustments to the CSV.  Given these adjustments, rather than report growth and a meet of consensus, Interface should have reported an EPS of just $0.17 – a $0.02 quarter-over-quarter decline and a $0.03 miss of consensus.

27.     During the Q1 2016 closing process, when weak sales weighed down Interface's performance, Bauer directed that the remaining $218,000 CSV write-down balance be reversed in full.  That same day, Lynch and Bauer directed their staff to reverse the entire $740,000 balance in the management bonus accrual even though Interface's best estimates for OIBI and cash flow suggested that an accrual of approximately $1 million was necessary in the quarter. Together, these adjustments – which did not comply with GAAP – resulted in an immediate $958,000 increase to income and a $0.01 increase in EPS.

28.     A few days later, and after discussing with Lynch how the company would "articulate to [the] street" its declining sales trends, Bauer directed his financial manager to increase the CSV asset's value another $210,000, stating simply, "Think we are gonna need that cash surrender value…."  Given this asset increase and Interface's intervening payment of another premium, Bauer continued to overstate the CSV asset, now by a total of $994,000.  Like the other entries Bauer directed, this CSV adjustment did not comply with GAAP, increased EPS, and enabled Interface to report a $0.20 meet of consensus estimates.

29.     Lynch and Bauer also caused Interface to understate the company's stock based compensation expense in Q1 2016, allowing the company to report an EPS meet.  Although the internal financial statements and best estimates for annual EPS plus dividends ("EPSD") showed it was probable that one of the company's stock grants would vest in full by the end of the year, Interface did not record any associated increase in expense.  As CFO and Controller, respectively, Lynch and Bauer should have known that the stock expense accrual level did not match the levels indicated by the company's best estimates for EPSD, but took no steps to ensure its accuracy.  As a result, Interface's stock expense for the quarter was understated by approximately $387,000.

30.     In total, Interface's income for Q1 2016 was overstated by approximately $2.43 million, or 15% of pre-tax income, and its EPS was inflated by $0.03.

**Second Quarter of 2016**

31.     In Q2 2016, Interface reported EPS of $0.32, which Interface and its senior management described in the accompanying press release and earnings call as "strong," the "second best quarterly earnings ever," and "just a penny short of the all-time record."  In truth, Bauer had directed improper and unsupported accounting entries and otherwise improperly misstated expenses, which inflated Interface's pre-tax income by 7%, or approximately $1.9 million.  Interface's true EPS of $0.30 actually reflected a $0.03 quarter-over-quarter and $0.01 year-to-date decline in earnings.

32.     The first set of improper entries that Bauer directed concerned the CSV.  The day after Interface reported its Q1 2016 meet of analyst estimates for EPS, Bauer once again began bleeding down the CSV asset.  As expected, in May 2016, the Consultant fully reimbursed Interface for the premiums paid – leaving Interface with no claim to the CSV at all.  Instead of reducing the full value of the CSV asset, Bauer left $179,000 on Interface's books.  This error alone, if corrected at the time, would have cost Interface $0.01 in EPS due to rounding.

33.     The second set of improper entries concerned the management bonus accrual.  By quarter end, Interface's bonus accrual was at an approximate 50% achievement level given the improper reversal at the end of Q1 2016.  The company's internal financial statements and best estimates for OIBI and cash flows at the end of Q2 2016 showed a probable bonus achievement of approximately 69%  – indicating that Interface needed to increase expense to meet the expected liability.  Nevertheless, Bauer directed a $400,000 reduction in bonus expense, which increased reported EPS by one penny with rounding.  As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.  As a result of their conduct, Interface's management bonus accrual and related expenses were understated by a total of $951,000 in Q2 2016, which inflated EPS by $0.01.

34.     Lynch and Bauer also caused Interface to understate its stock based compensation expense in Q2 2016, which enabled it to report a $0.32 EPS.  As in the prior quarter, the internal financial statements and best estimates for EPSD showed it was probable that one of the company's stock grants would vest in full by the end of the year.  Nevertheless, Interface did not

record the associated increase in expense, and Interface's stock expense was therefore understated by a cumulative total of $774,000 in Q2 2016. As CFO and Controller, respectively, Lynch and Bauer should have known that the stock expense accrual level did not match the levels indicated by the company's best estimates for EPSD, but took no steps to ensure its accuracy. Correcting this error at the time would have cost Interface almost another $0.01.

35.    In total, Interface's income for Q2 2016 was overstated by approximately $1.9 million, or 7% of pre-tax income, and its EPS was inflated by $0.02.

**Interface Lacked Accurate Books and Records and Sufficient Internal Accounting Controls**

36.    These adjustments to Interface's expenses, which inflated EPS quarter after quarter, were made in part because Interface lacked sufficient internal accounting controls over (a) significant recurring accruals subject to management estimate including incentives and stock based compensation, (b) journal entries, and (c) period-end adjustments made during the closing process. Interface did not require, for example, corporate level accounting entries to have supporting documentation, and corporate finance staff regularly recorded manual adjustments with nothing more than an email or oral directive. In addition, Bauer's direct reports did not analyze or consider the propriety of the entries he directed, and Interface's Internal Audit function did not perform procedures sufficient to ensure adjustments directed by Lynch and Bauer had support and complied with GAAP.

37.    As a result, Interface's internal accounting controls were not designed or maintained to provide reasonable assurance that Interface's financial statements would be presented in conformity with GAAP. Interface's books, records and accounts also did not accurately and fairly reflect, in reasonable detail, Interface's transactions and disposition of assets.

