# Exhibit H

## Allegations of Falsity in the Amended Complaint
~~SEC's Allegations~~

~~On the basis of this Order and Respondents' Offers, the Commission finds[1] that:~~

### ~~SUMMARY~~

36.   ~~1. From~~Starting in the second quarter of 2015, and continuing through the second quarter of 2016, Interface~~, a global designer and manufacturer of modular carpet,~~ reported ~~earnings per share ("~~artificially inflated quarterly and year end EPS~~") that~~, which did not accurately reflect ~~the company's~~Interface's underlying performance.

37.   During ~~these five consecutive financial quarters, Interface's then-Corporate Controller, Bauer, directed or otherwise caused his subordinates to book~~this time period, Interface booked unsupported~~, manual~~ accounting adjustments to Interface's management bonus accruals, expenses related to ~~a key independent consultant ("~~the Consultant~~")~~, and ~~stock based~~stock-based compensation. ~~These adjustments~~ arrangements.

38.   Interface manually adjusted these metrics in a way that did not comply with ~~generally accepted accounting principles ("GAAP") and~~GAAP, thereby artificially ~~inflated~~inflating Interface's income and EPS, which resulted in Interface meeting or beating consensus estimates for EPS and ~~showing~~falsely reflecting earnings growth. Defendant Lynch also directed Interface's ~~then-Chief Financial Officer ("CFO"), Lynch, also caused Bauer to direct~~then-Corporate Controller, "Bauer", to enter journal entries in two quarters that wholly lacked any support and did not comply with GAAP. ~~Bauer and Lynch were able to direct or cause these improper adjustments because~~

39.   As detailed below in ¶115, Interface ~~failed to have sufficient~~lacked adequate accounting controls or procedures ~~in place~~ to prevent unsupported, manual, period end, journal

---

[1] ~~The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.~~

~~Doc#: US1:14830519v1~~Doc#: US1:14831846v1

entries, allowing for these manual entries to be made and artificially inflate Interface's EPS. Interface also lacked critical journal entry controls and ~~Bauer's~~employed subordinate accountants who were not knowledgeable in GAAP.

40.    ~~2. The~~These misstatements and adjustments ~~and misstatements were also material to Interface's financial statements and~~ caused Interface to make false disclosures in public filings, press releases, and earnings calls about its actual EPS results, its earnings growth, and its pattern of meeting or beating consensus analyst estimates.

41.    Had ~~Lynch and Bauer ensured the~~Interface's reported financial ~~statements~~results complied with GAAP, as required, Interface's reported earnings would have been ~~more volatile~~less than reported, and in two quarters in which it reported ~~meets of~~that it had met analyst consensus EPS, ~~Interface~~it would have, in fact, missed the consensus estimates. ~~Consequently, Interface's conduct was materially misleading to investors in violation of the federal securities laws.~~

### ~~RESPONDENTS~~

~~3. Interface is a Georgia corporation with its principal place of business located in Atlanta, GA. The company's shares are registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ Exchange under the symbol "TILE." Interface files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.~~

~~4. Bauer, age 44, resides in Smyrna, GA, and is a CPA licensed in the State of Georgia. Bauer was Interface's Vice President and Controller from 2011 through October 2017, at which time he was promoted to the position of Vice President of Finance and Chief Accounting Officer. Interface placed Bauer on paid administrative leave on April 23, 2019, and terminated his employment on July 15, 2020.~~

~~5. Lynch, age 50, resides in Marietta, GA and is a CPA licensed in the State of Georgia. His license lapsed in approximately 2004. Lynch was Interface's CFO from June 2001 to November 2016, at which time he left Interface to be the CFO of another company. From May 2019 to the present, Lynch has served as the CFO of a privately-held consolidating subsidiary of a public holding company.~~

## FACTS
### The Second Quarter of 2015

42.    6. In Q2the second quarter of 2015, Interface reported EPS of $0.33 and its earnings release stated that it had "finished with earnings per share that. The Company touted this EPS result as having "tied our all-time record in the fourth quarter of 2007." In truth, Interface did not achieve record EPS in Q2 2015 because it understated its actual expenses for management bonuses by $1.58 million, which in turn inflated its pre-tax income by 5% and its EPS by $0.02.While this result was significantly above analysts' consensus estimates for the quarter, Defendants failed to disclose that it had only been accomplished by their manipulation of accounting entries in violation of GAAP.

43.    7. In earlySpecifically, earlier in the quarter, in June 2015, after learning that Interface was required to payhad learned of an unexpected $725,000 death benefit that it was required to pay. To compensate for this sudden expense, Bauer directed that a $500,000 reduction be made to the management bonus accrual. Bauer's contemporaneous instruction stated

44.    Bauer believed that decreasing the bonus accrual would limit to about "a 250k hit" the net income impact of the unexpected death benefit expense to a "250k hit," thereby lessening the blow to Interface's earnings numbers, particularly EPS. This adjustment did not comply with GAAP.

8. Bauer's decision to reduce the management bonus accrual in order to offset the surprise death benefit expense did not comply with GAAP.

45.    9. Interface paidInterface's policy for management bonuses was to pay non-discretionary management bonuses based on the achievement of established targets for operating income before incentives ("OIBI") and cash flow. If Interface met the stated "goal" for those targets, management would receive 100% of their bonus potential. If Interface exceeded the goal,

3

management would receive up to ~~a maximum,~~ 150%~~,~~ of their bonus potential depending on the amount by which the goal was exceeded.

~~10. The internal financial forecasts reviewed by Lynch and Bauer and provided to the board of directors in Lynch's monthly and quarterly board reports reflected Interface's best estimates for probable OIBI and cash flow. Throughout the relevant period, Lynch and Bauer understood the formulas for calculating the bonus amount. During the quarterly closing process, they both reviewed the bonus accrual and together determined whether to book any adjustments to it.~~

46.    ~~11. At the time that~~When Bauer improperly reduced the bonus accrual by $500,000, Interface's best estimate was that annual bonuses at levels far greater than 100% would be paid. Reducing the accrual by $500,000, however, caused Interface's accrual level to fall far below the 100% level.

47.    ~~12. During~~At the ~~closing process for~~end of the ~~second~~ quarter, when Interface was purportedly on track to report an all-time record EPS of $0.33, Bauer ~~kept~~maintained the accrual level at well below 100% despite the best estimates that showed ~~a maximum,~~ 150%~~,~~ annual bonus was probable to be paid~~. As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.~~ out.

48.    ~~13. As a result and~~Accordingly, in total, Interface's management bonus accrual and related expenses for Q2 2015 were understated by approximately $1.58 million, or 5% of pre-tax income, and its EPS was falsely inflated by $0.02.

49.    Securities analysts covering Interface reacted favorably to the increased EPS figures. For example, on July 30, 2015, analysts from BB&T Capital Markets stated, "Q2'15 EPS beat. Interface reported Q2'15 EPS of $0.33 vs our estimate of $0.26 and consensus of $0.29 . . . ."

4

**The Third Quarter of 2015**

50.    ~~14. In Q3~~<u>In the third quarter of</u> 2015, Interface publicly reported that it had met consensus estimates for EPS of $0.31, ~~reflecting a continued pattern of meeting or beating analyst estimates for four consecutive quarters.   In truth, Lynch and Bauer had directed unsupported~~<u>again misrepresenting to the market that Interface had beat or met consensus estimates for EPS, when in fact, it had only done so as a result by manipulating</u> accounting entries ~~and otherwise~~<u>in violation of GAAP.</u>

51.    <u>Specifically, Interface</u> misstated expenses~~,~~ which inflated Interface's pre-tax income by 12%, or a total of over $3.12 million. Rather than report ~~a meet of~~<u>that it had met</u> consensus EPS estimates, Interface should have reported a $0.04 miss.

52.    ~~15. The first set of improper entries in Q3 2015 concerned Interface's accounting~~<u>In the third quarter of 2015, Interface improperly accounted</u> for a collateral split dollar life insurance arrangement that Interface had with ~~its independent~~<u>the</u> Consultant. ~~Under this arrangement,~~ Interface agreed to pay for the annual premiums for a whole life insurance policy owned by the ~~Consultant~~<u>consultant</u>. The Consultant, in turn, agreed to repay those premiums to Interface in or around May 2016.

53.    As collateral for the ~~premiums Interface paid~~<u>premium payments</u>, the Consultant assigned to Interface the cash surrender value ("CSV") of his policy up to the amount of the premiums paid. Any amount of the policy's CSV in excess of the premiums paid belonged to the ~~Consultant outright, with certain defined exceptions that did not and were not probable to occur. Based on the plain language of Interface's agreement with the Consultant~~<u>consultant outright.</u>

54.    ~~15. , the value of the CSV as reflected on Interface's books should have never exceeded the amount of unreimbursed premiums paid.   Yet Interface historically~~<u>Interface,</u>

however, recorded the full value of the CSV on its balance sheet, when the value actually recorded should never have exceeded the amount of unreimbursed premiums paid.

55.    ~~During Q3 2015, Bauer~~Interface learned that the CSV, recorded by Bauer and Interface as an asset at the time, would need to be written down by $871,140, the amount recognized in excess of the premiums paid~~, $871,140. He also learned that the Consultant would likely reimburse Interface for the premiums paid in May 2016. Yet Bauer did not immediately write down the asset. Contrary to GAAP, Bauer instead began a process of bleeding the value down in equal increments~~. Interface, however, incrementally reduced the asset's value over the following ten months, in equal installments of $87,114 ~~over ten months.~~.

56.    By the end of the third quarter of 2015, ~~Bauer~~Interface had only recorded ~~just~~ $174,228 against the $871,140 excess valuation. ~~As a result, Interface's CSV asset and associated income were~~

57.    This improper accounting treatment inflated the value of the CSV on Interfaces books by approximately $697,000 (the difference between $871,140 and $174,228).

58.    This error, standing alone, increased Interface's EPS by almost $0.01, ~~and, if it~~ had it been recorded properly, ~~would have changed~~ *Interface's reported* ~~meet of~~*EPS that met consensus estimates* ~~to a miss.~~*would have actually missed consensus estimates.*[1]

59.    ~~17. The second set of improper entries in Q3 2015 concerned Interface's stock based compensation and management bonus. In October 2015, Interface's finance department prepared the first draft of Interface's Q3 2015 consolidated internal financial statements, which showed that actual EPS for the quarter was $0.02 shy of the $0.31 analyst consensus estimate. Bauer unreasonably~~Also in the third quarter of 2015, Interface directed ~~his~~ staff to book

---

[1]    All emphasis is added unless otherwise noted.

adjustments to achieve "a pick up of about 740k," and later that same day, ~~Bauer and his staff~~Interface improperly reduced the expense for a stock grant by $628,000. ~~The adjustment~~

60.     These adjustments to the stock-based compensation figures did not comply with GAAP and artificially inflated Interface's EPS by almost $0.01. ~~Standing alone, correcting this error~~Not fraudulently altering these figures would have changed Interface's ~~reported meet of~~EPS that reportedly met consensus estimates to ~~a miss~~missing them.

61.     ~~18. On~~At the same ~~day that~~time Bauer and Interface reduced the stock grant expense~~, he also~~ figures, they directed ~~his staff to increase~~that the management bonus accrual be increased by only $100,000 even though Interface's best estimates for OIBI and cash flows indicated that the management bonus liability was ~~under~~ under accrued by approximately $1.67 million. ~~The stated justification for the entry was~~

62.     While Interface justified this improper accounting as necessary to "correct bonus accrual," ~~but~~ the adjustment still left the bonus accrual – and associated expenses – understated by approximately $1.57 million in ~~Q3 2015. As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy~~the third quarter of 2015. As a result of this improper accounting treatment, Interface avoided reporting a $0.016 reduction to its EPS for the quarter and a miss of consensus estimates.

63.     ~~19. A third and final set of entries concerned the annual bonus that Interface was obligated by contract to pay its Consultant. Updated Q3 2015 internal financial statements reflected the adjustments described in the forgoing paragraphs, but still showed actual EPS to be just shy~~Finally, Interface was aware that after the foregoing improper accounting adjustments in the third quarter of 2015, its EPS was still going to fall short of consensus estimates. To avoid

7

that, Lynch and Bauer subsequently and unreasonably directed the full reversal of the $225,000 that had been accrued to date for the Consultant's bonus. This last-minute manual adjustment did not comply with GAAP. The Consultant's bonus was paid pro rata, and thus, it was incorrect to reverse the full (or any) amount.

19. This errorimproper accounting adjustment artificially boostedinflated Interface's EPS by $0.002 – just enough for Interface to round up to $0.31 and report a meet of analyst consensus EPSEPS in line with analysts' consensus estimates.

64.     In total, Interface's *accounting adjustments and errors in the third quarter of 2015 caused Interface's* income for Q3the third quarter of 2015 wasto be overstated by approximately $3.12 million, or 12% of pre-tax income, andinflating its reported EPS was inflated by $0.04.

### The Fourth Quarter of 2015

65.     21. In Q4In the fourth quarter of 2015, Interface reported a quarterly EPS of $0.28 and an annual EPS of $1.10, which representedInterface touted as a record for Interface and a $0.02 beat of consensus estimates for the year. While the quarter's EPS was a $0.01 miss of consensus, it was just enough to allow Interface to report a $0.02 beat of estimates for the year, and Interface's quarterly earnings release highlighted thattouted these results stating the "*fourth quarter rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share*[.]"

66.     In truth, however, Interface's results were artificially inflated by Bauer'sthe improper accounting adjustments to the Consultant's bonus, the CSV, and the management bonus. Had the financial statements complied with GAAP at the end of 2015, *Interface would have reported a $0.03 miss of the consensus for the quarter, and instead of beating analyst consensus estimates for the year, Interface would have reported only a meet.*

8

67.    ~~22. After the~~Once Interface's third ~~quarter's~~quarter books ~~had~~were closed and ~~the company~~Interface had publicly reported ~~that it met analyst consensus~~its EPS ~~estimates~~results, Bauer resumed the monthly accrual for the Consultant's bonus. By year end, Interface had accrued a balance of only $75,000, for this bonus even though the Consultant was due his full $300,000 ~~bonus~~. ~~However~~Nonetheless, neither Lynch nor Bauer directed the $225,000 increase required to make up for the reversal in the previous quarter.

68.    ~~23. Bauer also directed unsupported~~Further adjustments ~~to~~were also made regarding the Consultant's CSV. During the closing process for the quarter, Bauer directed his financial manager to "reverse half. . ._. for now" of the approximately $436,000 they had recorded by that time to write down the CSV asset ~~as part of their improper bleed down process~~. This ~~adjustment~~maneuver did not comply with GAAP and ~~served only to artificially reduce expense~~acted to reduce Interface's expenses by approximately $218,000. ~~A few days later~~

69.    Shortly thereafter, Bauer ~~also stopped~~directed the monthly ~~bleed-down~~write-down process to stop. As a result, ~~Interface~~these improper accounting adjustments and entries overstated the CSV asset and associated income by approximately $653,000, which in turn inflated its quarter-end and ~~yearend~~year-end EPS by $0.01.

70.    ~~24. Less than an hour after he had directed the $218,000 CSV expense reduction~~Next, on that same day, Bauer ~~also~~ directed that a $350,000 balance ~~he had~~held in another liability account be used to decrease ~~expense generally~~general expenses by $150,000 and increase the management bonus accrual by $200,000 without any corresponding increase to bonus expense. ~~Bauer's~~These further adjustments did not comply with GAAP~~, as~~.

71.    Interface's internal financial statements and best estimates at the time made clear that the bonus was under-accrued by approximately $949,000. ~~As CFO, Lynch also should have~~

9

~~known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.~~ By increasing the accrual by only $200,000, Interface's bonus accrual and related expenses remained understated at ~~year end~~<u>year-end</u> by approximately $749,000, which in turn inflated <u>both</u> its quarter-end and year-end EPS by $0.01.

72.    ~~25. In total, Bauer's improper~~<u>In sum, these accrual</u> adjustments and ~~Lynch's failure to ensure the bonus accruals were accurate~~<u>improper accounting adjustments</u> caused Interface to overstate income by a total of $1.63 million, or 7% of the quarter's pre-tax income. They also caused Interface's EPS to be inflated by $0.02. In reality, Interface should have reported EPS of $0.26 for the quarter and $1.08 for the year.

**First Quarter of 2016**

73.    ~~26. In Q1~~<u>For the first quarter of</u> 2016, Interface reported ~~an~~ EPS of $0.20, meeting consensus estimates and representing a quarter-over-quarter increase of $0.01. However, ~~these results were inflated because Lynch and Bauer had directed unsupported adjustments to the bonus accruals and otherwise caused Interface's stock based compensation expense to be understated. Bauer also directed unsupported and improper adjustments to the CSV. Given these adjustments, rather than report growth and a meet of consensus~~<u>during the first quarter</u>, Interface ~~should have~~ reported ~~an EPS of just $0.17 — a $0.02 quarter-over-quarter decline and a $0.03 miss of consensus~~<u>weak sales results</u>.

74.    ~~27. During the Q1 2016 closing process, when~~<u>To compensate for these</u> weak sales ~~weighed down Interface's performance~~<u>figures</u>, Bauer directed that the remaining $218,000 CSV write-down balance be reversed in full. That same day, Lynch and Bauer directed their staff to reverse the entire $740,000 balance in the management bonus accrual<u>,</u> even though Interface's

best estimates for OIBI and cash flow suggested that an accrual of approximately $1 million was necessary in the quarter. ~~Together, these~~

75. These adjustments – which did not comply with GAAP – resulted in an immediate $958,000 increase to income and a $0.01 increase in EPS.

76. ~~28. A few days later~~Shortly thereafter, and after discussing with Lynch how the ~~company~~Company would "articulate to [the] street" ~~its~~ declining sales trends, Bauer directed his financial manager to increase the CSV asset's value another $210,000, stating simply, "Think we are gonna need that cash surrender value. . . ." Given this asset increase and Interface's intervening payment of another premium, Bauer continued to overstate the CSV asset, now by a total of $994,000. ~~Like the other entries Bauer directed, this CSV~~

77. This adjustment did not comply with GAAP, ~~increased EPS, and enabled Interface to report a $0.20 meet of~~and functioned to artificially increase Interface's reported EPS figures, allowing interface to publicly announce EPS of $0.20, which met consensus estimates.

78. ~~29. Lynch and Bauer also caused~~Also in the first quarter of 2016, Interface ~~to understate the company's stock based~~understated the Company's stock-based compensation expense ~~in Q1 2016~~, allowing the ~~company~~Company to report ~~an~~artificially inflated EPS and meet consensus estimates.

79. Although the internal financial statements and best estimates for annual EPS plus dividends ("EPSD") showed it was probable that one of the ~~company's~~Company's stock grants would vest in full by the end of the year, Interface ~~did not~~failed to record any associated increase in expense. ~~As CFO and Controller, respectively, Lynch and Bauer should have known that the stock expense accrual level did not match the levels indicated by the company's best estimates~~

11

~~for EPSD, but took no steps to ensure its accuracy~~. As a result, Interface's stock expense for the quarter was understated by approximately $387,000.

80.    Despite the sales issues, analysts covering Interface expressed optimism because Interface purportedly was able to compensate and exceed EPS estimates. For example, on April 28, 2016, analysts at BB&T Capital Markets reported "Interface reported Q1'2016 EPS that was in line with consensus estimate and ahead of our estimate by $0.01, despite a slight top line miss." That same day, analysts at Barclays adjusted their "FY16 and FY17 estimates to EPS estimates to $1.23 (from $1.22) and $1.39 (from $1.37)[.]"

81.    ~~30. In total~~Ultimately, Interface's income for ~~Q1~~the first quarter of 2016 was overstated by approximately $2.43 million, or 15% of pre-tax income, and its EPS was inflated by $0.03.

### Second Quarter of 2016

82.    ~~31. In Q2~~For the second quarter of 2016, Interface reported EPS of $0.32~~, which Interface and its senior management described in~~. In the accompanying press release and earnings call, Interface and Defendant Hendrix described the Company's performance as "strong," the "second best quarterly earnings ever," and "just a penny short of the all-time record." ~~In truth, Bauer had directed improper and unsupported accounting entries and otherwise improperly misstated expenses, which inflated Interface's pre-tax income by 7%, or approximately $1.9 million.  Interface's true EPS of $0.30 actually reflected a $0.03 quarter-over-quarter and $0.01 year-to-date decline in earnings.~~

83.    ~~The first set of improper entries that Bauer directed concerned the CSV. The~~In the second quarter of 2016, the day after Interface reported ~~its Q1~~that it had met first quarter of 2016 ~~meet of~~analyst estimates for EPS, Bauer once again began ~~bleeding~~to write down the CSV asset. ~~As expected~~However, as was contemplated by the operative agreement with the consultant, in

May 2016, the ~~Consultant~~consultant fully reimbursed Interface for the premiums paid – leaving Interface with no claim to the CSV at all. ~~Instead of~~

84.     ~~32.~~ Rather than reducing the full value of the CSV asset, Bauer left $179,000 on Interface's books. This ~~error~~improper maneuver alone, if corrected at the time, would have ~~cost Interface~~reduced Interface's EPS by $0.01 ~~in EPS due to rounding~~.

85.     ~~33. The second set of improper entries concerned the management bonus accrual. By quarter end~~Also in the second quarter of 2016, Interface improperly directed a $400,000 reduction in bonus expense, which increased reported EPS by one penny. Prior to this improper accounting, Interface's bonus accrual was at an approximate 50% achievement level given the improper reversal at the end of ~~Q1~~the first quarter of 2016. The ~~company's~~Company's internal financial statements and best estimates for OIBI and cash flows at the end of ~~Q2~~the second quarter of 2016 showed a probable bonus achievement of approximately 69% – indicating that Interface needed to increase expense to meet the expected liability. ~~Nevertheless, Bauer directed a $400,000 reduction in bonus expense, which increased reported EPS by one penny with rounding.  As CFO, Lynch should have known that the bonus accrual level did not match the levels indicated by the company's best estimates for OIBI and cash flows, but took no steps to ensure its accuracy.  As a result of their conduct,~~

86.     This improper accounting adjustment caused Interface's management bonus accrual and related expenses ~~were~~to be understated by a total of $951,000 in the Q2 2016, ~~which inflated~~inflating its EPS by $0.01.

87.     ~~34.~~ Lynch and Bauer also caused Interface to understate its ~~stock based~~stock-based compensation expense in ~~Q2~~the second quarter of 2016, which enabled it to report ~~a~~ $0.32 EPS. As in the prior quarter, the internal financial statements and best estimates for EPSD

showed it was probable that one of the ~~company's~~Company's stock grants would vest in full by the end of the year. ~~Nevertheless,~~

88.    Interface ~~did not~~failed to record the associated increase in expense, and Interface's stock expense was therefore understated by a cumulative total of $774,000 in Q2 2016. ~~As CFO and Controller, respectively, Lynch and Bauer should have known that the stock expense accrual level did not match the levels indicated by the company's best estimates for EPSD, but took no steps to ensure its accuracy.  Correcting this error at the time would have cost Interface~~This error would have resulted in Interface reducing EPS by almost another $0.01.

89.    ~~35.~~In total, Interface's income for Q2 2016 was overstated by approximately $1.9 million, or 7% of pre-tax income, and its EPS was inflated by $0.02.

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 6/15/2021 10:07:50 AM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** SEC Allegations.DOCX | |
| **Modified filename:** AC Allegations of Falsity.DOCX | |
| **Changes:** | |
| Add | 264 |
| Delete | 228 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 492 |