UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

THOMAS S. SWANSON, Individually and on  :  Civil Action No. 1:20-cv-05518-BMC
Behalf of All Others Similarly Situated,      :
                                              :  CLASS ACTION
                        Plaintiff,            :
                                              :  LEAD PLAINTIFF'S MEMORANDUM OF
            vs.                               :  LAW IN OPPOSITION TO DEFENDANTS'
                                              :  MOTION TO DISMISS THE AMENDED
INTERFACE, INC., DANIEL T. HENDRIX,           :  COMPLAINT
JAY D. GOULD, BRUCE A. HAUSMANN               :
and PATRICK C. LYNCH                          :
                                              :
                        Defendants.           :
                                              :
———————————————————— x

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  PRELIMINARY STATEMENT ..........................................................................1

III.  STATEMENT OF FACTS ...................................................................................3

  A.  Interface Deliberately Inflated Its Quarterly and Annual Earnings ........................3

  B.  Q2 2015 ..................................................................................................4

  C.  Q3 2015 ..................................................................................................4

  D.  Q4 2015 ..................................................................................................5

  E.  Q1 2016 ..................................................................................................5

  F.  Q2 2016 ..................................................................................................6

  G.  The Truth Begins to Emerge ..................................................................7

IV.  ARGUMENT .......................................................................................................7

  A.  Applicable Legal Standards ...................................................................7

  B.  The AC Properly Relies on the SEC Order ...........................................8

  C.  The AC Pleads Actionable Misrepresentations and Omissions ............9

    1.  Interface's False Financial Results Were Material ....................9

    2.  The Quantitative Impact of Defendants' Phony Accounting
        Adjustments on Interface's Earnings ......................................12

    3.  The Accounting Adjustments Were Qualitatively Material .....12

    4.  Defendants' Misstatements Are Not Statements of Opinion ....14

    5.  Interface's SOX Certifications, and Statements Regarding the
        Adequacy of Interface's Internal Controls Were False............15

  D.  The AC Adequately Alleges Scienter ..................................................16

    1.  The Unsupported Accounting Entries Support Scienter ...........18

    2.  The AC Alleges Other Strong Circumstantial Evidence of Scienter ........20

i

**Page**

3.    Hendrix's and Lynch's Suspicious Stock Sales, and the OSIP
       Contribute to the Holistic View of Scienter................................................21

4.    The AC Alleges Corporate Scienter ...........................................................22

E.    The AC Adequately Alleges Loss Causation.........................................................23

F.    The AC Alleges Control Person Liability............................................................25

V.    CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................. 2, 10, 13, 25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ................................................................... 25

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
    735 F.3d 114 (2d Cir. 2013) ................................................................... 17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................... 3, 4, 12, 17

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012) ................................................... 19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................. 23

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F. 3d 187 (2d Cir. 2009) ................................................................. 10, 12

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ................................................................... 17, 18, 21, 22

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ................................................................... 14

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................... 14

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................... 22

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ................................................................... *passim*

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985) ................................................................. 2

**Page**

*In re AmTrust Fin. Serv.s., Inc. Sec. Litig.*,
2019 WL 4257110
(S.D.N.Y. Sept. 9, 2019) ...........................................................................14

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) .......................................................19

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008) .......................................................20

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ....................................................................10

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018) .......................................................25

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600
(S.D.N.Y. May 24, 2018) ...........................................................................19

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) .........................................................17

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012)
*aff'd*, 525 F. App'x 16 (2d Cir. 2013) ........................................................8

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 353 (E.D.N.Y. 2013) ..................................................20, 24

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395
(S.D.N.Y. Mar. 28, 2019) ...........................................................................16

*In re Indep. Energy Holdings PLC Sec. Litig.*,
154 F. Supp. 2d 741 (S.D.N.Y. 2001) .......................................................16

*In re Insys Therapeutics, Inc. Sec. Litig.*,
2018 WL 2943746
(S.D.N.Y. June 12, 2018) ...........................................................................16

*In re Kidder Peabody Sec. Litig.*,
10 F. Supp. 2d 398 (S.D.N.Y. 1998) ....................................................10, 13

iv

**Page**

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)........................................................................9

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985
   (S.D.N.Y. Mar. 28, 2018) .......................................................................20

*In re Mylan N.V. Sec. Litig.*,
   379 F. Supp. 3d 198 (S.D.N.Y. 2019)......................................................9

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)....................................................................24

*In re Petrobras Sec. Litig.*,
   150 F. Supp. 3d 337 (S.D.N.Y. 2015).....................................................24

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
   2016 WL 5339541
   (S.D.N.Y. Sept. 23, 2016) ...............................................................10, 11

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341
   (S.D.N.Y. Apr. 22, 2016) .........................................................................7

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).................................................................8, 15

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007).....................................................21

*In re Sonus Networks, Inc. Sec. Litig.*,
   2006 WL 1308165
   (D. Mass. May 10, 2006) ........................................................................22

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................24

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979
   (E.D.N.Y. May 20, 2020) .........................................................................9

v

**Page**

*In re XP Inc. Sec. Litig.*,
   2021 WL 861917
   (E.D.N.Y. Mar. 8, 2021) ...................................................................................25

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)...............................................................................19

*Interpublic Grp. of Cos., Inc. v. Fratarcangelo*,
   2002 WL 31682389
   (S.D.N.Y. Nov. 26, 2002) .....................................................................11, 12, 13

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306
   (S.D.N.Y. Mar. 30, 2012) ............................................................................24, 25

*JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*,
   2018 WL 5266877
   (S.D.N.Y. Oct. 23, 2018) ...................................................................................9

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976)..........................................................................8, 9

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)..........................................................................9, 10

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)..........................................................................8, 25

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) .........................................................................14

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .........................................................................24

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 F. App'x 10 (2d Cir. 2011) ....................................................................13, 22

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................................9, 18, 19, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Pension Fund*,
   135 S. Ct. 1318 (2015)......................................................................................15

**Page**

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012).....................................................................22

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821
  (S.D.N.Y. Apr. 14, 2020)........................................................................................20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)................................................................16, 20

*SEC v. Escala Grp., Inc.*,
  2009 WL 2365548
  (S.D.N.Y. July 31, 2009) ........................................................................................18

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)......................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................8, 17, 18, 21

*Thomas v. Shiloh Industries, Inc.*,
  2017 WL 2937620
  (S.D.N.Y. July 7, 2017) ....................................................................................22, 23

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)....................................................................................15

*United States Sec. & Exch. Comm'n v. DiMaria*,
  207 F. Supp. 3d 343 (S.D.N.Y. 2016).......................................................11, 13, 14

*United States v. Carroll*,
  2020 WL 1862446
  (S.D.N.Y. Apr. 14, 2020)........................................................................................12

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013).......................................................19, 21, 22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009).....................................................................14

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4(b)(1)...........................................................................................................9
    §78u-4(b)(2)(A)...................................................................................................16

Federal Rules of Civil Procedure
    Rule 15(a)(2)......................................................................................................25

17 C.F.R.
    §210...................................................................................................................12

Sarbanes-Oxley Act of 2002.......................................................................................2

## I.       INTRODUCTION

Lead Plaintiff Steamfitters Local 449 Pension Fund ("Plaintiff") respectfully submits this

memorandum of law in opposition to the motion to dismiss the Amended Complaint (the "AC")

filed by defendants Interface, Inc. ("Interface" or the "Company"), Daniel T. Hendrix ("Hendrix"),

Jay D. Gould ("Gould"), Bruce A. Hausmann ("Hausmann"), and Patrick C. Lynch ("Lynch")

(collectively, the "Individual Defendants," and with Interface, "Defendants").[1]

## II.      PRELIMINARY STATEMENT

In November 2017, Interface – a designer and producer of modular carpet – received a

request for documents and information from the Securities and Exchange Commission ("SEC")

seeking information associated with its financial reporting practices (the "SEC Investigation").  On

April 24, 2019, when Defendants publicly disclosed the SEC Investigation and the potential

wrongdoing regarding Interface's financial reporting, Interface's stock declined more than 8%.

Subsequently, on September 28, 2020, the SEC issued a cease-and-desist order (the "SEC

Order") and findings of fact that apprised investors of Interface's financial reporting misconduct.

The SEC found that Interface had materially falsified its financial results from Q2 2015 through

Q2 2016, and that Defendant Lynch (Interface's former CFO) and Gregory J. Bauer ("Bauer")

(Interface's former Controller) had willfully violated the Securities Act of 1933 (the "Securities

Act") and the Securities Exchange Act of 1934 ("Exchange Act").  When the SEC's findings of

fact were made public, Interface's stock price declined again.

This lawsuit alleges a straightforward case of securities fraud against Interface and its

former and current executives.  Specifically, the AC alleges that Lynch and Bauer intentionally

---

[1] References to "¶" and "¶¶" refer to the AC, filed April 28, 2021 (ECF No. 30).  Unless otherwise noted, all capitalized terms have the meaning given in the AC.  "Def. Br." refers to Defendants' memorandum of law in support of their motion to dismiss the AC.  ECF No. 42.  "Avidan Decl. Ex." refers to exhibits to the Declaration of Shane D. Avidan, dated June 16, 2021. ECF No. 43.

and repeatedly caused Interface to issue fraudulent financial statements from Q2 2015 through Q2 2016 that were reverse engineered, via phony accounting entries, to enable Interface to meet, or exceed, predetermined Wall Street analysts' earnings estimates.  Each of the Individual Defendants signed false certifications mandated by the Sarbanes-Oxley Act of 2002 ("SOX certifications") appended to Interface's SEC filings stating that they disclosed to Interface's independent auditor, BDO USA, LLP and Interface's Audit Committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" and that Interface's internal controls were operating effectively. *See, e.g.*, ¶¶143, 164, 169, 182, 187, 237, 239-240.

Defendants challenge the materiality of their fraud and attempt to recast their misstatements as statements of opinion.  But there is no question that their misconduct was material: as the Second Circuit has made clear, a misstatement that hides a failure to meet analysts' consensus expectations – as alleged here – supports a finding of materiality.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163-64 (2d Cir. 2000).  And, the effect of Defendants' misconduct caused Interface's quarterly pre-tax income during the Class Period to be quantitatively misstated by no less than *5% and by as much as 15%.*

Here, the deliberate, and repeated phony accounting entries made for no purpose other than to allow Interface's earnings to meet earnings estimates, which resulted in the SEC Investigation and the SEC Order, cannot be deemed "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988).  In any event, at this stage, the Court cannot conclude that the alleged financial misstatements are immaterial as

a matter of law.  *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012).

Moreover, Defendants' effort to characterize their accounting manipulations as opinions is a thinly veiled attempt to divert the Court's attention from the allegations of falsity.  As the AC alleges, Lynch and Bauer intentionally, and without any basis, booked unsupported accounting adjustments in violation of Generally Accepted Accounting Principles ("GAAP").  While the type of accounting metrics they misstated may ***generally*** require some subjective judgment, there was no subjective judgment with their actions, other than to commit fraud, because their actions were not supported by any application of GAAP.

Defendants challenge the AC's scienter allegations by asking this Court to view each scienter allegation in isolation.  This should be rejected as the Supreme Court has made clear that the required analysis is a holistic one.  The AC alleges a myriad of scienter allegations, including that the accounting manipulation was done intentionally, the existence and findings of the SEC Investigation and internal investigation, Lynch's suspicious resignation, and suspiciously timed stock sales, that, when taken together, more than adequately allege scienter.

Plaintiff has more than satisfied its obligation of adequately alleging a violation of the federal securities laws.  Accordingly, the Court should deny Defendants' motion in its entirety.

## III.   STATEMENT OF FACTS

### A.   Interface Deliberately Inflated Its Quarterly and Annual Earnings

Interface began reporting artificially inflated financial results in Q2 2015.   ¶36. Specifically, Interface booked phony accounting entries associated with Interface's management bonuses, the cash surrender value ("CSV") of a consultant's life insurance policy, and stock-based compensation arrangements.   ¶37.  These sham accounting entries violated GAAP and enabled

Interface to report financial results for each affected quarter that either met or exceeded Wall Street consensus estimates.  ¶41.

### B.    Q2 2015

During Q2 2015, Interface misleadingly reported it achieved EPS of $0.33, exclaiming it had tied its "all-time record [set] in the fourth quarter of 2007." ¶42.  In violation of GAAP, Bauer, without any legitimate basis for doing so, directed employees to record accounting entries that would purposely understate management bonuses.  ¶¶43-48.  As a result, Interface's pre-tax income during the quarter was overstated by $1.58 million, or approximately 5.0%.  ¶204.  As such, but for Defendants' earnings management manipulation, Interface would have missed consensus Q2 2015 earnings estimates. ¶¶42, 49.

### C.    Q3 2015

During Q3 2015, Interface misleadingly reported it had met consensus earnings estimates of $0.31 EPS.  ¶50.  However, Interface inflated its pre-tax income by $3.12 million, or around 12%, via a series of deliberate earnings management manipulations. ¶207.

First, Interface manipulated the reporting of the CSV of a life insurance arrangement it had with a consultant.  ¶52.  During Q3 2015, Bauer became aware the CSV of the life insurance arrangement was overstated by $871,140 and was required to be written off.  ¶¶53-55.  Bauer then formulated a process to manage Interface's earnings by bleeding the write down against earnings over a ten month period so that the entire charge would not be recognized in Q3 2015.  *Id*.

Second, Bauer directed employees of Interface to record phony accounting entries to reduce stock-based compensation expense.  ¶59.

Third, Bauer directed employees to understate employee bonus expense, which, standing alone, overstated Interface's pre-tax earnings by $1.57 million, or approximately 5.7%.  ¶¶61-62.  After engaging in the foregoing earnings manipulations and realizing that Interface's earnings

during the quarter were *still* going to fall short of consensus estimates, Defendant Lynch and Bauer directed employees to record an entry to reverse a previously recorded $225,000 consultant bonus, thereby artificially inflating Interface's earnings to meet consensus estimates.  ¶¶63-64.

In total, the earnings management manipulations noted above overstated Interface's pre-tax income during Q3 2015 by approximately $3.12 million, or approximately 12%.  ¶207.  As such, but for Defendants' earnings management manipulations noted above, Interface would have missed Wall Street consensus Q3 2015 earnings estimates.

### D.     Q4 2015

Interface reported EPS of $0.28 and $1.10 for Q4 and year end 2015, respectively. Interface touted these "record" results stating that Q4 "rounded out a phenomenal year in which Interface posted all-time records for net income and earnings per share[.]"  ¶66.  In truth, however, Interface's results were overstated by a series of accounting machinations.

First, Defendant Lynch and Bauer failed to correct the consultant bonus misstatement recorded in Q3 2015.  ¶67.  Second, Bauer directed his financial manager to "reverse [correct] half" of the then remaining $218,000 CSV asset overstatement recorded in Q3 2015.  ¶¶65-68. Third, Bauer directed his employee to record bogus accounting entries that caused bonus and related expenses to be understated by $749,000.  ¶71.

In total, these earnings management manipulations overstated Interface's pre-tax income during Q4 2015 by approximately $1.63 million, or approximately 7%.  ¶210.  As such, but for Defendants' earnings management manipulations noted above, Interface would have missed Wall Street consensus Q4 2015 earnings estimates.  ¶72.

### E.     Q1 2016

During Q1 2016, Interface reported EPS of $0.20, meeting consensus estimates and representing a quarter-over-quarter increase of $0.01.  ¶73.  However, these results were overstated

because, in a manner similar to prior quarters, Defendant Lynch and Bauer intentionally directed employees to record bogus accounting entries that: (i) reversed the remaining $218,000 CSV write-down of the consultant's life insurance policy previously recorded during Q1 2016; (ii) caused the CSV asset to be overstated by a total of $994,000; (iii) reversed $740,000 of bonus related expenses previously recorded during Q1 2016; (iv) caused bonus related expenses to be understated by a total of $1 million; and (v) caused stock-based compensation expense to be understated by $387,000.  ¶¶74-79.

In total, these earnings management manipulations overstated Interface's pre-tax income during Q1 2016 by approximately 15%.  ¶81.  As such, but for Defendants' earnings management manipulations, Interface would have missed consensus Q1 2016 earnings estimates.  ¶¶73, 81.

**F.   Q2 2016**

During Q2 2016, Interface reported EPS of $0.32, which Hendrix touted as the "*second best quarterly earnings ever*," and "*just a penny short of the all-time record*."  ¶82.  In truth however, Defendants directed Interface employees to record bogus accounting entries that inflated Interface's pre-tax income by 7%, or approximately $1.9 million.  ¶¶83, 203.

First, Bauer caused Interface to misstate the value of the CSV asset by $179,000.  ¶¶83-84. Second, Bauer directed his financial managers to understate bonus and related expenses by $951,000.  ¶86.  Finally, Defendant Lynch caused Interface to understate its stock-based compensation expense by a total of $774,000.  ¶88.

In total, these earnings management manipulations overstated Interface's pre-tax income during Q2 2016 by approximately $1.9 million, or approximately 7%.  ¶203.

Shortly thereafter, Interface announced that Lynch was leaving his position as CFO, a position he had held for 15 years.  ¶¶91, 249.  It was also announced that Hendrix was retiring from his position as CEO, a position he had held for 17 years, and that Hausmann was replacing

Lynch.  ¶¶92-93.  In November 2017, the SEC began investigating Interface's "historical quarterly [EPS] calculations and rounding practices during the period 2014-2017[.]"  ¶¶94-96.  The SEC served subpoenas on Interface in February 2018, July 2018, and April 2019.  ¶95.

### G.    The Truth Begins to Emerge

On April 24, 2019, Interface disclosed the existence of the SEC Investigation and the subpoenas.  ¶96.  The Company also disclosed that Bauer had been placed on paid administrative leave because he had actively interfered with the SEC Investigation by adding "***certain notes to those materials that were then produced to the SEC***."  ¶97.  Interface's stock price fell $1.43 per share, or 8.37%, to close at $15.66 per share on April 25, 2019.  ¶98.

On September 28, 2020, the SEC issued the SEC Order in which it found that Interface, Lynch and Bauer had violated various sections of the Securities Act and Exchange Act.  ¶¶100-102.  The SEC also explained that Interface had deliberately impeded the SEC Investigation by producing documents in response to investigative requests that were suggestive of contemporaneous support for journal entries that, in truth, did not exist at the time the entries were recorded.  ¶103.  One of Interface's employees also certified as contemporaneous business records certain documents that had been modified after the investigation began, and that these deliberate actions impeded the SEC's investigation.  *Id*.

## IV.    ARGUMENT

### A.    Applicable Legal Standards

"In general, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient 'to state a claim to relief that is plausible on its face.'"  *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *4 (S.D.N.Y. Apr. 22, 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court must construe the complaint liberally, "accept[ing] all factual allegations in

the complaint as true" and construing them in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

"[A] plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino*, 228 F.3d at 161.  As the Second Circuit has explained, "Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). The AC more than ably satisfies these requirements and Defendants' motion should be denied.

## B.     The AC Properly Relies on the SEC Order

Citing to *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), Defendants argue that the AC's reliance on the facts developed by the SEC during the SEC Investigation, which included information derived from Interface's own internal investigation, is inappropriate. Def. Br. at 8-9.  Defendants are incorrect.  More recent Second Circuit authority has distinguished *Lipsky* and clarified that "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA."  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). Indeed, where the evidence of wrongdoing is peculiarly within the Defendants' knowledge, or that of the SEC, like here, it is certainly proper for Plaintiff to rely on an SEC order.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (allowing SEC order to be relied upon in order to survive a motion to dismiss where the underlying facts are "peculiarly within the opposing party's knowledge").  Indeed, *Lipsky* itself explicitly states that

"its holding was limited to the facts of [that] case," 551 F.2d at 893-94.[2]  Thus, the Court should

not strike any allegations in the AC.

### C.  The AC Pleads Actionable Misrepresentations and Omissions

To allege an actionable misstatement or omission, a plaintiff must "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v.

Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *see also* 15 U.S.C. §78u-4(b)(1).

### 1.  Interface's False Financial Results Were Material

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by

alleging a statement or omission that a reasonable investor would have considered significant in

making investment decisions."  *Ganino*, 228 F.3d at 161.  Materiality is "inherently fact-specific,"

requiring a reasonable investor to consider information "'significant in making investment

decisions . . . .'"  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716-17 (2d Cir. 2011) (quoting

*Ganino*, 228 F.3d at 161-62).  "A complaint may not properly be dismissed . . . on the ground that

the alleged misstatements or omissions are not material unless they are so obviously unimportant

to a reasonable investor that reasonable minds could not differ on the question of their importance."

*Ganino*, 228 F.3d at 162; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360

(2d Cir. 2010) (the issue of materiality "will rarely be dispositive in a motion to dismiss.").  Courts

must analyze "all relevant considerations" when assessing materiality.  *Litwin*, 634 F.3d at 717.

---

[2]   It is fairly commonplace, especially in courts in this Circuit, for plaintiffs to use facts alleged in other cases to support claims in their litigation.  *See, e.g.*, *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *19 (E.D.N.Y. May 20, 2020) (holding that counsel "may rely on documentary evidence that qualifies as a reliable source for pleading purposes."); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019) ("the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings"); *JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*, 2018 WL 5266877, at *15-*16 (S.D.N.Y. Oct. 23, 2018) (permitting prior consent order between SEC and defendant to remain in amended complaint).

"Quantifying, in percentage terms, the magnitude of a misstatement . . . cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Id.*

Indeed, materiality is not simply judged by application of a bright-line numerical threshold. *See Basic*, 485 U.S. at 236 & n.14 (rejecting a rigid application of materiality determinations); *see also Ganino*, 228 F.3d at 162 (following *Basic*, "we have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation"). Qualitative materiality factors can render quantitatively small misstatements actionable. *See id.* at 163.[3]

In an effort to downplay the impact of their misconduct, Defendants ask the Court to view the quantitative effect of their manipulations through the prism of total expenses and assets – financial statement line items that are, conveniently, the least impacted. But the quantitative effect of Defendants' manipulations on Interface's quarterly reported ***earnings*** cannot be deemed "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance." *Basic*, 485 U.S. at 236. Earnings results and releases are clearly material to investors. *See Ganino*, 228 F.3d at 163-64 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997) ("earnings reports are among the pieces of data that investors find most relevant to their investment decisions . . . information about a company's past and current earnings is likely to be highly 'material'")); *see also In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) (same).

---

[3]    While it is true that the Second Circuit has described misstatements falling below 5% as "presumptively immaterial," in the same stroke the Circuit has cautioned that courts must consider both quantitative and qualitative factors in assessing materiality. *See, e.g., ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F. 3d 187, 197 (2d Cir. 2009). Judge Oetken more recently held that "[s]etting up a per se numerical bar to materiality – whether five percent of sales or otherwise – runs counter to the guidance of the Supreme Court and the Second Circuit, which have described materiality as an 'inherently fact-specific finding.'" *In re Ply Gem Holdings, Inc. Sec. Litig.*, 2016 WL 5339541, at *4 (S.D.N.Y. Sept. 23, 2016).

And as SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999), which has been adopted as persuasive authority in this Circuit, notes, "[i]nvestors presumably also would regard as significant an accounting practice that, in essence, rendered all ***earnings*** figures subject to a management-directed margin of misstatement." (emphasis added). *Ganino*, 228 F.3d at 163. Moreover, as Defendants are aware, research reports issued by securities analysts primarily focus upon Interface's projected *earnings*, not its projected expense and assets values. Thus, Defendants' argument that the Court should ignore the effect of their manipulations on Interface's reported earnings misses the mark. *See United States Sec. & Exch. Comm'n v. DiMaria*, 207 F. Supp. 3d 343, 354 (S.D.N.Y. 2016) (finding under similar circumstances, "[t]hese arguments strike the Court as disingenuous - after all, if these two measures were so insignificant to the reasonable investor, why was [Defendant] so focused on them?" and "[a]t this stage in the litigation the [Plaintiff] is entitled to have the Court to draw all reasonable inferences in its favor, and on the facts alleged it is reasonable for the Court to conclude that [Defendants, as well as] financial analysts, and investors - viewed these two metrics as significant.").[4]

Regardless, the decision of "which particular financial metric offers the best like-to-like comparison" is highly fact specific and inappropriate for resolution at the motion to dismiss stage. *Ply Gem*, 2016 WL 5339541, at *4 (citing *Ganino*, 228 F.3d at 165); *see also Interpublic Grp. of Cos., Inc. v. Fratarcangelo*, 2002 WL 31682389, at *11 (S.D.N.Y. Nov. 26, 2002) (where parties disagreed on which accounting metric was best for comparison of alleged overstatement, materiality was satisfied at pleadings stage).

---

[4]   Like in *DiMaria*, 207 F. Supp. 3d at 354, Defendants prominently touted their earnings at every turn, leading with them in their earnings releases and explaining that on more than one occasion they had set EPS records for quarterly and annual EPS. *See, e.g*., ¶¶109, 123, 140, 142.

- 11 -

2.   **The Quantitative Impact of Defendants' Phony Accounting Adjustments on Interface's Earnings**

During the Class Period, Interface's financial statements presented its earnings under the following income captions, as required by Regulation S-X [17 C.F.R. §210]: (i) operating income; (ii) income before income tax expense, or pre-tax income; and (iii) net income.  Except for net income, which Plaintiff cannot quantify without the benefit of discovery because it is a function of the Company's income tax expense, the following chart shows that Defendants' manipulations of Interface's quarterly reported income numbers by no less than 5% and by as much as 15% during the Class Period, ¶¶194, 196, 198, 201, 203, were quantitatively material:

| | For The Quarters Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | July 5, 2015 | October 4, 2015 | January 3, 2016 | April 4, 2016 | July 3, 2016 |
| **Operating Income** | 5% | 11% | 6% | 13% | 6% |
| **Income Before Income Tax Expense** | 5% | 12% | 7% | 15% | 7% |

As Defendants themselves concede, when assessing the quantitative aspect of materiality, courts routinely begin with a 5% threshold that is easily satisfied here.  *See, e.g., ECA & Loc. 134*, 553 F.3d at 204; *Lockheed*, 875 F.Supp.2d at 368 (observing that five percent threshold is "merely a 'rule of thumb'" and "materiality cannot be reduced to a numerical formula"); *see also Ganino*, 228 F.3d at 166 (misstatements of 11.7% and 8% of pre-tax income not dismissed as immaterial).

3.   **The Accounting Adjustments Were Qualitatively Material**

The AC alleges that Interface reported artificially inflated income and EPS results by making non-GAAP compliant adjustments in order to meet or exceed earnings estimates.  *See, e.g.*, ¶¶42, 44, 48, 50-51, 55, 58, 60, 64-65, 72, 81, 89, 194-224, 230-232.  SEC SAB No. 99 embodies the "thoroughly reasoned," non-exhaustive list of qualitative materiality factors "consistent with existing law[.]"  *Ganino*, 228 F.3d at 163; *see also ECA & Loc. 134*, 553 F.3d at 198; *United States v. Carroll*, 2020 WL 1862446, at *4 (S.D.N.Y. Apr. 14, 2020); *Interpublic*

- 12 -

*Grp.*, 2002 WL 31682389, at *11 (materiality analysis premature where "alleged overstatement masked a change in ***earnings*** and a failure to meet the expectations") (emphasis added).

Here, as in *Ganino*, the relevant qualitative materiality factors are "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise[,]" and "whether the misstatement masks a change in earnings . . . ." SAB No. 99.[5]  As alleged in the AC, Lynch and Bauer, in violation of GAAP, caused Interface to record sham accounting entries in order to inflate Interface's earnings so that it met or exceeded consensus estimates, and *continued to incorporate those falsified results* throughout the Class Period, strongly satisfying two important qualitative materiality factors.  *See, e.g.*, ¶¶42, 44, 48, 50-51, 55, 58, 60, 64-65, 72, 81, 89, 147, 156, 169; *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (misstatement material when, *inter alia*, it concealed failure to meet analysts' expectations).

This analysis is also supported by SEC SAB No. 99:

> ". . . where management has intentionally misstated items in the financial statements to "manage" reported earnings.  *In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements*."  [Emphasis added.]

This case bears a striking resemblance to *DiMaria*.  There, the SEC alleged that defendants "tune[d] Bankrate's numbers to meet financial targets" including EPS results.  207 F. Supp. 3d at 347-48, 350.  Like here, defendants challenged materiality by "devot[ing] several pages of their briefs to descriptions of alternate calculations of the impact of the allegedly false financial information on various metrics[.]"  *Id.* at 353; *see* Def. Br. at 11-13.  But these alternate calculations are simply an attempt to obfuscate the highly factual issue of materiality.  Relying on

---

[5]   Against this backdrop, Defendants' arguments that the size of the quantitative effect of the misstatements is important loses force.  *See, e.g.*, *Kidder*, 10 F. Supp. 2d at 410 (relying on *Basic* and declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial).

*Ganino* and SAB No. 99, the court in *DiMaria* found that the quantitative analysis of materiality is "only the starting point in the Court's materiality analysis."  207 F. Supp. 3d at 353-54.  And the allegations that "DiMaria intended to manage earnings and thereby conceal Bankrate's failure to meet analysts' consensus expectations" satisfied "two qualitative factors [that] are highlighted in the SAB as factors that may render relatively smaller misstatements material and support a finding of materiality at the pleading stage."  *Id*. at 353.

### 4.  Defendants' Misstatements Are Not Statements of Opinion

Defendants argue that Interface's *intentionally misstated* earnings are inactionable statements of opinion because the underlying accounting required some subjective analysis.  *See* Def. Br. at 9-11.[6]  Not so.  Interface's intentionally falsified inflated earnings, derived from non-GAAP compliant accounting adjustments, are not statements of opinion because they are not based on any supported application of GAAP.  *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) ("[M]isstated asset valuations attributable to 'improper accounting practices' raise issues of objective fact that are not protected as opinion statements."); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) (holding that where GAAP violations caused income and earnings to be artificially inflated "*[m]isreported financial information* clearly amounts to a false statement of fact").[7]

---

[6]  Defendants' authorities are inapposite. Each involves inherently subjective accounting principles such as future estimates or loss reserves, and not intentionally manipulated accounting entries in order to meet or exceed earnings estimates.  *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011) (addressing goodwill and loan loss reserves); *Martin v. Quartermain*, 732 F. App'x 37, 40-41 (2d Cir. 2018) (analyzing statements about the *estimated value* of newly discovered mineral deposits).  *In re AmTrust Financial Services, Inc. Securities Litigation*, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019), only analyzed the treatment of various accounting metrics, not whether after-the-fact manual adjustments in violation of GAAP were statements of opinion.

[7]  Unsurprisingly, Defendants argue that the AC's allegations are deficient because they fail to plead evidence prior to discovery.  Def. Br. at 10.  This is not the law at the pleading stage.  *See*

Even if the Court finds that the statements alleged to be false or misleading contain opinions, they are still actionable because Defendants could not have sincerely believed them to be true. *See Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)) ("[L]iability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.''). As there is no authority whatsoever under GAAP for making unsupported after-the-fact accounting entries, no valid opinion can be derived from them. Thus, any subjectivity regarding the actual valuations of the CSV and management incentive bonus were largely irrelevant because the adjustments were not made as part of any subjective analysis required by GAAP but, rather, as part of Defendants' scheme to manipulate Interface's earnings. *See, e.g.*, ¶¶46, 55-57, 62, 67-68, 71, 74, 76, 84, 88.

### 5.   Interface's SOX Certifications, and Statements Regarding the Adequacy of Interface's Internal Controls Were False

Throughout the Class Period, Interface appended Exhibits to its Forms 10-Q and 10-K attesting to their accuracy, which were signed by each of the Individual Defendants. *See, e.g.*, ¶¶114, 119, 121, 129, 138, 148, 154, 161, 165, 173, 180, 187. Lynch signed several of these certifications while he was directing the recording of unsupported accounting entries in Interface's books (up until his resignation in November 2016). *See, e.g.*, ¶¶114, 119, 121, 129, 138, 148, 154. Interface also included statements in its quarterly and annual reports, often signed by Lynch, that Interface's independent auditor and Interface's Audit Committee were made aware of "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" and that "[b]ased on [their] evaluation

---

*Scholastic*, 252 F.3d at 72 ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation[.]"

our President and [CEO] and our Senior Vice President and [CFO] concluded that our disclosure controls and procedures were effective . . ." ¶¶111, 119, 127, 136, 146. These were knowingly false and misleading, and attributable to each signatory. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001).

The statements concerning the adequacy of Interface's internal controls are actionable because Lynch attested to representations about Interface's disclosure controls he knew to be false, based on his own personal involvement in the fraud. *See, e.g., In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019). The later SOX certifications, attestations, and statements were false or misleading because Defendants knew facts or had access to information suggesting these statements were false given the institution of the SEC Investigation into these issues, and their own internal investigation. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617-19 (S.D.N.Y. 2015) (SOX certifications actionable).

Interface's statements concerning the effectiveness of its internal controls are likewise actionable. *See, e.g.*, ¶¶111-114, 119, 129, 135-136, 138, 146, 148, 152, 154, 228-232. These statements falsely represented that such controls were operating effectively at the same time Lynch and Bauer were directing the fraud. *See In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *4 (S.D.N.Y. June 12, 2018) (finding a later admission that internal controls were not effective sufficient to show falsity).[8]

### D. The AC Adequately Alleges Scienter

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A).

---

[8] Moreover, even if the SOX certifications, attestations, and statements are viewed as opinions, they could not possibly have been sincerely held because of Lynch's direct involvement in the fraud and the Company's internal investigation.

Plaintiffs may plead scienter by "'alleging facts to show that defendants had both motive and opportunity to commit fraud, *or* . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69. To plead recklessness, the conduct alleged must be "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 127 n.11 (2d Cir. 2013). At the pleading stage, "the plaintiff is not required to prove his case; only to raise a reasonable and strong inference of scienter." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006).

"[T]he reviewing Court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326. The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324; *Lockheed*, 875 F.Supp.2d at 372 ("a tie . . . goes to the plaintiff"); *see also Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("A court . . . must assess the complaint in its entirety, and not scrutinize each allegation.").

Here, the AC more than adequately alleges scienter both by alleging facts illustrating Defendants' motive and opportunity, as well as strong circumstantial evidence of scienter. The AC alleges that Lynch and Bauer intentionally and repeatedly made unsupported sham journal entries for no purpose other than to meet or exceed consensus estimates (*see, e.g.*, ¶¶39, 41-42, 58, 67, 74, 76, 87); that Defendants had access to information undermining the accuracy of their statements (*see, e.g.*, ¶¶94-95, 99; Avidan Decl. Ex. A ¶10); that Defendants signed SOX certifications falsely attesting to the accuracy of Interface's financial statements and internal

controls (¶¶251-253); that the SEC Order charged Bauer and Lynch with willful violations of the Exchange Act (¶¶100-103); the existence of the SEC Investigation itself (¶¶243-248); and Lynch's resignation on November 2, 2016 from a position he held for 15 years, just after the end of Q2 2016 when the fraud is alleged to have concluded (¶¶249-250), as facts supporting scienter. The AC also pleads motive by alleging Hendrix and Lynch's highly suspicious stock sales. ¶¶253-256.

Based on these allegations – which must be accepted as true – it is at least equally likely that Defendants acted with scienter when falsely reporting artificially inflated earnings based on unsupported accounting entries. Tellingly, *Defendants fail to offer any competing inference*, much less one more likely than the inference suggested by Plaintiff. *Tellabs*, 551 U.S. at 326. Indeed, there is no credible inference drawn from the facts as pleaded other than that Defendants knew or recklessly disregarded that Interface's earnings were false as a result of the unsupported accounting entries that did not conform with GAAP.

### 1. The Unsupported Accounting Entries Support Scienter

The AC alleges that Lynch and Bauer intentionally, and repeatedly, caused Interface to issue fraudulent financial statements using phony accounting entries to enable Interface to meet, or exceed, earnings estimates. *See, e.g.*, ¶¶43-48, 54-58, 62-64, 67-72, 74, 76, 87; Avidan Decl. Ex. A ¶10. This alone is sufficient to allege scienter as Lynch and Bauer were personally involved in this misconduct with the intent of falsifying Interface's reported income. *See, e.g., Blanford*, 794 F.3d at 309 (finding scienter where, "[t]aken together, and even in light of opposing inferences, the Complaint's allegations articulate Defendants' intent to craft a false growth story"); *Novak*, 216 F.3d at 311-12; *SEC v. Escala Grp., Inc.*, 2009 WL 2365548, at *13 (S.D.N.Y. July 31, 2009) ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under §10(b).").

Tellingly, Defendants do not contend that the adjustments were proper or that they complied with GAAP. Instead, they argue that GAAP violations are insufficient to allege scienter,

especially when they involve the exercise of judgment.  Def. Br. at 17.  But this argument misses the mark as the AC clearly alleges that the accounting adjustments at-issue were groundless and had no support under *any* application of GAAP.  *See, e.g.*, ¶¶44, 50, 63, 68, 70, 75, 77.  In other words, the only reason for Lynch and Bauer's actions was to ensure Interface would meet or exceed analysts' expectations.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) ("allegations of a knowing or reckless violation of GAAP" support scienter).

In any event, Courts in this circuit have found that, while GAAP violations "standing alone" may be insufficient to state a securities fraud claim, when "coupled with evidence of corresponding fraudulent intent," as the AC alleges, a strong inference of scienter is supported. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016); *Novak*, 216 F.3d at 309; *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018).[9]

Moreover, the SEC Investigation began in November of 2017 (¶246), after the manipulative journal entries had already been made (and after Lynch had resigned (¶¶249-250)), and Interface received subpoenas in connection with the SEC Investigation in February 2018, July 2018, and April 2019.  ¶247.  Nonetheless, Defendants repeatedly misstated Interface's earnings results throughout the Class Period, even after Interface had already conducted its own internal investigation.  *See, e.g.*, ¶¶176, 178-180, 182-183, 185-187.  This further supports scienter as Defendants were plainly aware that Interface's results were not reliable, *see Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 473 (S.D.N.Y. 2013) ("find[ing] a strong inference of

---

[9]   Defendants prominently displayed and discussed Interface's income and EPS in the Company's earnings releases, underscoring the importance of the metric to Defendants.  ¶¶42, 65, 82.  This further supports scienter under these facts.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (repetition of a statement will more readily support scienter); *Novak*, 216 F.3d at 311-12 (same).  Defendants mischaracterize Plaintiff's scienter allegations regarding the repeated discussion of earnings as invoking the "'core operations' doctrine," Def. Br. at 18, but that argument fails because no such allegation exists in the AC.

scienter" where plaintiffs "adequately alleged that defendants were aware of information that contradicted their statements") and had access to information undermining the accuracy of their statements regarding the Company's earnings and the strength of the Company's internal controls. ¶99.  *See Novak,* 216 F.3d at 308, 311; *Orthofix,* 89 F. Supp. 3d at 618 (scienter supported by the allegation that information regarding the company's finances were "reasonably available," even though the plaintiff did not specifically allege that the officer read those reports).[10]

### 2.    The AC Alleges Other Strong Circumstantial Evidence of Scienter

The AC further alleges that Defendants signed SOX certifications attesting to the accuracy of Interface's financial statements and the adequacy of its internal controls (¶¶251-253), *Plumbers & Pipefitters Nat'l Pension Fund v. Davis,* 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *11-*12 (S.D.N.Y. Mar. 28, 2018); that the SEC Order charged both Bauer and Lynch with willful violations of the Exchange Act and the existence of the SEC Investigation itself (¶¶100-103); *see In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 353, 380 (E.D.N.Y. 2013); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008);[11] and Lynch's resignation on November 2, 2016, just after the end of Q2 2015

---

[10]   Defendants' contention that scienter is somehow undercut because "Interface 'missed' consensus about as often as it 'met' or 'beat' it, including during Lynch and Bauer's tenure." Def. Br. at 17, should be disregarded because that misses all happened *prior to the alleged fraud*. In fact, this cuts in favor of scienter because Interface went on a four quarter run of meeting or exceeding earnings estimates *during* the Class Period, including its highest ever EPS.

[11]   While Defendants argue that the SEC Order only alleges negligence and not fraud, Def. Br. at 19, that contention ignores that the facts alleged in the SEC Order also support a claim for fraud (despite whatever claim the SEC ultimately decided to proceed with), as alleged in the AC.  Indeed, the SEC Order – which followed offers of settlement from those charged – is unambiguous about the underlying misconduct: Interface's two most senior accounting officers intentionally made or caused others to make unsupported manual accounting adjustments to increase Interface's reported earnings.  Defendants' cases are inapposite because the facts alleged there did not independently

from a position he held for 15 years (¶¶249-250), *see Van Dongen.*, 951 F. Supp. 2d at 474; *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007), as facts further supporting the holistic analysis of scienter.  Defendants' attempts to compartmentalize and analyze each allegation independently should be rejected.  *See Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also Blanford*, 794 F.3d at 305 ("A court . . . must assess the complaint in its entirety, and not scrutinize each allegation.").

### 3. Hendrix's and Lynch's Suspicious Stock Sales, and the OSIP Contribute to the Holistic View of Scienter

Considering the strength of the conscious misbehavior and/or recklessness allegations here, pleading "motive and opportunity" is unnecessary.  *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"); *see also Ganino*, 228 F.3d at 170.  Nonetheless, the AC alleges large, unusually timed stock sales for both Hendrix and Lynch (¶¶235-236), which correspond to the timing of the accounting improprieties at-issue, further adding to the holistic view of scienter.  *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  The AC also alleges that Interface amended and restated its Omnibus Stock Incentive Plan ("OSIP") just prior to the start of the accounting improprieties, which included annual EPS as a performance objective,[12] further adding to Defendants' motive to commit fraud.  ¶¶254-257.

Contrary to Defendants' argument that there is no alleged pattern of sales post-fraudulent accounting (Def. Br. at 15), the AC pleads that Lynch sold 15,000 shares of stock pursuant to a

---

support fraud.  Moreover, Defendants' argument that the SEC settlement should not be relied on because there was no admission of guilt overlooks that there was also no denial of the charges.

[12]  Interface falsely reported the highest annual EPS in Company history after the OSIP was amended and restated.  ¶¶123-124. Citing no support, Defendants advance the argument that annual targets, one of them being EPS – for which Interface claimed the highest result in Company history (¶¶123-124) – provide no incentive to defer expenses within the same year. Def. Br. at 16. This is clearly a question of fact incapable of being determined at the pleading stage.

10b-5(1) trading plan entered into on March 14, 2016, well after the fraudulent accounting had begun.  ¶¶234-236; Avidan Decl. Ex. A ¶41.  Moreover, these shares were granted to him pursuant to the OSIP, which tied incentive grants to annual EPS, a figure that Interface touted as having been the highest in its history.  *See, e.g.*, ¶¶123-124, 254-257.  Further, Lynch's resignation on November 2, 2016, after he had sold 7,500 of these shares at inflated prices pursuant to the 10b-5(1) trading plan entered into during the Class Period, adds to the scienter analysis.  ¶¶249-250.  *See Van Dongen*, 951 F. Supp. 2d at 475 (in evaluating the totality of the scienter allegations, stock sales "comparatively small in amount, can be considered unusual because of their timing").  Hendrix sold his shares pursuant to 10b-5(1) plans entered into on May 12, 2016 and June 7, 2017.  *See Blanford*, 794 F.3d at 309 (where 10b5-(1) trading plans are entered into during the class period, they "provide[] no defense to scienter allegations").  Moreover, some of Hendrix's largest trades (February 27, 2017 and March 8, 2017) were not made pursuant to any 10b5-1 trading plan but were made while Hendrix was in possession of material non-public information, which adds to the scienter inquiry.  *See, e.g.*, ¶235.  Thus, Plaintiff's allegations of motive enhance the scienter allegations here.[13]

### 4.    The AC Alleges Corporate Scienter

Because the AC pleads a strong inference of scienter as to the Individual Defendants, it establishes Interface's corporate scienter as well.  ¶258.  *See Celestica*, 455 Fed. Appx. at 15.[14]

---

[13]   That Gould and Hausmann increased their net holdings during the Class Period does not undermine scienter, *see* Def. Br. at 16, as any share increases came **solely** via automatic grants of restricted stock, **not** through open market purchases.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (shares acquired at no cost did not undermine scienter).

[14]   Defendants erroneously argue that Bauer's scienter cannot be imputed to Interface because he was not at the management level.  Def. Br. at 14 n.12.  As the Company's controller, however, Bauer would certainly be considered "an individual whose knowledge is imputed to the corporation."  *See, e.g.*, *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012); *In re Sonus Networks, Inc. Sec. Litig.*, 2006 WL 1308165, at *22 (D. Mass.

E.    **The AC Adequately Alleges Loss Causation**

A plaintiff must allege "a causal connection between the material misrepresentation and the loss" to establish loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  To adequately plead loss causation, plaintiffs need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," which should not "impose a great burden upon a plaintiff."  *Id*. at 347.

The AC alleges that, on April 24, 2019, Interface announced the SEC had been investigating Interface's "historical quarterly [EPS] calculations and rounding practices," "[t]he Company subsequently received subpoenas . . . in February 2018, July 2018 and April 2019[,]" and Bauer had been placed on administrative leave because "in the process of collecting materials . . . for production to the SEC, he added certain notes to those materials that were then produced to the SEC[,];"investors suffered a loss when the stock price fell.  ¶¶96-98, 270-271.  Likewise, the AC alleges that on September 28, 2020, the SEC Order confirmed that Interface's earnings had been intentionally misstated, that Interface lacked sufficient controls to prevent unsupported manual journal entries, and that an Interface employee had attempted to impede the SEC Investigation.  ¶¶273-279.  These allegations adequately allege loss causation at this stage.

Defendants challenge loss causation for both adverse disclosure dates.  With regard to the April 2019 disclosure, Defendants contend that, by that date, the incentive compensation had been paid and the collateral had been removed from Interface's balance sheet so the "balance-sheet effects of the alleged under-accruals and over-valuations [had already] materialized" and were

---

May 10, 2006) (pleading scienter of corporate controller satisfied the strong inference standard). Indeed, the lone case cited by Defendants, *Thomas v. Shiloh Industries, Inc.*, 2017 WL 2937620 (S.D.N.Y. July 7, 2017), concerned a controller at one location, not company-wide like Bauer.  *Id*. at *4.  Defendants do not dispute that Lynch, Interface's CFO who was also engaged in the underlying accounting improprieties, can easily establish Interface's scienter.

therefore disclosed. Def. Br. at 20.  This argument fails because it is not what Plaintiff alleges was

not disclosed.   Indeed, the AC alleges that statements regarding Interface's earnings were

materially false and misleading for, *inter alia*, failing to disclose that improper and unsupported

adjustments were made to Interface's accounting entries for the purpose of manipulating its

earnings, that Interface's reported earnings did not accurately reflect its underlying financial

performance and did not comply with GAAP, and that Interface lacked critical controls and had

inadequate internal controls and disclosure controls.  Contrary to what Defendants contend, none

of these claims were disclosed by the payment of the incentive compensation or the removal of the

collateral from Interface's balance sheet.[15]

The AC also adequately alleges loss causation for the April 2019 disclosure of the SEC

Investigation.   *See, e.g., Gentiva*, 932 F. Supp. 2d at 388 ("announcement regarding a

governmental investigation into the precise subject matter which forms the basis of the fraudulent

practices at issue can qualify as a partial corrective disclosure"); *In re Take-Two Interactive Sec.

Litig*., 551 F. Supp. 2d 247, 288 (S.D.N.Y. 2008) ("the court has found little support for a per se

rule holding that the announcement of an SEC investigation cannot alone form the basis of loss

causation allegations"); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y.

---

[15]   Unsurprisingly, Defendants' cited authorities are inapposite.  In *In re Omnicom Group, Inc.
Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), the details of a transaction and the effect on
Omnicom's balance sheet had been the discussion of analysts for over a year.  *Id*. at 511-12.  Here,
there is no suggestion that the market was previously aware of the accounting improprieties.
Moreover, "*In re Omnicom*, [ ] concerned a motion for summary judgment.  On a motion to
dismiss, all that is required is 'some indication of the loss and the causal connection that the
plaintiff has in mind.'" *In re Petrobras Sec. Litig*., 150 F. Supp. 3d 337, 343 (S.D.N.Y. 2015).  In
*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), plaintiffs relied on a presentation from a third
party that relied on only publicly available sources to plead loss causation.  Here, there was no
publicly available source that would provide the information concerning Interface's non-GAAP
manual accounting adjustments that inflated their EPS results.

Mar. 30, 2012) (announcement of internal investigation sufficient for loss causation when "*investigation [is linked] to the actual fraudulent conduct alleged in the complaint*").[16]

Moreover, Defendants' challenge to the September 2020 disclosure – that Interface's stock price did not decline until the following day, Def. Br. at 21-22 – also falls short.  *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (loss causation adequately alleged where the market reacted negatively one day later to a corrective disclosure made the prior morning).  Further, the Supreme Court has explained that due to market realities, it may take time for information to be filtered into the market.  *See Basic*, 485 U.S. at 240 (rejecting a bright-line rule for loss causation that a stock price must instantly react).[17]

### F.     The AC Alleges Control Person Liability

Because the AC states a 10(b) claim against Defendants, and scienter has been pled with particularity, Plaintiff has also stated a control-person claim with culpable participation.

## V.     CONCLUSION

For the reasons above, the Court should deny Defendants' motion.[18]

DATED:  July 19, 2021                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         PHILIP T. MERENDA

---

[16]   Defendants' reliance on *In re XP Inc. Securities Litigation*, 2021 WL 861917 (E.D.N.Y. Mar. 8, 2021), is misplaced as it analyzed whether there is an independent duty to disclose an investigation absent another recognized duty to disclose, which is not at issue here.

[17]   Defendants' argument that loss causation is undermined because Interface's stock price rebounded after the final disclosure is a factual issue not resolved at this stage.  *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 248 (S.D.N.Y. 2018) (citation omitted).

[18]   If the Court dismisses all or part of the AC, Plaintiff respectfully requests leave to amend, which should be freely given.  *See* Fed. R. Civ. P. 15(a)(2); *Loreley Fin*, 797 F.3d at 190 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
pmerenda@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on July 19, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD