PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS       (1927-1950)
JOHN F. WHARTON      (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3306

WRITER'S DIRECT FACSIMILE

(212) 492-0306

WRITER'S DIRECT E-MAIL ADDRESS

hfischman@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
GERALD BRANT
ROBERT A. BRITTON
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
ARIEL J. DECKELBAUM
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
BRUCE A. GUTENPLAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN M. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MATTHEW B. JORDAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
ALAN W. KORNBERG
DANIEL J. KRAMER
BRIAN KRAUSE

CAITH KUSHNER
KAISA KUUSK
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. MCCOLM
JEAN M. MCLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT
JESSICA E. PHILLIPS*
AUSTIN S. POLLET*
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE*
WALTER G. RICCIARDI
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM*
SUHAN SHIM
CULLEN L. SINCLAIR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
JOHN WEBER
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
ADAM WOLLSTEIN
JULIA TARVER MASON WOOD
STACI YABLON
JORDAN E. YARETT
BOSCO YIU*
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

December 21, 2022

VIA ECF

Honorable Judge Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *Swanson* v. *Interface, Inc.*, No. 1:20-cv-05518-BMC-RER (E.D.N.Y.)

Dear Judge Cogan:

We represent Interface, Inc., Daniel T. Hendrix, Bruce A. Hausmann, and Patrick C. Lynch (together with Jay D. Gould, "Defendants") in the above-referenced action. We write jointly with Steamfitters Local 449 Pension Fund ("Lead Plaintiff") and third-party Chartwell Investment Partners ("Chartwell") pursuant to Paragraph III.A.1 of Your Honor's Individual Rules of Practice, regarding an outstanding discovery dispute.

Specifically, Defendants seek to compel: (i) Lead Plaintiff to comply with Defendants' Requests Nos. 1-10, 13-14, 16-18, 20-22, and 25 from Defendants' First Set of Requests for

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

Production to Lead Plaintiff; and/or (ii) Chartwell to comply with Requests No. 1-18 and 25-27 from Defendants' August 25, 2022 subpoena to Chartwell (the "Subpoena").[1]

The Parties have met and conferred over email and phone in compliance with Fed. R. Civ. P. 37(a)(1).[2]

## I.  Defendants' Position

Plaintiffs bring this case under section 10(b) of the Securities Exchange Act of 1934, claiming they purchased Interface's stock at artificially inflated prices.  Chartwell was Lead Plaintiff's investment adviser.  Defendants move to compel Lead Plaintiff and Chartwell to produce documents reflecting why Chartwell bought and sold Interface securities on behalf of Lead Plaintiff during the purported class period.  These documents are among the most relevant evidence Lead Plaintiff (or any plaintiff) has in the case as they bear upon when Lead Plaintiff traded, why it traded, what it did and did not rely upon when it traded and what damages, if any, it suffered.  Further, since Lead Plaintiff will soon seek to become a class representative, these documents also will be highly relevant to various class certification issues, including whether Lead Plaintiff will be an adequate class representative, whether its claims are typical of the class it seeks to represent, and whether individual issues predominate over issues that are common to the proposed class.  Although the documents Interface seeks are in Chartwell's possession, it is clear that Lead Plaintiff "controls" the documents both as Chartwell's client and pursuant to express rights to obtain such information under its Advisory Agreement with Chartwell.

---

[1]   The Subpoena called for a production at Paul Weiss' office in the Southern District of New York.  Chartwell has consented to this motion being heard in this District pursuant to Fed. R. Civ. P.  Ex. D-1.

[2]   Defendants met and conferred with Lead Plaintiff regarding the issues in this joint letter over email on November 11, 14, 15, and 23, 2022 (Exs. D-2, D-3) and over phone on: (i) October 20, 2022 for approximately one hour; and (ii) November 28, 2022 for approximately thirty minutes.  Harris Fischman, Shane Avidan, Emily Vance, and Amitav Chakraborty participated in the October 20 meet and confer on behalf of Defendants.  Harris Fischman, Shane Avidan, and Amitav Chakraborty participated in the November 28 meet and confer on behalf of Defendants.  David Rosenfeld, Natalie Bono, and Philip Merenda participated in both meet and confers on behalf of Lead Plaintiff.  In addition, Defendants met and conferred with Chartwell over email regarding the issues outlined in this joint letter on October 7, October 11, October 13, November 1, November 2, November 7, and November 8, 2022. *See* Ex. D-1.  Defendants met and conferred with Chartwell over the phone on: (i) October 10, 2022 for approximately thirty minutes; (ii) October 28, 2022 for approximately 30 minutes; and (iii) November 30, 2022 for approximately thirty minutes.  Shane Avidan and Amitav Chakraborty participated in the October 10 and October 28 meet and confers on behalf of Defendants.  Harris Fischman and Shane Avidan participated in the November 30 meet and confer on behalf of Defendants.  Chaila Restall participated in all meet and confers on behalf of Chartwell.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

Nonetheless, Lead Plaintiff has refused to collect and produce these documents and instead has told Defendants that they must obtain them from Chartwell. Chartwell, in turn, has refused to produce the documents (other than a few) unless Defendants agree to pay Chartwell's costs in producing them. When Lead Plaintiff was informed of Chartwell's position, it refused to take any action to facilitate the production of its trading records; it refused to instruct Chartwell to produce the documents and refused to pay for the production.

Lead Plaintiff's refusal to ensure production of key documents relating to its investment decisions is a total derogation of its responsibilities in this action. In its motion to be appointed as Lead in this case, Lead Plaintiff assured this Court that it is a "sophisticated institutional investor that is familiar with the requirements and responsibilities of being a lead plaintiff in a securities class action and is willing to undertake those responsibilities." *Swanson* Dkt. No. 10. Lead Plaintiff has failed to fulfill those duties. Instead of demonstrating that it is "generally able to conduct this litigation," *id.*, including by meeting its discovery obligations, Lead Plaintiff is resisting discovery into the core issue in the case: why it invested in Interface securities. Lead Plaintiff's unwillingness to ensure that documents related to its investment decisions are promptly produced in this litigation would prevent it from being a plaintiff in this action, much less lead the action, and casts serious doubts on its fitness to serve as Lead or class counsel altogether.

Chartwell's demand for cost shifting from Defendant is similarly improper. Chartwell is not a classic, disinterested third party. Instead, it entered into a voluntary, contractual, for-profit relationship with Lead Plaintiff, whose lawsuit has necessitated the discovery. Chartwell must produce documents relevant to this case. And its demand for cost shifting should be denied as courts disfavor cost-shifting in favor of third parties, like Chartwell, who were substantially involved in the transactions underlying the litigation and for whom the risk of litigation discovery was foreseeable. Chartwell also has the means to pay. It manages $10 billion in assets, and its parent company manages more than $1 trillion. Ex. D-4. Moreover, Defendants have offered modest ESI search parameters to address any concerns about undue burden.

## A. Background

This is a lawsuit under section 10(b), where plaintiffs claim that they purchased Interface's stock at artificially inflated prices. Defendants, naturally, sought all documents relating to Lead Plaintiff's purchase of Interface stock. Lead Plaintiff identified Chartwell as its investment adviser in its initial disclosures and interrogatory responses. Exs. D-5, D-6. Chartwell has produced its advisory agreement with Lead Plaintiff, which gives Lead Plaintiff the right to obtain "such other information or reports as relates to the management of the Account as the [Lead Plaintiff] or its duly authorized representative may reasonably request from time to time or as required by applicable law." Ex. D-7 at 5.

Defendants' discovery requests to Lead Plaintiff sought documents from "the files of [Lead] Plaintiffs' representatives, agents, . . . [and] outside investment advisors, . . . who advised on, possessed discretion to make investment decisions regarding, and/or monitored [Lead] Plaintiff's investments in Interface." Ex. D-8 at 5. Lead Plaintiff has agreed to produce those documents to the extent they exist on its own servers or files, but has repeatedly refused to make

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

any effort to provide documents held by Chartwell, whether as party or third-party discovery, including refusing to reimburse Chartwell for its costs.  Exs. D-2, D-3.  Lead Plaintiff has taken the position that obtaining Chartwell's documents concerning decisions to buy or sell Interface securities on behalf of Lead Plaintiff is Defendants' problem.

Defendants also served a Rule 45 subpoena to Chartwell on August 25, 2022.  *See* Ex. D-9.[3]  The subpoena seeks documents concerning:  Lead Plaintiff's transactions in Interface securities, Requests Nos. 1-4; the reasons for those transactions and information relied upon, *id.* Nos. 5-8; Lead Plaintiff's profits or losses, *id.* Nos. 9-11; the information about Interface available to Chartwell, Nos. 12-16; Chartwell's decision-making structure, policies and procedures, and agreements and communications with Lead Plaintiff, *id.* Nos. 17-18, 25, 27; and the identity of other class members, *id.* No. 26.  Chartwell did not make any specific objections to those requests.  Ex. D-10.

To date, Chartwell has made an extremely limited production of hard copy documents (~200 pages), but has not produced any emails, including its internal emails about its investment in Interface.  Chartwell's limited hard copy production to date confirms the importance of those communications.  For example, Chartwell's hard copy documents suggest that Chartwell had direct communications with Interface management.  *See* Ex. D-11 at 1-5.  The hard copy documents also suggest that Chartwell did not believe that Interface's stock price reflected its full value.  *See id.* at 4-6 (printout of email opining that Interface stock was "underlevered" and its "valuation is attractive relative to the market").

Interface has tried hard to minimize the burden on Chartwell.  After several meet and confer sessions, Defendants offered (subject to caveats regarding the accuracy of Chartwell's factual representations) to limit the discovery it is seeking to only three email custodians (even though Chartwell initially proposed eleven custodians) and five email search terms:  *Interface* and *TILE* (Interface's stock symbol on NASDAQ); email domains for Lead Plaintiff; and *(EPS OR "earnings per share") and (rounding OR rounded)*.  At this point, the number of documents Chartwell would be required to produce is quite modest, under 30,000 documents by Chartwell's own estimate.  Chartwell provided the following hit counts (Ex. D-1 at 6):

| Term | Hits |
|---|---|
| TILE | 6,303 |
| Interface | 9,290 |
| (EPS or "earnings per share") AND (rounded or rounding) | 13,794 |
| @cdsadmin.com | 2 |
| @ua449.com | 6 |

And even that estimate is overbroad since, as Chartwell acknowledges, the software that it used to generate its estimate has significant limitations that overstates the numbers.  For

---

[3]   Contrary to Lead Plaintiff's suggestion, Defendants' service of a subpoena was not a concession that Lead Plaintiff lacked repsonsibility for this discovery.  It was an effort to mitigate the damage caused by Lead Plaintiff's abdication of its responisbility.

example, a search for "TILE" on Rackspace does not just count hits for the word "TILE"; it also counts hits for all words that happen to include those four letters, such as: futile, mercantile, and percentile. *Id*. Chartwell also represented that its software cannot calculate a deduplicated total hit count for the seven terms together. For example, a document that hits on both "Interface" and "TILE" would be counted twice.

In short, despite the relatively small size of the production, Chartwell has refused to produce **any** emails, based on **any** search parameters, without Defendants first agreeing to full cost shifting. And Lead Plaintiff has refused to take any steps to cause Chartwell to produce documents, including refusing to bear the associated costs.

### B. Lead Plaintiff Has a Duty to Provide Discovery from Chartwell.

Every securities fraud plaintiff, and particularly a lead plaintiff in a putative class action, has a duty to ensure discovery concerning the reasons for its own investment decision. A plaintiff cannot "immunize [itself] from reliance challenges by outsourcing [its] investment decisions to [its] investment advisers." *Villella* v. *Chemical & Mining Co. of Chile Inc.*, 15 Civ. 2106 (ER), 2018 WL 2958361, at *6 (S.D.N.Y. June 13, 2018). Nor should be able to immunize itself from the cost of the discovery by outsourcing.

Chartwell's documents are in Lead Plaintiff's control because Lead Plaintiff has both the "legal right" and "practical ability" to obtain them. *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007), *aff'd sub nom. Gordon Partners* v. *Blumenthal*, No. 02 CIV 7377 LAK, 2007 WL 1518632 (S.D.N.Y. May 17, 2007). As noted, the Advisory Agreement between Lead Plaintiff and Chartwell gives Lead Plaintiff the right to obtain "such other information or reports as relates to the management of the Account as the [Lead Plaintiff] or its duly authorized representative may reasonably request from time to time or as required by applicable law." Ex. D-7 at 5. Lead Plaintiff has a duty to exercise that contractual right, and comply with lawfully issued document requests, or to otherwise cause Chartwell to comply with Defendants' Subpoena. *See NTL Sec. Litig.*, 244 F.R.D. at 195-96 (finding possession, custody, and control where contract "makes it clear that [the third party] was to make available to [the party[ any documents that it needed to be able to comply with its legal obligations, such as this lawsuit").[4]

---

[4] The cases cited by Lead Plaintiff are distinguishable because they did not involve a contractual right like that here. *See Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften* v. *MDL Info. Sys., Inc.*, No. C 04-05368 SI, 2006 WL 3742244, at *3 (N.D. Cal. Dec. 19, 2006) ("Beilstein provides no evidence of such a contract between MDL Inc. and MDL GmbH."); *In re Subpoena Issued to Cisco Sys., Inc.*, No. C10-80144MISC JW (HRL), 2010 WL 3155895, at *2-3 (N.D. Cal. Aug. 9, 2010) (no contractual information right cited); *Tatum* v. *Schwartz*, No. CIV S-06-1440 RRB EFB, 2007 WL 2220977 (E.D. Cal. Aug. 2, 2007) (same); *S.E.C.* v. *Credit Bancorp, Ltd.*, 194 F.R.D. 469 (S.D.N.Y. 2000) (same). *W.R. Huff Asset Mgmt. Co., LLC* v. *Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), does not concern control for discovery purposes at all, but rather standing to sue.

The relevant contractual language in *NTL*—which is analogous to the "as required by applicable law" clause of the Advisory Agreement here—provided: "[E]ach party shall . . .

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

Even if (counter-factually) Lead Plaintiff lacked control over Chartwell's documents, Lead Plaintiff would still have a duty to cause Chartwell to provide this discovery. It is fundamentally unfair for a fraud plaintiff to press its claim while disclaiming responsibility for discovery into its reliance on the ground that the documents are held by a third party who made the investment decision at issue. As Judge Lynch explained when he sat on the District Court, "there is nothing unfair about imposing on [plaintiff] the cost of purchasing cooperation [from the third party] or otherwise complying with discovery obligations." *JPMorgan Chase Bank* v. *Winnick*, 228 F.R.D. 505, 507 (S.D.N.Y. 2005). "As a matter of fundamental fairness," Lead Plaintiff "must assume the litigation responsibilities that accompany those rights" that it seeks to enforce. *Blackrock Balanced Capital Portfolio (FI)* v. *HSBC Bank USA*, No. 14-CV-09366 (LGS)(SN), 2016 WL 11187259, at *3 (S.D.N.Y. June 2, 2016). While this case involves the delegation of investment decisions rather than an assignment, it raises a similar issue of a plaintiff's attempt to sue for fraud without providing discovery into the reasons for its investment.

## C. The Subpoena Seeks Highly Relevant Documents.

There can be no doubt that the documents Interface seeks are highly relevant to Lead Plaintiff's claim. Where, as here, a lead plaintiff's investment decision is made by a third-party adviser, courts "look[ ] to the knowledge of plaintiff's investment adviser in assessing" the "reliance" element of Lead Plaintiff's fraud claim, as well as the requisites of "predominance or typicality in the class certification context." *Villella*, 2018 WL 2958361, at *5 & n.4 (collecting cases). Discovery from a lead plaintiff and/or its adviser is thus "relevant and proportional," even when—as in *Villella*, which involved an advisor located in England—it must be obtained through a cumbersome "letter rogatory" under the Hague Convention. *Id.* at *8.

The documents are directly relevant to the issue of whether Lead Plaintiff relied upon Defendants' statements in buying Interface stock. Specifically, Defendants have a right to rebut the fraud-on-the-market presumption of reliance, on which Lead Plaintiff relies (Compl. ¶ 265), with "[a]ny showing that severs the link between the alleged misrepresentation and . . . [plaintiff's] decision to trade at a fair market price," including evidence that Lead Plaintiff "did not rely on the integrity of the market price in trading stock." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 269, 276 (2014) (*Halliburton II*). "[B]oth prior to and following the Supreme Court's decision in *Halliburton II*, courts have permitted defendants to challenge the fraud-on-the-market presumption by demonstrating, on an individual basis, that the lead plaintiff did not rely on the integrity of a stock's market price in trading in that security." *Villella*, 2018

---

allow the other party and its personnel to have access to . . . and (at the expense of the party requesting the information) take copies of all documents, records or other materials containing any information which that party or any of its Group Companies or affiliated joint ventures *might reasonably require to be able to comply with their respective legal*, regulatory, accounting or filing *obligations*, or to resist, appeal, dispute, avoid or compromise any tax assessment . . . ." 244 F.R.D. at 181-82 (emphasis added).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

7

WL 2958361, at *6 (collecting cases).  If a plaintiff uses an adviser, the adviser's reliance (or non-reliance) is "imputed" to plaintiff.  *Id.* at *4-5 & n.4 (collecting cases).

The documents are also directly relevant to the question whether Interface has a "unique defense" to Lead Plaintiff's claim of reliance, and such a unique defense can preclude the findings of adequacy and typicality required for class certification.  *Id.* at *7-8 (collecting cases).  Even if Lead Plaintiff could eventually overcome the unique defense on the merits and prove its reliance, the unique defense will preclude class certification if it "threaten[s] to become the focus of the litigation" or if lead plaintiff may become "preoccupied" with it.  *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).

Recognizing the core importance of its documents Chartwell did not make any specific objections to any of these twenty-one requests at issue.  *See* Ex. D-10.  Lead Plaintiff likewise agreed to conduct a "reasonable search" in response to Defendants' Requests for Production Nos. 1-10, 13, 16-18, 20-22, and 25 to Lead Plaintiff.  Ex. D-12 at 9-16, 18-19, 20-22, 23-26, 28.  Those RFPs correspond to the vast majority of the Subpoena requests at issue.

Chartwell's limited hard copy production to date confirms the importance of obtaining the materials sought in this motion to compel.  As noted above, Chartwell's hard copy documents suggest that Chartwell had direct communications with Interface management, *see* Ex. D-11 at 1-5,[5] and that Chartwell did not believe that Interface's stock price reflected its full value, *see id.* at 4-6.[6]

### D.  Defendants Have Taken Reasonable Steps to Avoid an Undue Burden.

Defendants also have worked very hard to lessen the burden of production on Lead Plaintiff and Chartwell.  Where, as here, "the party issuing the subpoena establishes the relevance of the materials sought, the burden then shifts to the [third party] to demonstrate an undue burden."  *Mackey* v. *IDT Energy, Inc.*, No. 19 MISC. 29(PAE), 2019 WL 2004280

---

[5]  *See Beach* v. *Healthways, Inc.*, No. 3:08-0569, 2009 WL 3245393, at *3 (M.D. Tenn. Oct. 5, 2009) (finding atypicality since private conversations with corporate management are "not generally available to the public and, therefore, not available to the unnamed class members"); *Blank* v. *Jacobs*, No. 03-CV-2111 (JS) (MLO), 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30, 2009) (proposed class representatives atypical due to private conversations with company's CFO, given no evidence that the "typical class member spoke to management through private telephone calls"); *Shiring* v. *Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) (same); 7 Newberg on Class Actions § 22:72 (5th ed.) (plaintiff is atypical if it "relied on information unavailable to the public" (citing *Swack* v. *Credit Suisse First Boston*, 230 F.R.D. 250, 262–63 (D. Mass. 2005))).

[6]  *See, e.g.*, *Blank*, 2009 WL 3233037, at *5 (unique defense "could arise if the plaintiff was relying not on the market, but on his own assessment of the value of the stock"); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (investment strategy "focus[ing] on technical price movements rather than price" presents a "compelling reason to rebut the reliance presumption").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8

(S.D.N.Y. May 7, 2019) (citing *Griffith* v. *United States*, No. M8-85 (JFK), 2007 WL 1222586, at \*2 (S.D.N.Y. Apr. 25, 2007)).  Neither Lead Plaintiff nor Chartwell can carry that burden.

Defendants made substantial efforts to work with Chartwell to negotiate reasonable search parameters for an email production:

The time period is reasonable.  Defendants proposed a time period that reflects the putative class period in the underlying action (plus 90 days on each end).  Ex. D-9 at  9. Chartwell has never objected to that time period.

The custodians are reasonable.  Defendants offered to limit Chartwell's email production to just three custodians (the two Portfolio Managers and Lead Plaintiff's Client Relationship Manager)—a substantial reduction from the eleven email custodians that Chartwell had itself initially proposed.  *Supra*, p. 4.

The search terms are reasonable.  Defendants asked Chartwell to add only three email search terms—two of which have reported hit counts of only two and six documents.

The number of documents to be searched is reasonable.  The searches hit on fewer than 30,000 documents (the majority of which hit on the two search terms that Chartwell itself proposed) and, as explained above, even that number is clearly overstated because includes false hits (e.g., "percentile" for "TILE") and double counting between terms.  *Supra*, p. 4-5.  That number also fails to take into account further narrowing of the search terms that Defendants have offered.  Defendants attempted to work with Chartwell to modify the search terms with the most hits—both the one term that Defendants' requested and the two terms that Chartwell itself proposed.  *See* Ex. D-1.  Those efforts were unsuccessful only because Chartwell refused to engage with them unless Defendants agreed to cost shifting as a precondition.  *Id.*  These efforts discharged Defendants' duty, under Rule 45(d)(1), to take reasonable steps to avoid imposing an undue burden.  *See, e.g.*, *The Sanborn Libr. LLC* v. *ERIS Info. Inc.*, No. 19-CV-2049, 2021 WL 4316141, at \*2 (S.D.N.Y. Sept. 22, 2021) (duty discharged by "negotiating in good faith").

Based on all of this, Chartwell and Lead Plaintiff cannot substantiate any burden that is "undue."  *See Delta Air Lines, Inc.* v. *Lightstone Grp., LLC*, No. 21-MC-374 (RA) (OTW), 2021 WL 2117247 (S.D.N.Y. May 24, 2021) (holding that third party "failed to show" an undue burden because requesting party had "narrowed its requests" and third party failed to "specify[ ] the nature or size of the burden").

## E.  Cost-Shifting Should Be Denied or Imposed on Lead Plaintiff.

Chartwell's costs should not be shifted to Defendants.  If anything, those costs should be shifted to Lead Plaintiff.

As a matter of law, orders requiring cost shifting are rare.  The relevant factors that courts consider include: "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance."  *Nike, Inc.* v. *Wu*, No. 13 CIV. 8012 (CM), 2020 WL 257475,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

9

at *11 (S.D.N.Y. Jan. 17, 2020) (quoting *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003)).[7]  Those factors confirm that Chartwell's costs should not be shifted to Defendants for several reasons:

*First*, if any costs are shifted, they should be shifted to Lead Plaintiff, not Defendants. These documents are within Lead Plaintiff's control, and more generally Lead Plaintiff has a duty to ensure discovery into its investment decisions is made available to Defendants.

*Second,* Rule 45(d)(2)(B)(ii), which is the basis for cost shifting, applies only if a timely objection is made.  *Id.*  Chartwell's September 23, 2022 R&O made no specific objection to Requests 1-18 or 25-27 and did not demand cost shifting or provide any basis for cost-shifting. Ex. D-10.  Chartwell's October 25, 2022 objection was not timely.  Defendants' agreed to a "document production by October 25," but never agreed to extend the objection deadline (which was September 23).   Ex. D-13.

*Third*, Chartwell has not demonstrated that compliance with the Subpoena would impose costs that are "undue" or "significant."  Chartwell's estimate of the cost of an attorney document review (first provided in its insert for this joint letter) is based on the inflated Rackspace hit counts.  *See supra*, pp. 4-5, 8.[8]  Nor is that flawed estimate undue or significant in light of the amount in controversy; Chartwell's control of the primary evidence of Lead Plaintiff's reliance, adequacy, and typicality; and Chartwell's resources.  *See, e.g.*, *Chevron* v. *Donzinger*, No. 11-cv-0691, 2013 WL 1087236, at *33 (S.D.N.Y. Mar. 15, 2013) (denying cost-shifting despite estimated subpoena response costs greater than $1 million).[9]

Chartwell has pointed to the cost of a contract attorney review, but that exists in virtually every document production and would not be an expense "resulting from compliance."  Fed. R. Civ. P. 45(d)(2)(B)(ii); *see, e.g.*, *Nike*, 2020 WL 257475, at *13-14 (declining to shift cost of document review intended to screen for Chinese-law privacy issues because it did not "flow directly from a Rule 45 subpoena").  The reference to "attorney's fees" in Rule 45(d)(1) but not in Rule 45(d)(2)(B)(ii) confirms that the latter does not authorize an award of attorney's fees. *See Key Tronic Corp.* v. *United States*, 511 U.S. 809, 818-19 (1994) (inclusion of "express provision[ ]" for attorney's fees in some sections of statute, but not another, "strongly suggest a deliberate decision not to authorize such awards" in the latter).  Chartwell may desire to review

---

[7]  Lead Plaintiff notes that *Nike* involved an assignment.  That is true, but irrelevant, because the discovery at issue did not involve the assignor.

[8]  The estimate Chartwell attributes to Defendants is likewise based on the inflated Rackspace hit counts.  To be clear, Defendants lack the information necessary to estimate the cost of a review—if Chartwell chooses to conduct one.

[9]  In *Chevron*, the law firm denied cost shifting had represented Ecuadorean plaintiffs in efforts to collect on an Ecuadorean judgment.  The law firm had no involvement in the underlying litigation in Ecuador that, the court found, was tainted by misconduct.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10

the documents before producing them for its own reasons, but such review is not compelled by the Subpoena, and the cost of it should not be borne by Defendants.[10]

*Fourth*, cost shifting would be inequitable.  Chartwell is not a disinterested third party.  Chartwell has a voluntary, contractual, for-profit relationship with Lead Plaintiff.  Lead Plaintiff invested more than $5 million with Chartwell, and Chartwell generates substantial fees from Lead Plaintiff's account.  *See* Ex. D-7 at 2, 10.  Chartwell has an interest in a favorable outcome for its client, in currying favor with its client (who has more than $5 million available to invest), and in defending its own decision to invest in Interface stock.  It was foreseeable to a sophisticated investment manager like Chartwell that it would be subject to discovery if Lead Plaintiff were to initiate litigation concerning the investments that Chartwell made on Lead Plaintiff's behalf.  *See, e.g.*, *Chevron*, 2013 WL 1087236, at *33.[11]  Chartwell had the ability to bargain for indemnification from Lead Plaintiff, as is customary in its industry.  *See* Ex. D-7.

*In re Honeywell International Inc. Securities Litigation*, 230 F.R.D. 293, illustrates these points.  Like this case, *Honeywell* involved securities fraud claims under the Exchange Act.  Lead Plaintiff subpoenaed Honeywell's auditor, PriceWaterhouseCoopers.  PWC was not sued or accused of any wrongdoing in the case.  *Id*. at 296.  PWC produced 63,500 pages of documents before motion practice, and then Judge Pauley compelled PWC to produce more.  *Id*. at 296-97, 300-02.  Judge Pauley denied PWC's request for cost-shifting, finding that "PWC is not a classic disinterested non-party."  *Id*. at 303.  Just as an auditor (such as PWC) has a relationship with defendant in a securities fraud case, an investment manager (such as Chartwell) has a relationship with a plaintiff.

*Finally*, Chartwell has assets under management of approximately $10 billion, and its parent company, Raymond James, has assets under management greater than $1 trillion, annual revenues of $9.9 billion in 2021, and total assets of $61.89 billion at YE 2021.  *See* Ex. D-4; *Chevron*, 2013 WL 1087236, at *33 (considering subpoena recipient's size and gross revenue).  There can be no serious dispute that Chartwell can readily bear the costs of responding to this Subpoena.  Moreover, because this action involves statutory claims under the Exchange Act, and

---

[10]  The cases cited by Chartwell do not hold otherwise.  *In re First Am. Corp.*, 184 F.R.D. 234 (S.D.N.Y. 1998), shifted legal fees incurred in applications to foreign courts to lift legal impediments to production, not document review.  *Id*. at 238.  In *Kahn v. General Motors Corp.*, No. 88 Civ. 2982, 1992 WL 208286, at *2 (S.D.N.Y. Aug. 14, 1992), it is not clear that GM objected to shifting the cost of attorney document review.  That issue was determined in a prior, unreported order.  *See id*. at *1.

[11]  The cases cited by Chartwell are distinguishable.  In *Contant* v. *Bank of Am. Corp.*, No. 117CV03139LGSSDA, 2020 WL 3260958 (S.D.N.Y. June 17, 2020), the third party was not a party's investment manager or adviser but rather its arm's-length trading counterparty.  *Id*. at *1.  In *Siltronic Corp.* v. *Emps. Ins. Co. of Wausau.*, No. 3:11-CV-1493-ST, 2014 WL 991822 (D. Or. Mar. 13, 2014), the underlying lawsuit concerned which party (plaintiff or defendant) was obliged to pay the third-party's invoices for engineering work.  Id. at *1-2.  Here, there is no claim that Defendants are obliged to pay for Chartwell's investment management services to Lead Plaintiff.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11

because the discovery concerns Lead Plaintiff's adequacy as a class representative, the discovery is of public importance. These factors weigh further against cost shifting.

## II. Lead Plaintiff's Position

Defendants' efforts to require Lead Plaintiff to assist them in obtaining discovery lack any legal support and should be denied. Indeed, in practically every meet and confer on this issue, Lead Counsel asked Defendants for authority to support their position that it is Lead Plaintiff's obligation to assist it with its discovery efforts and to pay for any associated production costs. Despite that institutional investors such as Lead Plaintiff (and their investment advisors) have been involved in securities litigation since the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Defendants have not cited a single case in which a lead plaintiff was required to assist defendants with its discovery efforts or to pay for such efforts. Importantly, and as Defendants concede, Lead Plaintiff has not sought to preclude Chartwell in any way from complying with Defendants' subpoena.

For these reasons, and as detailed below, this discovery dispute concerns Chartwell – a non-party to this litigation – and its compliance with Defendants' subpoena; it does not concern Lead Plaintiff and Lead Plaintiff should not be required to involve itself in Defendants' quarrel.

At the outset, Lead Plaintiff reiterates that it has not, in any way, sought to obstruct Defendants' third party discovery efforts.[12] Nor has Lead Plaintiff contested the relevancy[13] of Defendants' third party discovery requests.[14] Defendants' contention, however, that it is Lead

---

[12]   Defendants erroneously contend that "Lead Plaintiff is resisting discovery into the core issue in the case: why it invested in Interface securities." Letter at 3. Putting aside that why Lead Plaintiff invested in Interface securities is likely not relevant (in light of the presumption of reliance alleged by Lead Plaintiff) and that it is far from the "core issue in the case," Lead Plaintiff has never once resisted discovery into this issue. *Id*. Moreover, Defendants' argument that "Lead Plaintiff's refusal to ensure production of key documents relating to its investment decisions is a total derogation of its responsibilities in this action," *id*., falls short because Defendants have not cited any authority that Lead Plaintiff is required to ensure that third parties comply with subpoenas issued to them.

[13]   Defendants' argument that Chartwell's hard copy documents suggest that "Chartwell did not believe that Interface's stock price reflected its full value," Letter at 4, even if true (which Lead Plaintiff is not conceding), is a red herring. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273-74 (2014) (rejecting argument that value investor who "does not believe that the market price accurately reflects public information *at the time he transacts*" is sufficient to rebut the presumption of reliance; "he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period") (emphasis in original).

[14]   Lead Plaintiff takes no position on the relevance of Defendants' requests; it is not Lead Plaintiff's obligation to negotiate the contours of Defendants' third party discovery efforts. Lead Plaintiff, however, reserves all rights to respond to the arguments raised by Defendants regarding the adequacy or typicality of Lead Plaintiff (in particular, how it relates to Chartwell)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12

Plaintiff's responsibility to participate in their third party discovery under the guise of agency principles, arguing that Lead Plaintiff somehow "controls" Chartwell's internal emails and communications, *see* Letter at 2, is simply wrong and misplaced.

Lead Plaintiff does not control Chartwell. Indeed, Lead Plaintiff has not had any discussions in this case with Chartwell regarding Defendants' subpoena. In fact, when Chartwell produced documents to Defendants, it was Defendants who sent Chartwell's production to Lead Plaintiff – not the other way around.

Finally, Defendants argue that, if the Court shifts Chartwell's production expenses, Lead Plaintiff – and not Defendants – should bear these costs despite that the expenses will be incurred for responding to *Defendants'* subpoena. Defendants cite no case law for the proposition that a lead plaintiff should bear the costs of a third party's non-compliance with discovery efforts where lead plaintiff was not the requesting party. *See* Letter at 8. Defendants' efforts to involve Lead Plaintiff in its discovery disputes, or to impose production costs on Lead Plaintiff, should be rejected.

### A. Lead Plaintiff Does Not "Control" Chartwell Such that Lead Plaintiff Should Be Compelled to Assist Defendants with Their Own Discovery Efforts

"Control is defined as the legal right to obtain documents upon demand." *In re Subpoena Issued to Cisco Sys., Inc.*, 2010 WL 3155895, at *3 (N.D. Cal. Aug. 9, 2010). Lead Plaintiff has no such right with respect to a non-party. Defendants "bear[] the burden of proving that [Lead Plaintiff] has 'control' over the requested documents." *Tatum v. Schwartz*, 2007 WL 2220977, at *6 (E.D. Cal. Aug. 2, 2007). To that end, it is insufficient for the requesting party to show that another party has a modicum of control over some of the documents in the possession of a non-party; the requesting party must establish the party's control **over the specific documents requested**. *See S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 475 (S.D.N.Y. 2000).

Here, Defendants assert that Lead Plaintiff should be compelled to assist Defendants with their discovery efforts against Chartwell based on nothing more than an advisory agreement. Not only is this agreement irrelevant for purposes of proving Lead Plaintiff's control over the subpoenaed documents, but it is not enough to support Defendants' burden.[15]

Lead Plaintiff's advisory agreement with Chartwell allows Lead Plaintiff to "obtain 'such other information or reports as relates to the management of the Account as [Lead Plaintiff] or its duly authorized representative may reasonably request from time to time or as required by

---

and intends to do so in connection with its motion for class certification, if raised by Defendants at that time.

[15]  Defendants' argument that Lead Plaintiff has control over Chartwell's documents is belied by the subpoena served on Chartwell. If Lead Plaintiff indeed had control over Chartwell's documents, Defendants would have simply requested them from Lead Plaintiff and not from Chartwell.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

13

applicable law.'" Letter at 3.  Defendants, however, are not seeking information or reports *relating to management of Lead Plaintiff's account*, as Chartwell already produced such documents.[16]

The type of documents Defendants are seeking from Chartwell are ones that Lead Plaintiff has no control over.  *See generally Beilstein-Institut Zur Forderung Der Chemischen Wissenschaften v. MDL Info. Sys., Inc.*, 2006 WL 3742244, at \*3-\*4 (N.D. Cal. Dec. 19, 2006) (rejecting that a party had "general access to documents" in another party's possession merely because the parties entered into an agreement to provide reports to each other).[17]

In truth, Lead Plaintiff is not able to "control" Chartwell or request access to any of its internal documents, and should not be compelled to assist Defendants with their third party discovery.  Indeed, "[c]ontrol must be firmly placed in reality, not in an esoteric concept such as 'inherent relationship.'" *Subpoena Issued*, 2010 WL 3155895, at \*3 (noting how a "mere business relationship" is not enough "to confer legal control by one company over the documents of another"); *see generally W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100,

---

[16]  Defendants complain that "Lead Plaintiff has refused to collect and produce [] documents and instead has told Defendants that they must obtain them from Chartwell."  Letter at 2.  To be clear, Lead Plaintiff has told Defendants it will comply with its discovery obligations and produce relevant, non-privileged documents within its custody or control.  Internal Chartwell emails and other similar documents – which is what Defendants are seeking – do not fall within that category.  Moreover, to date, Chartwell has produced documents identifying Lead Plaintiff's holdings and transactions in Interface common stock during the Class Period, documents concerning Interface's business and financials, analyst reports concerning Interface, and emails concerning Interface's Class Period results.

[17]  Defendants rely on *Villella v. Chemical & Mining Co. of Chile Inc.*, 2018 WL 2958361 (S.D.N.Y. June 13, 2018), for this proposition.  But *Villella* concerned the relevancy of the documents sought, an issue that Lead Plaintiff does not contest (or concede).  Moreover, the motion in *Villella* concerned whether or not a letters rogatory should be issued to a third party, not whether a lead plaintiff should be responsible for aiding, or paying for, defendants' discovery.  Defendants' reliance on *In re NTL, Inc. Securities Litigation*, 244 F.R.D. 179 (S.D.N.Y. 2007) – which concerned the relationship between a corporation that entered into a Chapter 11 bankruptcy and its successor company that took its place as defendant in the lawsuit – is similarly misplaced.  Defendants are wrong in arguing that the document sharing clause in that case is analogous to the advisory agreement here.  First, the clause in *NTL* was entered into by two entities which emerged from the Chapter 11 reorganization and "it would be patently unfair for defendant NTL Europe to benefit from the artificial separation of entities that was created after the bankruptcy."  *Id.* at 196.  Second, the document sharing clause included "any documents that it needed to be able to comply with its legal obligations" (*id.* at 195) which cannot be reconciled with Lead Plaintiff's advisory agreement which merely covers documents relating to the *management* of Lead Plaintiff's account.  Third, defendant NTL Europe's CEO testified that NTL Europe had a practice of calling New NTL and asking for documents.  *Id.* at 195-96.  This is not the case here.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

14

110 (2d Cir. 2008) ("the investment advisor-client relationship is not the type of close relationship courts have recognized as creating a 'prudential exception' to the third-party standing rules").[18]

**B. Lead Plaintiff Should Not Be Compelled to Share in Any Costs Associated with Defendants' Third Party Discovery Requests to Chartwell**

Defendants also argue that while Chartwell should pay for its own production, Lead Plaintiff should be compelled to pay if Chartwell does not. *See generally* Letter at 8. As Defendants correctly point out, orders requiring cost shifting are rare. What is more, Defendants have not provided any authority which stands for the proposition that their third party costs should be shifted to Lead Plaintiff. *See* Letter at 8. Cost shifting any amount to Lead Plaintiff, in this instance, would be inappropriate. *See In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *14 (D. Conn. Oct. 18, 2017) (declining to cost-shift to adverse party not seeking compliance with subpoena from third party); *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (explaining cost shifting under Rule 45 "applies to non-parties only").

Notably, none of Defendants' cases support their argument that Lead Plaintiff should cover a third party's production costs for complying with Defendants' subpoena. *Nike*, 2020 WL 257475, at *11, *Chevron Corp. v. Donziger*, 2013 WL 1087236, at *33 (S.D.N.Y. Mar. 15, 2013), and *In re Honeywell International, Inc. Securities Litigation*, 230 F.R.D. 293, 302-03 (S.D.N.Y.

---

[18] Defendants' lone case that they cite to support their contention that Lead Plaintiff has a duty to cause Chartwell to provide discovery is *JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505, 507 (S.D.N.Y. 2005). But unlike the relationship between an institutional investor lead plaintiff and its investment advisor, *Winnick* involved the discovery relationship between an assignor and an assignee. As the omitted words from Defendants' case quotation make clear, "**After all, since the assignees are suing in the shoes of the original lenders, having purchased the right to bring the lawsuit**, there is nothing unfair about imposing on them the cost of purchasing cooperation or otherwise complying with discovery obligations." *Id.* (emphasis added). In that case, and unlike here, "[p]laintiff's position as administrative agent for the banks and/or their assignees *raises the unusual issues about plaintiff's discovery obligations that are presented here*." *Id.* at 506 (emphasis added). Similarly, *Blackrock Balanced Capital Portfolio (FI) v. HSBC Bank USA*, 2016 WL 11187259, at *2 (S.D.N.Y. June 2, 2016), is equally misplaced because it also dealt with the unique discovery issues that are presented when a new party is assigned to a lawsuit. There, the court found that assignees should obtain discovery from assignors because all of the obligations of litigation are transferred to the assignee. Likewise, *Nike, Inc. v. Wu*, 2020 WL 257475 (S.D.N.Y. Jan. 17, 2020), is an assignment case and therefore not relevant for these same reasons. *Nike* was a unique case where certain Banks were subpoenaed and "create[d] obstacles" in producing documents from China by "adopting an absurdly cautious interpretation of Chinese law" so they were not entitled to collect fees in overcoming obstacles that they created. *Id.* at *13. There, the Banks resisted complying with a subpoena for years while relying on a jurisdictional argument and thus "allowed the number of relevant [documents] to multiple for five years[.]" *Id.* at *15. The same cannot be said for Lead Plaintiff who has complied with all of its discovery obligations in this case.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15

2003), are all inapposite.  In *Nike*, the court rejected the third-party's request that the *requesting party* reimburse it for discovery costs, not the party adverse to the requesting party, which is what Defendants are requesting here.  2020 WL 257475, at *14-*16.  In *Chevron*, the subpoenaed third party also sought discovery costs be shifted to the *requesting party*.  2013 WL 1087236, at *33.  Finally, in *Honeywell*, plaintiffs subpoenaed a third party accounting firm, PWC, to produce certain documents and PWC asked the court to shift its production costs to plaintiffs – the *requesting party*.  230 F.R.D. at 302-03.  Whether or not Chartwell's costs should be paid by itself or Defendants is an issue unrelated to Lead Plaintiff and Lead Plaintiff should not be drawn into Defendants' dispute with a third party.

### III.  Chartwell's Position

#### A.  Background and Nature of the Dispute

Chartwell was founded in 1997 in Berwyn, Pennsylvania.  It manages active equity, fixed income, and balanced strategies on behalf of its institutional and advisory clients, including Steamfitters Local 449 Pension Fund, Lead Plaintiff in this action.  On June 1, 2022, Chartwell became a wholly-owned subsidiary of Raymond James Financial, Inc.

Following the receipt of Defendants' Subpoena on August 25, 2022, Chartwell interposed Objections on September 23, 2022, and again on October 25, 2022, the agreed-upon extended date of production.  A copy of Chartwell's Objections are attached to this letter as **Ex. C-1** and **Ex. C-2**.  In connection with the parties' meet-and-confer efforts, Chartwell informed Defendants that its emails were not yet integrated with Raymond James's email system but, instead, were archived on a third-party platform run by Rackspace Technology ("Rackspace").[19]

As early as October 2022, Chartwell raised with Defendants the numerous limitations of the Rackspace archiving system for retrieving, reviewing, and producing emails.  *See* **Ex. D-1** at 5-6, Oct. 27, 2022 email from C. Restall to S. Avidan (indicating that Rackspace does not allow "and not" limitations, the use of quotation marks, or a single de-duplicated hit count).  As a result of these limitations, the parties all agreed that Chartwell's emails needed to be loaded onto a third-party platform for review and production.  *See* **Ex. D-1** at 3-4, Nov. 2, 2022 email from C. Restall to S. Avidan.  Unlike Paul Weiss's abundant number of lawyers and paralegals that can engage in document discovery, Chartwell (or Raymond James) has access to a *very* limited number of in-house attorneys and paralegals that process subpoenas.  With approximately 30,000 emails at issue, it is not only necessary for the emails to be loaded onto a third party platform for review, but it is also necessary for Chartwell to retain an e-discovery vendor and its document review attorneys to perform the actual document review.  According to Trustpoint, an electronic discovery vender that Chartwell has contacted in connection with this case, the cost of loading these 30,000 emails onto a third-party review platform and reviewing the emails for production is estimated to be $39,521.00.  To be clear, these are not "internal" Chartwell costs – *i.e.*, costs associated with in-house counsel or in-house paralegals; instead they are *solely* costs charged by an e-discovery

---

[19]  For various reasons with regulatory and other implications, Chartwell's emails are, likewise, unable to be loaded on to Raymond James's email platform and, therefore, cannot be searched using the more robust search capability of Raymond James's platform.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

16

vendor to Chartwell.  Defendants have refused to bear any of this cost and, instead, have demanded that Chartwell alone pay a significant amount to an outside vendor so that it may respond to Defendants' subpoena.  Accordingly, Chartwell asks this Court to shift the significant cost of complying with Defendants' Subpoena from Chartwell to Defendants in accordance with Fed. R. Civ. P. Rule 45(d)(2)(B)(ii).

Defendants argue that Chartwell alone, should bear these costs because (1) it failed to make timely objections and (2) the factors courts consider in determining whether cost shifting is appropriate under Rule 45 weigh in favor of Defendants and against Chartwell.  As demonstrated below, both of these arguments are without merit.

**B.  Chartwell Timely Objected to Defendants' Subpoena Under Rule 45(d)(2)(B)(ii)**

As an initial matter, Defendants argue that cost shifting is only available if a timely objection is made.  Contrary to Defendants' assertions, Chartwell raised—on two separate occasions— timely objections to discovery sought by Defendants that imposed an "undue burden on Chartwell" or "require[d] it to engage in an excessive expenditure of time and/or money."  *See* **Ex C-1 and C-2**, Chartwell's Sept. 23, 2022 and Oct. 25, 2022 Responses and Objections to the Subpoena *Duces Tecum*.  These objections were made on or before the initial time for compliance with the Subpoena (**Ex. C-1**) as well as on the extended date of production, agreed upon by both parties (**Ex. C-2**).  Therefore, any allegation that timely objections were not made is simply not supported by the record.

**C.  Cost Shifting is Appropriate Given the Facts and Circumstances of this Case**

Rule 45 of the Federal Rules of Civil Procedure mandates that a party serving a subpoena on a non-party "take reasonable steps to avoid imposing undue burden or expense on a person subject to a subpoena."  Fed. R. Civ. P. 45(d)(1).  Here, Defendants have failed to avoid imposing such an undue burden on Chartwell.  As detailed below, under the facts of this case, cost-shifting is necessary and appropriate.

1.      The Costs of Production are Both
        Reasonable and Reimbursable Under Rule 45

As an initial matter, "'only reasonable expenses are compensable under Rule 45.'"  *Nike, Inc. v. Wu,* No. 13 CIV. 8012 (CM), 2020 WL 257475, at \*11 (S.D.N.Y. Jan. 17, 2020), *aff'd sub nom. Next Invs., LLC v. Bank of China*, 12 F.4th 119 (2d Cir. 2021) (quoting *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or., Inc.*, No. 9-cv-3855, 2018 WL 1701944, at \*4 (E.D.N.Y. Mar. 31, 2018)).  Here, after discussing the matter with Trustpoint, an experienced outside vendor, Chartwell estimates that the cost of compliance would be approximately $39,521.00.  Defendants have provided a similar estimate of approximately $40,000.  *See* **Ex. D-1** at 3-4, Nov. 2, 2022 email from C. Restall to S. Avidan.  Based on the foregoing, Defendants have not—and cannot— argue that the costs at issue are unreasonable.

Furthermore, while Defendants argue that contract attorney review is not an expense reimbursable under Rule 45, they are incorrect.  The use of contract attorneys to review documents is common in the legal industry and has not only been approved by courts but suggested as a means

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

17

to reduce expenses. *See Chevron Corp. v. Donziger,* No. 11 CIV. 0691 LAK, 2013 WL 1087236, at \*32 (S.D.N.Y. Mar. 15, 2013) (finding no reason why "far less costly contract attorneys could not do all or most of the review, as is common in the legal community today"); *Kahn v. General Motors Corp.,* No. 88 Civ. 2982, 1992 WL 208286, at \*2 (S.D.N.Y. Aug. 14, 1992) (finding that "the retrieval and evaluation of documents should be done by the lowest-level person consistent with accurate and reliable identification of the material called for"). Moreover, courts have held that legal fees that benefit the requesting party, as opposed to the producing party, are a "cost of compliance reimbursable under" Rule 45. *See, e.g., In re First Am. Corp.*, 184 F.R.D. 234, 241 (S.D.N.Y. 1998). Here, as Defendants concede, the legal fees directly benefit Defendants as the materials are relevant to Lead Plaintiff's class certification motion as well as to Defendants' defenses on the merits. Further, Chartwell simply does not have access to the number of in-house attorneys (or paralegals) that would be necessary to review 30,000 emails in a reasonable amount of time. Therefore, the argument that such costs are not reimbursable is baseless.

### 2. Cost Shifting is Equitable

Defendants argue, without citation to any authority, that "[a]s a matter of law, orders requiring cost shifting are rare." Numerous courts, however, have said precisely the opposite, interpreting the cost shifting provisions of Rule 45 as "mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena.'" *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-02516 (SRU), 2017 WL 4679228, at \*1 (D. Conn. Oct. 18, 2017) (quoting *Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013)). In the Second Circuit, courts determining the proper allocation of non-party costs generally consider three factors: (1) "whether the nonparty actually has an interest in the outcome of the case," (2) "whether the nonparty can more readily bear the costs than the requesting party," and (3) "whether the litigation is of public importance." *Nike*, 2020 WL 257475, at \*11. Here, all three factors weigh in Chartwell's favor and support cost shifting.

***First***, Defendants argue that Chartwell is not a disinterested non-party because it has a "voluntary, contractual, for-profit relationship with Lead Plaintiff," and therefore has some interest in a favorable outcome. Defendants' equation of a contractual relationship with an automatic interest in litigation, however, is overbroad and unsupported by law. An interested non-party is one that was "***substantially*** involved in the underlying transaction and could have anticipated that [the underlying involvement would] reasonably spawn some litigation." *In re First Am. Corp.*, 184 F.R.D. at 242 (emphasis added); *see Integrity Elecs. Inc. v. Garden State Distributors, Inc.*, No. 09 CV 2367 (1LG), 2010 WL 11626842, at \*2 (E.D.N.Y. July 12, 2010); *see also Alabama Aircraft Indus., Inc. v. Boeing Co.*, No. 2:11-CV-03577-RDP, 2016 WL 9781825, at \*5 (N.D. Ala. Feb. 25, 2016) ("An interested non-party is an entity that . . . has a ***significant***, underlying connection to the case and, typically, some sort of financial or reputational stake in the litigation's outcome.") (emphasis added). Chartwell's connection to the underlying transaction was neither substantial nor significant. Chartwell was simply an investment advisor who purchased Interface shares as one among many investments in Lead Plaintiff's portfolio. Indeed, at the beginning of August 2020, Interface (stock symbol: TILE) was just one of 72 different stocks Lead Plaintiff held in its Chartwell account. Defendants cannot possibly allege that such involvement should have prompted Chartwell to reasonably expect to be involved in subsequent litigation over Interface stock.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18

Furthermore, unlike in *Chevron* and *In re Honeywell International Inc. Securities Litigation*, 230 F.R.D. 293 (S.D.N.Y. 2003), the two cases Defendants cite, Chartwell is not an "alleged co-conspirator," did not have access to unique information regarding the purported misconduct, and does not stand to "reap a fee" or benefit from a successful outcome. *Chevron*, 2013 WL 1087236, at \*32; *see also In re First Am. Corp.,* 184 F.R.D. at 242 (finding that an auditor that had "unique access to documents that may be critical in unraveling a bank fraud of unprecedented scale'" was not a disinterested non-party). On the contrary, Chartwell was an innocent third party in the underlying transaction. It did not have access to any unique, non-public information about the Defendants, nor did it have any knowledge of the alleged underlying securities violations. *See Nike*, 20202 WL 257475, at \*14 (finding that the nonparty was not "involved with, or even aware of, the Judgment Debtors' infringing conduct prior to the litigation). A case more on point with the facts here is *Contant v. Bank of Am. Corp.* In that case, the court held that a non-party retail foreign exchange dealer, from which Plaintiffs (representing a putative class) purchased the foreign exchange instruments that were the subject of the litigation, "has no interest in the outcome of this case." No. 117CV03139LGSSDA, 2020 WL 3260958, at \*4 (S.D.N.Y. June 17, 2020) ("First, although the case will benefit FXCM's customers . . . , FXCM itself has no interest in the outcome of this case."). Moreover, Chartwell has already earned its fees from Lead Plaintiff and does not stand to gain anything from a successful outcome from this lawsuit. *See, e.g., Siltronic Corp. v. Emps. Ins. Co. of Wausau*, No. 3:11-CV-1493-ST, 2014 WL 991822, at \*2 (D. Or. Mar. 13, 2014) ("Although Maul Foster may have an interest in the accuracy of its coding, that is not the same as an interest in the outcome of this case. Regardless of who wins this case, Maul Foster will be paid by either Siltronic or one of its insurers."). Simply put, while Chartwell had a connection to the underlying transaction, it did not have a substantial or significant involvement in that transaction. As such, because Chartwell does not have an interest in the outcome of this case, cost shifting is appropriate.

***Second***, Defendants can more easily bear the costs of production than Chartwell.[20] At the beginning of 2022, Interface employed 3,646 employees while Chartwell employed approximately 53. Chartwell's annual revenues in 2021 were $38.7 million—far less than Interface's 2021 annual revenues of $1.2 billion. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Cf. United States v. Cardinal Growth, L.P.*, No. 11 C 4071, 2015 WL 850230, at \*3 (N.D. Ill. Feb. 23, 2015) ("During its representation of Cardinal, P & H collected $2 million in fees. … Relative to the substantial income that P & H collected from Cardinal, the expenses incurred by P & H in complying with the Court's order do not constitute a 'significant expense.'"). Finally, not only is Interface a far larger company than Chartwell, this information is far more important to Interface than it is to Chartwell given the potential liability facing Interface if a class is certified. Thus, given that Interface is larger than Chartwell in terms of both revenue and number of employees, that the fees Chartwell made from Lead Plaintiff are

---

[20]   Defendants cite the annual revenues and assets of Chartwell's parent company, Raymond James, to argue that Chartwell does not face an undue burden. These statistics are beside the point as the relevant inquiry should be on the non-party's ability to pay, not the ability of the non-party's parent or affiliated companies to pay. Furthermore, the Class period relates entirely to a time when Chartwell was not affiliated with Raymond James.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

19

modest, and that the importance of the documents is far greater to Interface than to Chartwell, this factor likewise supports cost shifting.

**Third**, Defendants argue that cost shifting is not available because "the discovery is of public importance" as "this action involves statutory claims under the Exchange Act" and "the discovery concerns Lead Plaintiff's adequacy as class representative." Defendants are incorrect. Courts in similar actions have held that such matters are **not** of public importance. For example, in *Contant,* Plaintiffs, investors in foreign exchange instruments from retail foreign exchange dealers, filed a putative class action against certain banks under the Sherman Act and state antitrust and consumer protection laws, alleging that they paid inflated prices for financial instruments as a result of Defendants' conspiracy to fix prices. 2020 WL 3260958, at *1. There, the court held that "while this case has importance to retail FX purchasers, it does not have a larger public importance." *Id*. at *4. Similar to *Contant*, this matter may be important to the Lead Plaintiff, to Defendants, and to the putative class, but it is not particularly important to the public at large. *Cf. In re World Trade Center Disaster Site Litigation*, No. 21-MISC-00100, 2010 WL 3582921, at *1 (S.D.N.Y. Sep. 14, 2010); *In re Exxon Valdez,* 142 F.R.D. 380, 384 (D.D.C. 1992). Accordingly, this factor favors cost-shifting. *See Nike*, 2022 WL 257475, at *14 (finding that cost shifting is favored when the litigation involves a private dispute).

In sum, Chartwell should not be required to bear the entirety of the costs of compliance with Defendants' Subpoena. Chartwell respectfully requests that this Court shift these costs to Defendants as the requesting party.

\*　　　\*　　　\*

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Harris Fischman
HARRIS FISCHMAN

Daniel J. Kramer
Harris Fischman
Shane D. Avidan
1285 Avenue of the Americas
New York, NY  10019-6064
212/373-3306
dkramer@paulweiss.com
hfischman@paulweiss.com
savidan@paulweiss.com

*Counsel for Interface, Inc., Daniel T. Hendrix and Bruce A. Hausmann*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

20

SQUIRE PATTON BOGGS LLP

/s/ David Long-Daniels
DAVID LONG-DANIELS

David Long-Daniels
Allyson M. Lumpkin
(*pro hac vice application forthcoming*)
1201 W Peachtree St.
Suite 3150
Atlanta, GA  30309
678/272-3200
david.long-daniels@squirepb.com
allyson.lumpkin@squirepb.com

*Counsel for Jay D. Gould*

ROBBINS GELLER RUDMAN
  & DOWD LLP

/s/ David A. Rosenfeld
DAVID A. ROSENFELD

David A. Rosenfeld
Samuel H. Rudman
Philip T. Merenda, III
58 South Service Road, Suite 200
Melville, NY  11747
631/367-7100
drosenfeld@rgrdlaw.com
srudman@rgrdlaw.com
pmerenda@rgrdlaw.com

*Counsel for Lead Plaintiff*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

21

MAYNARD COOPER & GALE

/s/ Jonathan J. Brennan
JONATHAN J. BRENNAN

Jonathan J. Brennan
Margaret M. Siller
551 Fifth Avenue, Suite 1600
New York, NY 10176
646/609-9299
jbrennan@maynardcooper.com
msiller@maynardcooper.com

*Counsel for Chartwell Investment Partners*