**Conduct During the Investigation**

38.    Between November 2017 and March 2018, Interface employees caused Interface to produce documents in response to Commission investigative requests that were suggestive of contemporaneous support for journal entries that, in truth, did not exist at the time the entries were recorded. One of these employees also certified as contemporaneous business records certain documents that, in fact, had been modified after the investigation began. These shortcomings had the effect of impeding the staff's investigation.

39.    When Interface learned of these issues, Interface promptly informed the Staff, conducted an internal review, took disciplinary and remedial measures, and reported its findings.

**Sales of Interface Stock**

40.    Interface awarded restricted stock grants to certain executives and management under Interface's Omnibus Stock Incentive Plan. On July 30, 2015, Interface filed a Form S-8, registering an additional $4.9 million of shares at a maximum offering price per share of $23.46. The Form S-8 incorporated by reference all of Interface's subsequent annual and quarterly

reports filed thereafter until termination of the offering, including Interface's 2015 Form 10-K and its 2015 and 2016 Forms 10-Q filed during the relevant period.

41.     Lynch received Interface stock under the Omnibus Stock Incentive Plan and, pursuant to a 10b5-1 plan executed on March 14, 2016, sold a total of 7,500 shares for proceeds of $134,861 between March 18, 2016, and July 28, 2016.

42.     Bauer also received Interface stock under the Omnibus Stock Incentive Plan.  On March 10, 2016, he sold 8,270 shares of Interface stock for total proceeds of $138,283.

## VIOLATIONS

43.     Section 17(a)(2) of the Securities Act proscribes the receipt of "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  Section 17(a)(3) of the Securities Act proscribes engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  A violation of these provisions does not require scienter and may rest on a finding of negligence.  *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

44.     Section 13(a) of the Exchange Act requires issuers to file such periodic and other reports as the Commission may prescribe and in conformity with such rules as the Commission may promulgate.  Exchange Act Rules 13a-1, 13a-11, and 13a-13 require the filing of annual, current, and quarterly reports, respectively.  The obligation to file such reports embodies the requirement that they be true and correct.  *See, e.g., SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979).  In addition to the information expressly required to be included in such reports, Rule 12b-20 of the Exchange Act requires issuers to add such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.  A violation of these reporting provisions does not require scienter and may rest on a finding of negligence.  *See SEC v. Wills*, 472 F. Supp. 1250, 1268 (D.D.C. 1978).

45.     Section 13(b)(2)(A) of the Exchange Act requires Section 12 registrants to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of their assets.  Section 13(b)(2)(B) of the Exchange Act requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles.  Scienter is not an element of the books and records and internal control provisions.  *See Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003) (noting that a "plain reading of Section 13(b) reveals that it also does not impose a scienter requirement").

46.     Rule 13b2-1 also prohibits any person from directly or indirectly, falsifying or causing to be falsified, any book, record, or account subject to Section 13(b)(2)(A).  A violation of Rule 13b2-1 does not require scienter and may rest on a finding of negligence.  *World-Wide Coin Investments*, 567 F. Supp. 724, 749 (N.D. Ga. 1983).

**FINDINGS**

47.     Based on the foregoing, the Commission finds that Respondent Interface violated Securities Act Sections 17(a)(2) and 17(a)(3) and Exchange Act Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13.

48.     Based on the foregoing, the Commission finds that Respondent Bauer: (a) willfully[4] violated Securities Act Sections 17(a)(2) and 17(a)(3) and Exchange Act Rule 13b2-1; and (b) caused Interface's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

49.     Based on the foregoing, the Commission finds that Respondent Lynch: (a) willfully[5] violated Exchange Act Rule 13b2-1; and (b) caused Interface's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

**INTERFACE'S COOPERATION AND REMEDIAL EFFORTS**

50.     In determining to accept Respondent Interface's Offer, the Commission considered the cooperation and remedial acts promptly undertaken by Interface.  Interface has taken disciplinary action, enhanced review of the finance area, expanded and enhanced its corporate finance department, and instituted enhanced training, policies and procedures to prevent and detect the type of misconduct described in the Order.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.     Interface shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

B.     Bauer shall cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act and Sections 13(a),

---

[4]     A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).  There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id*. (quoting *Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965)).

[5]     *Id*.

13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 promulgated thereunder.

C.    Lynch shall cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13b2-1 promulgated thereunder.

D.    Bauer is denied the privilege of appearing or practicing before the Commission as an accountant.

E.    After three (3) years from the date of this order, Bauer may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Bauer's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.    a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.    an independent accountant.

Such an application must satisfy the Commission that:

(a)    Bauer, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)    Bauer, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the

12

respondent's or the firm's quality control system that would indicate that Bauer will not receive appropriate supervision;

(c) Bauer has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d) Bauer acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

F. The Commission will consider an application by Bauer to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Bauer's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

G. Lynch is denied the privilege of appearing or practicing before the Commission as an accountant.

H. After one (1) year from the date of this order, Lynch may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Lynch's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an

13

application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.      an independent accountant.

Such an application must satisfy the Commission that:

(a)      Lynch, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)      Lynch, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that Lynch will not receive appropriate supervision;

(c)      Lynch has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)      Lynch acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

I.      The Commission will consider an application by Lynch to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Lynch's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

J.      Interface shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $5,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

14

Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Interface as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita B. Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

K.    Bauer shall, within  ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $45,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341

6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Bauer as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita B. Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

L.      Lynch shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $70,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Lynch as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Anita B. Bandy, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

M.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agrees that they shall, within 30 days after entry of a final order

16

granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents Bauer and Lynch, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Bauer and Lynch under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Bauer and Lynch of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary